**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

*Electronically Filed*

| | | |
|---|---|---|
| NATALIE ISENSEE, | ) | |
| 1008 DERRINGER DR | ) | |
| ENGLEWOOD, OH 45322 | ) | |
| | ) | |
| PLAINTIFF, | ) | CASE NO. _____ |
| | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AMPLITY INC. | ) | WITH JURY DEMAND |
| 2080 CABOT BLVD W STE 100 | ) | |
| LANGHORNE, PA 19047-1813 | ) | |
| | ) | |
| SERVE: | ) | |
| CT CORPORATION SYSTEM | ) | |
| 4400 EASTON COMMONS WAY #125 | ) | |
| COLUMBUS, OH 43219 | ) | |
| | ) | |
| DEFENDANT | ) | |

**<u>COMPLAINT</u>**

For her complaint against Amplity Inc. (Amplity), Plaintiff Natalie Isensee alleges and

avers as follows:

1.      Throughout the Covid-19 pandemic, the Plaintiff, Natalie Isensee stood ready,

willing, and able to take safety precautions in the workplace as required by her past employer to

prevent the spread of Covid-19 and protect her health and the health of those employees with

whom she worked and patients she ultimately served. The Plaintiff, however, has a religious

belief that conflicts with one of her past employer's safety policies: mandatory vaccination.  The

1

Plaintiff's conflict is protected by federal and state law. Thus, this case is not a challenge to the lawfulness of the Defendant having a vaccination policy, but rather the lawfulness at how the policy was implemented, an attempt to prevent unlawful discrimination based on religion in the future, and to hold her past employer accountable for the harm she has suffered at its hands.

2.      Federal and state law recognize an employee has the right to have religious beliefs considered when those beliefs conflict with an employer's policies, and, when possible, accommodated. The Defendant ignored federal and state law and instead applied its own set of rules when it came to evaluating religious accommodations and exemptions to its mandatory Covid-19 vaccine. Defendant then wrongfully denied Plaintiff's request by arbitrarily determining that Ms. Isensee's request for a religious accommodation to the vaccine mandate did not "establish that [her] refusal to be vaccinated [was] based upon a sincere belief that is religious in nature." As determined by the "Exemption Review Board." As stated in an e-mail sent to Ms. Isensee on November 24, 2021. (attached here to as **Exhibit A)** (emphasis added). This was done in violation of Defendant's obligations under Title VII of the Civil Rights Act of 1964 ("Title VII") and Section 4112.02 of the Ohio Revised Code.

3.      Defendant's actions left Ms. Isensee with the impossible choice of either taking the Covid-19 vaccine, at the expense of her religious beliefs, or losing her livelihood.

4.      Under Title VII and Ohio law, if an employee seeks a religious accommodation, the employer cannot summarily impose employer-preferred workplace rules that abridge an employee's sincerely held religious beliefs. In order to protect an employee's rights, the employer must engage in a genuine, good-faith dialogue and consideration of proposed accommodations with objective evidence, and, if the employer chooses to deny employee

accommodations, proof that allowing the accommodations would place an undue burden on the employer. The Defendant's behavior was in violation of these laws.

## PARTIES

5. The Plaintiff, Natalie Isensee, ("Plaintiff" or "Ms. Isensee") is a resident of Englewood, Ohio. The majority of her business was conducted in Ohio. However, she also conducted business in Kentucky and West Virginia. The Plaintiff had been employed by the Defendant for almost one year. The Plaintiff has a sincere religious belief that taking a Covid-19 vaccine violates her religious beliefs. The Plaintiff requested a religious accommodation from the Defendant's vaccine mandate policy ("vaccine mandate") (attached here to as **Exhibit B**.)

6. The Defendant is incorporated in the State of New Jersey with offices and employees throughout America and the world. The Defendant is licensed and registered with the Ohio Secretary of State to transact business in Ohio. Direct oversight of Ms. Insensee originated out of Michigan.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the parties pursuant to 28 U.S.C. § 1331 because the Complaint seeks relief and damages under federal statute, 42 U.S.C. § 2000e, *et seq.,* and has supplemental jurisdiction over the Plaintiff's state law claim arising from the same events and occurrences under O.R.C. § 4112.02 pursuant to 42 U.S.C. § 1367.

8. Venue is proper in this district pursuant to U.S.C. § 1391(b) because the relevant events took place in Cincinnati, Ohio, which is in the Southern District of Ohio and the Defendant's conducting of business therein.

9. The Court has personal jurisdiction over the Defendant because the Defendant conducts business in this judicial circuit.

3

10.     Plaintiff's claims for attorney's fees and costs are predicated upon Title VII, 42 U.S.C. § 2000e-5, and as allowed under state law.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

11.     On or about January 10, 2022, Plaintiff timely filed charges of religious discrimination with the Equal Employment Opportunity Commission.

12.     Her Notice of Right to Sue was issued on September 16, 2022. (attached hereto as **Exhibit C**).

13.     This Complaint is being timely filed based on the date Plaintiff received her Notice to Right to Sue.

14.     All administrative prerequisites to the filing of this suit have been meet.

## ALLEGATIONS

15.     In March 2020, American life was irreparably changed both by Covid-19 and by various governments and employers' response to it. Covid-19 is a virus that was first detected in Wuhan, China, and eventually made its way to the United States of America, setting off a chain of events that has irretrievably changed the day-to-day life of many, if not most, Americans.

16.     In the spring of 2020, the Defendant began implementing procedures for its workforce, including several of the following requirements for its employees: masks, social distancing, temperature checks, Covid-19 testing, and self-quarantine. Upon information and belief, the Defendant had substantial success reducing the risk of Covid-19 spread through these efforts.

4

17.     Despite the Defendant's success in controlling the spread of Covid-19 in its workspaces, the Defendant chose to implement a blanket vaccine mandate, based on reasoning unsupported by science, and has improperly implemented its vaccine mandates in violation of Title VII and O.R.C. § 4112.02.

18.     Furthermore, the Defendant improperly terminated the Plaintiff for refusing to comply with one of its safety procedures – mandated vaccination – which has no documented positive results in preventing the transmission of Covid-19 in the workplace, ignores natural immunity, and improperly asses risk.

19.     As a part of the Defendant's religious accommodation form completed by Ms. Isensee, (attached here as **Exhibit D**), the Defendant documented how their policy was in violation of the established EEOC guidelines from the beginning of the process.  The form stated:

> In some cases, the Company will need to obtain additional information and/or documentation about your religious practices(s) or belief(s). We may need to discuss the nature of your religious belief(s) practice(s) and accommodation with your religion's spiritual leader (if applicable) or religious scholars to address your request for an exemption.

20.     The threat that an employee may have to make their religious leader and/or religious scholars available to speak on their behalf were in themselves in violation of EEOC guidelines.  In the document posted at the EEOC website titled: "What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws" (EEOC guidelines) the EEOC provides guidelines on how a religious exemption to the Covid-19 vaccine should be evaluated.  In Section L.2 it states:

> Generally, under Title VII, an employer should proceed on the assumption that a request for religious accommodation is based on sincerely held religious beliefs, practices, or observances. However, if

> an employer **has an objective basis** for questioning either the religious nature or the sincerity of a particular belief, the employer would be justified in making a **limited** factual inquiry and seeking additional supporting information.[1] (emphasis added).

The Defendants threating to reach out to reach out to an individual's spiritual leader or scholars without first establishing an objective basis to do so is just the initial piece of evidence that shows the Defendant manipulated the vaccine exemption process to such a degree as to make the process against EEOC guidelines, statutes, and case law as further documented below. The multiple illegalities of the Defendant's behaviors began at the very initiation of the accommodation evaluation process.

21.     The Plaintiff followed all legal procedures and provided more than enough information to meet her legal obligations to have her religious accommodation granted.

22.     Ms. Isensee provided a thorough explanation of her religious beliefs and how those beliefs made taking any of the Covid-19 vaccines against her sincerely held religious beliefs. *See* **Exhibit D**.

23.     In spite of all the efforts and information provided by Ms. Isensee, the Defendant wrongfully and improperly denied the Plaintiff's request and terminated her employment in violation of state and federal law.

24.     The Defendant seemingly applied their own religious criteria in evaluating Ms. Isensee's sincerely held religious beliefs. Ms. Isensee was informed of the denial of her religious exemption request in the Nov. 24, 2021 email. The conclusory statement that was given was that Ms. Isensee's beliefs were determined to be either/both not sincere and/or not religious in nature *See* **Exhibit A.**

---

[1] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#L

25. Ms. Isensee reached out multiple times to the Defendant to try to understand how this conclusion was made.

26. Her reasonable questions were never answered, and she was never provided anyway to contact anyone on the Exemption Review Board who is the group that made the decision to deny Ms. Isensee's accommodation request.

27. Further, she was never informed who made up the Exemption Review Board even though she was told on a number of occasions that the review board would be the only people who could answer her question as to how her religious exemption was found to be inadequate.

28. This process of the Defendant providing conclusory statements, and not addressing Ms. Isensee's reasonable questions, is perfectly documented in an email chain between Ms. Isensee and Karen McAndrews, a human resources specialist at Amplity. (attached here as **Exhibit E**).

29. Following the denial of Ms. Isensee's religious exemption, she reached out to Ms. Andrews "requesting an explanation in writing on why my legal federal exemption was denied." She also asked for the name of the committee members and how they made their decisions. She closed the e-mail stating she was issuing a formal appeal to the denial of her exemption to the vaccines. *See* **Exhibit E**

30. Ms. Andrews responded with the phrase documented above. That her exemption was either not sincere and/or not religious in nature.

31. At no time did the Defendant provide how they concluded Ms. Isensee's exemption request failed to meet their requirements.

32.    However, the EEOC guidelines are clear. The guidelines in section L.2 document

how broadly religion is defined and therefore how broadly the protections are to be considered.

The guidelines state:

> The definition of "religion" under Title VII protects both traditional and
> nontraditional religious beliefs, practices, or observances, including
> those that may be unfamiliar to employers…The sincerity of an
> employee's stated religious beliefs, practices, or observances **is usually
> not in dispute**.  The employee's sincerity in holding a religious belief is
> "largely a matter of individual credibility. (emphasis added)[2]

33.    The Defendant never claimed that Ms. Insensee's credibility was in question.

34.    Ms. Insensee's religious beliefs are well documented by her exemption request.

Specifically, she states:

> My personal convictions are inspired by my study and understanding of
> the Bible, and personally directed by the true and living God. I am
> personally convicted that I should not receive any of the three Covid-19
> shots presently authorized by the FDA…I personally searched the
> Scriptures and sought guidance from the Holy Spirit to come to my
> decision…Perhaps the most notably significant reason why the
> acceptance of these vaccines would be considered sinful centers around
> the fact that fetal stem cell lines were used in either
> the initial development and/or testing of the Covid-19 shots. By receiving
> the Covid-19 shots presently available, I believe it would constitute a
> complicit action in the act of abortion. I believe abortion is murder and is
> strictly prohibited in the Bible. *See* **Exhibit D.**

35.    Under no fair reading of Ms. Isensee's words, and applying them to federal and

state law, can those words be found to be not religious in nature.

36.    The Defendant did not follow the above guidelines, nor the case law and/or

statutes further documented below.

37.    Instead, they substituted their own evaluation of what is a sincerely held religious

belief.  In doing so, they violated the very well-defined religious rights of the Plaintiff.

---

[2] Id. at L.2

38.     Defendants never claimed that Ms. Isensee's sincerity was in question leaving the very important question: How did the Defendants determine what is required to meet their threshold?

39.     Ms. Isensee asked that question numerous times without ever receiving an answer.

40.     One thing is certain; however, it is a vastly different threshold than what is required under law and federal guidelines. This discrepancy puts the Defendant at odds with federal and state law. Thereby making the Defendant's decision to deny Ms. Isensee's religious exemption request illegal.

41.     Since there is no claim that Ms. Isensee was insincere, and no legitimate argument that her beliefs are not religious, the Defendant failed in their responsibility to grant Ms. Isensee's religious accommodation unless specific evidence of undue burden is shown.

42.     The Defendant was given numerous opportunities to claim undue burden was a factor in denying Ms. Isensee's religious exemption request. Yet, undue burden was never mentioned specific to Ms. Isensee's accommodation request.

43.     The Defendant mentioned undue burden generically in their accommodation request form. *See* **Exhibit D**. However, there is zero evidence that undue burden was an issue the Defendant faced had they granted Ms. Isensee's exemption request.

44.     The clearest statement that proves the Defendant's actions were in violation of Federal Law is the unambiguous statement from the EEOC guidelines from section K.12 where it states:

> Once an employer is on notice that an employee's sincerely held religious belief, practice, or observance prevents the employee from getting a COVID-19 vaccine, the employer **must** provide a reasonable

> accommodation unless it would pose an undue hardship." (emphasis added) [3]

EEOC guidance explains that the definition of religion is broad and protects:

> beliefs, practices, and observances with which the employer may be unfamiliar. Therefore, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief, practice, or observance.[4]

45. The Defendant failed to meet the above requirements in their declaration that Ms. Isensee's religious exemption request somehow failed to meet an undefined and significantly different threshold than what is defined in federal law and guidelines. They did this willfully while trampling the rights guaranteed under Title VII and specifically documented in the EEOC guidelines that are particular to religious exemptions and the Covid-19 vaccine.

46. Ms. Isensee's religious beliefs are hers and hers alone. Regardless of whether the Defendant agrees or not, there is no objective basis to believe they are insincere nor that they are not religious in nature. Therefore, they **must** be granted unless an undue burden is objectively shown. Such undue burden claim also fails as documented below.

**The Defendant pivoted from successful and proven Covid-19 mitigation practices and improperly chose mandated vaccination as its sole safety procedure upon which it predicated employment.**

A. The vaccine mandate is unlawful as enforced.

47. The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020 for select populations. One week later a second EUA for the Moderna COVID-19 vaccine was issued. The FDA issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021. On

---

[3] Id at K.12
[4] Id

August 23, 2021, the FDA issued full approval for the Pfizer-BioNTech COVID-19 vaccine marketed as Comirnaty. However, it should be noted, that the FDA has admitted the Comirnaty vaccine, which is legally distinct from the Pfizer vaccine that is currently available in the US, was not available when Ms. Isensee was terminated.

48.     Though the FDA has approved the use of a currently unavailable vaccine for future use, the only vaccines widely available for use in the United States are these three experimental, investigative and unlicensed drugs, all of which were either developed, tested, or produced with the use of fetal cells from aborted fetuses.

49.     Since the rollout of the vaccines, and prior to Ms. Isensee's termination, more and more data increasingly showed the vaccines do not prevent infection, do not prevent transmission, and do not prevent illness. Indeed, countries with the most aggressive, expansive use of the vaccines have seen record-setting infection rates and continuing high illness rates.

50.     Scientists studying over 4,000 frontline workers found that between December 2020 until April 2021, the effectiveness of the vaccines cratered from 91 percent to 66 percent. This drastic decline occurred before the Delta and Omicron variants became dominant.[5]

51.     Even more alarming, research focusing on the Pfizer vaccine's effectiveness in America shows that from December 14, 2020, until August 8, 2021, the vaccine plummeted in effectiveness, collapsing from 88 percent to 47 percent.[6]

---

[5] Ashely Fowlkes, et al., *Effectiveness of COVID-19 Vaccines in Preventing SARS-CoV-2 Infection Among Frontline Workers Before and During B.1.617.2 (Delta) Variant Predominance – Eight U.S. Locations, December 2020-August 2021,* 70 Morbidity and Mortality Weekly Report (Aug. 27, 2021) available at https://www.cdc.gov/mmwr/volumes/70/wr/mm7034e4.com.
[6] Sara Y. Tartof, et al., *Six-month Effectiveness of BNT162b2mRNA COVID-19 Vaccine in a Large US Integrated Health System: A Retrospective Cohost Study,* Lancet, 2021 Oct. 16, 398 (10309):1407-16, available at https://pubmed.ncbi.nlm.nih.gov/34619098/.

52.    In addition, governmental authorities have revised their definition of the word "vaccine" itself to continue to label these experimental drugs with novel ingredients "vaccines" because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission. None of which these vaccines can any longer claim credit for such results which reflects the fact there has never been a successful COVID-19 vaccine in history due to the viral evolution.[7]

B. The vaccine mandate ignores natural immunity.

53.    The National Institutes of Health and other bodies have found that natural immunity to Covid-19 – that is, immunity cause by infection with Covid-19 and recovery – is incredibly strong. Specifically, antibodies against the spike protein of the Covid-19 virus remain in 98% of people who have recovered from the virus six to eight months after infection (the outer limit of the study was simply because the study was done on individuals where were six to eight months out of recovery, not because immunity begins to wear off).[8]

54.    Health and Human Services' Assistant Secretary, Dr. Admiral Brett Giroir stated in August 2021, in a nationally televised interview, that "there are still no data to suggest vaccine immunity is better than natural immunity. I think both are highly protective." [9]

55.    The data out of the State of Israel underscores this point. In a paper

---

[7] Katie Carrero, *Why did the CDC change its definition for 'vaccine'? Agency explains more as skeptics lurk,* MIAMI HERALD (Sept. 27, 2021) available at https://wwww.miamiherald.com/news/coronavirus/artcle254111268.html.

[8] NIH, *Lasting immunity found after recovery from COVID-19*, NIH (Jan. 26, 2021), available at https://www.nih.gov/news-events/nih-research-matters/lasting-immunity-found-after-recovery-covid-19.

[9] FOX NEWS, *Admiral Brett Giroir explains natural immunity to COVID-19*, Admiral Brett Giroir (Aug. 13, 2021) available at https://www.youtube.com/watch?v=O641EW4okPs.

awaiting peer review, scientists out the State of Israel report that in studying thousands of patients, those whose only source of immunity was a vaccine (in the case of Israel, the Pfizer vaccine was used) had a 5.96 to 13.06-fold increased risk of a breakthrough infection with the Delta variant of Covid-19 over those whose immunity was natural.[10]

56.     Israel is one of the most vaccinated places in the world, with close to 80% of the country having been vaccinated. Israel's bout with the Delta variant of Covid-19 has demonstrated that the Pfizer vaccine, once considered the Cadillac of the three Covid-19 vaccines, is only 64% effective at preventing symptomatic cases of Covid-19.[11] Moreover, despite Israel's high vaccination rates, Israel is becoming "the world's COVID hotspot."[12]

57.     In addition, in a study concerning the Omicron variant, scientists found that the variant "can evade immunity from Covid-19 more so than any other previous variants discovered during the course of the pandemic."[13] "Researchers studied over 11,000 Danish households and found that those who had the Omicron variant had a 31 percent chance of a secondary attack rate (SAR), which refers to the probability an infection occurs within a specific group like a

---

[10] Sivan Gazit, et al., *Comparing SARS-CoV-2 Natural Immunity to Vaccine -Induced Immunity: Reinfections Versus Breakthrough Infections*, medRvix (Aug. 25, 2021), available at https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf.
[11] Aaron Blake, *Vaccine doubters' strange fixation with Israel*, WASHINGTON POST (Jul. 22, 2021) available at https://www.washingtonpost.com/politics/2021/07/19/vaccine-skeptics-zero-israel-again-some-reasons/.
[12] Conor Boyd, *Israel is not the world's Covid hot spot: Cases sours despite country's trail blazing vaccine roll-out – sparking fears other highly-vaccinated countries will be hit by another wave due to jabs' waning immunity*, DAILY MAIL (Sept. 3, 2021) available at https://dailymail.co.uk/news/article-9951117/Isreal-worlds-covid-hotspot-0-2-population-catching-yesterday.html.
[13] Shirin Ali, New study finds omicron variant better at evading immunity, THE HILL (Jan. 3, 2021) available at https://thehill.com/changing-america/well-being/prevention-cures/588040-new-study-finds-omicron-variant-better-at citing and referencing https://www.medrxiv.org/content/10.1101/2021.12.27.21268278v1.

household or close contacts."[14] Moreover, the study revealed that "vaccine effectiveness was reduced to around 40 percent against symptoms and to 80 percent against severe disease. . ."[15]

58.     The now well-known study of the effects of natural immunity in the Cleveland Clinic Health System provides yet another example of the real-world superiority of natural immunity to vaccine immunity. That study compared "breakthrough infections" (re-infection after either contracting Covid-19 or taking a vaccine) among employees of the Cleveland Clinic Health System and found that those who were previously infected and unvaccinated, 1359 people, none suffered breakthrough infections. [16]

59.     Another published study found that there is "no discernible relationship between percentage of population fully vaccinated and new COVID-19 cases in the last [seven] days."[17] The study found to the contrary that there was a "marginally positive association such that countries with higher percentage of population fully vaccinated have higher COVID-19 cases per [one] million people." [18] That study, which analyzed 68 different countries' vaccination rates and the rate of new Covid-19 cases, specifically referred to Israel, Portugal and Iceland, each of which is highly vaccinated and which had more cases per one million people than, for example, Vietnam and South Africa, which had around ten percent of their population fully vaccinated.[19]

---

[14] *Id.*

[15] *Id.*

[16] Nabin K. Shrestha, et al., *Necessity of COVID-19 Vaccine in Previously Infected Individuals*, medRxiv (Jun. 19, 2021), available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v3.

[17] S.V. Subramanian and Aknil Kumar, Increases in COVID-19 are Unrelated to Levels of Vaccination Across 68 Countries and 2947 Counties in the United States, Eur J Epidemiol 2021 Sep 30:1-4, https://doi.org/10.1007/s10654-021-00808-7.

[18] *Id.*

[19] *See id.*

60.     Several scholarly journals have also weighed in on the superiority of natural immunity to vaccine immunity. [20] Further, those who previously were infected with Covid-19 were at greater risk for bad side effects associated with the vaccine - in such cases, the vaccine might even weaken their pre-existing immunity.[21]

61.     While the vaccines have been effective at preventing serious cases and deaths, they lag far behind natural immunity in preventing symptomatic cases of Covid-19, and, therefore, transmission of Covid-19.

C.  The vaccine mandate relies on an improper assumption about the infection-fatality rate and asymptomatic spread.

62.     Covid-19 presents a risk primarily to individuals aged 85 or older[22] and those with comorbidities such as hypertension and diabetes.[23]

63.     The majority of deaths associated with Covid-19 occur in those over the age of 55.[24] Within the most heavily impacted age group (age 85 and up), only 13.3% of deaths from February 2020 to February 2021 were attributed to Covid-19.[25]

---

[20] Jackson S. Turner, et al., *SARS-CoV-2 Infection Indicates Long-lived Bone Marrow Plasma Cells in Humans*, Nature, 595, 421-25 (May 24, 2021), available at https://www.nature.com/articles/s41586-021-03647-4.
[21] Carmen Camara, et al., *Differential Effects of the Second SARS-CoV-2 mRNA Vaccine Dose on T Cell Immunity in Naïve and COVID-19 Recovered Individuals*, bioRxiv (Mar. 22, 2021) https://doi.org/10.1101/2021.03.22.436441, available at https://www.biorxiv.org/content/10.1101/2021.03.22.436441v1.
[22] Mayo Clinic, *COVID-19: who's at higher risk of serious symptoms* (Jan. 22, 2022) available at: https://www.mayoclinic.org/diseases-conditions.
[23] Wren Hann, et al., *Comorbidities in SARS-CoV-2 Patients: a Systematic Review and Meta-Analysis*, ASM Journals/mBio/Vol.12, No. 1 (Feb.9, 2021) https://doi.org/10.1128/mBio.03647-20, available at  https://journals.asm.org/doi/10.1128/mbio.03647-20?permantly+true&.
[24] *Id.*
[25] Heritage Foundation, *COVID-19 Deaths by age* (Feb. 17, 2021) available at https://datavisualizations.heritage.org/public-health/covid-19-deaths-by-age/.

64.     One of the most useful measures for calculating the risk of dying from a virus is the infection-fatality rate ("IFR"). The IFR is calculated by dividing the number of Covid-19 deaths by the number of Covid-19 infections. It attempts to answer the critical question: "If I get sick, what is the chance that I will die?" The Center for Disease Control and Prevention ("CDC") estimates the IFR for the bulk of most working-age adults is exceedingly low.[26] For adults under age 50, the CDC's "current-best estimate" is that 500 people will die per 1,000,000 infections nationwide.[27] In other words, for every one million adults infected age 50 or younger, 999,500 of them will survive Covid-19.[28]

65.     Assuming the data regarding Covid-19 infections is accurate, the CDC's numbers show Americans across the board are far more likely to die of something other than Covid-19, which casts considerable doubt on the Defendant's assertions that all employees should be vaccinated due to business necessity.[29]

66.     The Defendant already employed a very successful method of preventing Covid-19 spread from the symptomatic – self-quarantine. The Defendant's vaccine mandate only addresses one risk: asymptomatic lethal spread. The problem with the Defendant's mandate is two-fold: first, asymptomatic lethal spread is significantly less of a threat than the Defendant

---

[26] CDC, *COVID-19 Pandemic Panning Scenarios,* Centers for Disease Control and Prevention (Mar. 19, 2021) available at https://www.cdc.gov/oronavirus/2019-ncov/hcp/planning-scenerios.html.
[27] *Id.*
[28] *Id.*
[29] Smiriti Mallapaty, *The Coronavirus Is Most Deadly If You Are Older and Male,* NATURE (Aug. 28, 2020) (demonstrating that individuals under 50 face a negligible threat of a severe medical outcome from a coronavirus infection, akin to the types of risk that most people take in everyday life, such as driving a car) available at https://www.nature.com/articles/d41586-020-02483-2.

16

seems to assert,[30] and second, testing more effectively, and easily, suffices rather than forced injections of unwanted experimental, potentially life-altering drugs developed in ways that offend the Plaintiff's religious beliefs or discriminates against her because of her sincerely held religious beliefs.

67.     The Defendant uses the specter of "asymptomatic spread" – the notion that fundamentally healthy people could transmit Covid-19 to others without having any symptoms of Covid-19 – to justify its vaccine mandate. But there is little credible scientific evidence that demonstrates the phenomenon of "asymptomatic spread" poses any meaningful danger to employees or anyone else for that matter. Indeed, it is "very rare" even according to Anthony Fauci, and, at worst, poses a one-in-a-million risk of lethal spread. The Defendant's response to Covid-19 is predicated, in part, on the flawed assumption that asymptomatic individuals pose a meaningful risk of spreading disease.

68.     Evidence of transmission requires that an individual can be shown to be the source of infection for another person who then developed symptoms of a disease/illness.

---

[30] Michael A. Johansson, et al., *SARS-CoV-2 Transmission from People Without COVID-19 Symptoms,* JAMA Netw. Open, 2021; 4(1):e2035057 (Jan. 7, 2021) http://doi.10.1001/Jamanetworkopen.202.35057, available at https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2774707. *See also* Kenneth McIntosh, et al., *COVID-19: Epidemiology, Virology, and Prevention,* WoltersKluner (Jan. 13, 2022) available at https://www.uptodate.com/contents/covid-19-epidemiology-virology-and-prevention#H3392906512.

69.     Basic microbiology shows that infectiousness or transmission of viruses such as Covid-19 require an active infection resulting in elevated levels of viral replication in the host and shedding of the virus.[31]

70.     Decades of research demonstrates that symptomatic people, such as those coughing, sneezing, and wheezing, are the real drivers of viral spread, a fact Dr. Anthony Fauci initially acknowledged during the early days of the pandemic when he told the press, "[E]ven if there is some asymptomatic transmission, in all the history of respiratory-born viruses of any type, asymptomatic transmission has never been the driver of outbreaks. The driver is always a symptomatic person." [32]

71.     When the viral replication process is blocked by a healthy immune system, the virus is neutralized, preventing significant viral replication and shedding. This occurs in approximately half the people exposed to the virus. Their immune system's defenses effectively ward off Covid-19 before it can take hold and cause symptomatic disease. Research demonstrated that asymptomatic people are not the drivers of Covid-19 transmission as demonstrated in the following points.

---

[31] *See generally*, Samuel Baron, et al., *Medical Microbiology* (4th ed. 1996) available at: https://www.ncbi.nlm.nih.gov/books/NBK8149/. *See also* Hitoshi Kawasuji, et al., *Transmissibility of COVID-19 depends on the viral load around onset in adult and symptomatic patients*, PLOS ONE (Dec. 9, 2020) available at https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0243597.
[32] U.S. Department of Health and Human Services, *Update on the New Coronavirus Outbreak First Identified in Wuhan, China*, Press Briefing (Jan. 28, 2020) available at https://www.youtube.com/watch?v=w6koHkBCoNQ&t=2642s

72.     Researchers studying real-world laboratory samples of more than a quarter-million people found that even with a positive RT-PCR test, asymptomatic people have a much lower probability of being infectious.[33]

73.     A research article published in the CDC's *Emerging Infectious Diseases* journal notes that little to no transmission of Covid-19 occurred from asymptomatic people studied by research in Germany.[34] The researchers note: "The fact that we did not detect any laboratory-confirmed SARS-CoV-2 transmission from asymptomatic case-patients is in line with multiple studies . . ."[35] The lack of scientific and medical evidence surrounding asymptomatic spread led the researchers to conclude that asymptomatic spread is "unlikely to substantially spread COVID-19."[36]

74.     A review in March 2021 of all the published meta-analysis on asymptomatic transmission from Dr. John Lee, a retired British Professor of Pathology, reveals that in many cases, the same few studies have been recycled repeatedly to support the flawed proposition that those who are asymptomatic pose a real danger.[37] In the words of Allyson M. Pollock, a professor of public health at Newcastle University in the United Kingdom, "[s]earching for

---

[33] Andreas Stang, *The performance of the SARS-CoV-2-RT-PCR test as a tool for detecting SARS-CoV-2 infection in the population* (Aug. 2021) 83 J. Infect. 2, https://doi:10.10161j.jinf.2021.05.022 available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8166461/.
[3434] Jennifer K. Bender, *Analysis of Asymptomatic and Presymptomatic Transmission in SARS-CoV-2 Outbreak, Germany, 2020,* 27 Emerging Infectious Diseases 4 (April 2021) available at https://www.cdc.gov/cid/article/27/4/20-4576_article.
[35] *Id.*
[36] *Id.*
[37] *See* John Lee, *Asymptomatic spread: who can really spread COVID-19,* Health advisory & Recovery Team (Mar. 2021) available at https://www.hartgroup.org/wp-content/uploads/2021/03/ASYMPTOMATIC-SPREAD.pdf.

people who are asymptomatic yet infectious is like searching for needles that appear and reappear transiently in haystacks, particularly when rates are falling."[38]

75.     Moreover, according to FDA, there is insufficient data to determine the vaccines authorized for emergency use actually prevent asymptomatic infection or the transmission of SARS-CoV-2, the virus that causes Covid-19.[39]

76.     Recently, the CDC reported that "new scientific data" demonstrated that vaccinated people who experienced breakthrough infections carried similar viral loads to the unvaccinated (but not naturally immune), leading the CDC to infer that vaccinated people transmit the virus at concerning levels.[40]

77.     In sum, little objective evidence exists to support a finding that asymptomatic spread is a driver of Covid-19 and, therefore, poses a danger to the Defendants' workplaces. Rather, the epidemic spread of Covid-19 is propelled almost exclusively by symptomatic persons (many of whom are fully vaccinated) who can easily self-isolate or quarantine from their co-workers.

78.     The government-operated Vaccine Adverse Event Reporting System ("VAERS") database is intended to function as an "early warning" system for potential health risks caused by vaccines. Presently, VAERS is broadcasting a red alert, but the Defendants are refusing to take

---

[38] Allyson M. Pollock, *Asymptomatic transmission of covid-19,* the BMJ (Dec. 21, 2020) available at https://www.bmj.com/content/371/bmj.m4851.

[39] FDA, *Pfizer-BioNTech COVID-19 Vaccine Frequently Asked Questions,* (Nov. 19, 2020) available at https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/pfizer-biontech-covid-19-vaccine-frequently-asked-questions.

[40] *See CDC reversal on indoor masking prompts experts to ask, "Where's the data?",* WASHINGTON POST (Jul. 28, 2021) available at https://www.washingtonpost.com/health/breakthrough-infections-cdc-data/2021/07/28/dcaaa6b2-efce-11eb-a452-4da5fe48582d_story.html.

account this important data of adverse reactions to the vaccines and instead is barreling down the tracks of forced vaccination at full steam.

79.     Recent data presents an alarming picture. As of December 2, 2022, there have been 32,621 deaths reported to VAERS from Covid-19 vaccines, compared to just 8,673 for the preceding 30 years for all other vaccines.[41] According to Josh Guetzhow, Ph.D., there are 91 times the number of deaths and 276 times the number of coagulopathy events reported after Covid-19 vaccination than after flu vaccination.[42]

80.     Moreover, new research suggests the heightened risk of adverse effects results from "preexisting immunity to SARS-CoV-2 [that] may trigger intense, albeit relatively rare, inflammatory and thrombotic reactions in previously immunized and predisposed individuals

81.     Although the number of VAERS reports is alarming in its own right, it is likely the true number of adverse effects associated with the COVID-19 vaccines far exceeds cases reported to VAERS. In 2010, a federal study commissioned by the U.S. Health and Human Services and performed by Harvard University consultants on behalf of the Agency for Health care Research and Quality ("AHRQ") found that "fewer than 1% of vaccine adverse events" are ever reported to VAERS.[43] Thus, it is likely scores of adverse events associated with the COVID-19 vaccines, including deaths, go unreported.

---

[41] Josh Guetzhow, *Safety Signals for COVID Vaccines are Loud and Clear. Why is Nobody Listening?* THE DEFENDER (Sept. 29, 2021) available at https://childrenshealthdefendse.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/.
[42] *Id.*
[43] Ross Lazerus, et al. *Electronic Support for Public Health – Vaccine Adverse Event Reporting System (ESP:VAERS),* Agency for Healthcare Research and Quality (Sept. 30, 2010) available at https://digital.ahrq.gov/sites/default/files/docs/publication/r18hs017045-lazarus-final-report-2011.pdf.

82.     It is not just VAERS that is broadcasting a red alert. On October 1, 2021, the

European Union's drug regulator, the European Medicines Agency ("EMA"), identified a new

possible link between rare cases of blood clotting in deep veins with Johnson & Johnson's

Covid-19 vaccine.[44] The EMA said the new, possibly life-threatening clotting condition known

as venous thromboembolism ("VTE") should be included on the Johnson & Johnson product

label as a possible side-effect of the shot.[45]

83.     What is more, the Moderna and Pfizer vaccines are made with polyethylene

glycol ("PEG") and Johnson & Johnson uses a similarly problematic ingredient: polysorbate.[46]

PEG has been linked to anaphylaxis in numerous recipients of the vaccine. PEG is the delivery

mechanism to the cells that keeps the mRNA from dispersing and not reaching its intended

target. PEG performs its intended use. Unfortunately, about 70% of the U.S. population is

slightly to somewhat allergic to PEG. The National Institute of Health ("NHI") recently began a

clinical trial of "systematic allergic reaction to the Moderna or Pfizer-BioNTech COVID-19

vaccines" due to the recipients of those vaccines experiencing anaphylaxis.[47]

---

[44] Reuters, EU finds J&J COVID shot possibly linked to another rare clotting condition, REUTERS (Oct. 1, 2021) available at https://www.reuters.com/business/healthcare-pharmaceuticals/eu-finds-jj-covid-shot-possibly-linked-another-rare-clotting-condition-2021-10-01/.
[45] Id.
[46] CDC, *COVID-19 Vaccines for People with Allergies* (Dec. 14, 2021) available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/recommendations/specific-groups/allergies.html.
[47] NIH, *NIH begins study of allergic reactions to Moderna, Pfizer-BioNTech COVID-19 vaccines* (Apr. 7, 2021) available at https://www.nih.gov/news-events/news-releases/nih-begins-study-allergic-reactions-moderna-pfizer-biontech-covid-19-vaccines.

84.　　According to the CDC, individuals who are allergic to PEG should not take the Moderna or Pfizer vaccines, and those who are allergic to polysorbate should not take the Johnson & Johnson vaccine.[48]

85.　　Despite this known risk, the Defendant is not offering PEG allergy testing pre-vaccination and are not offering any indemnity or disability coverage from any of the known and potential adverse effects of the COVID-19 vaccines.

86.　　To summarize, the potential adverse effects Plaintiff faced in being coerced to receive the Covid-19 vaccines pursuant to the Defendant's vaccine mandate is not theoretical, hypothetical or academic – they are very real and have real victims. Given the alarming reports of adverse side-effects associated with the COVID-19 vaccines, subjecting Plaintiff to vaccination exposes them to a variety of health risks ranging from headaches and blood clots to death.

**The Defendant improperly refused to grant the Plaintiff's religious exemption in violation of Title VII and O.R.C. § 4112.12**

A.　The Defendant's improper conduct regarding the vaccine mandate policy and procedures and its communications with the Plaintiff regarding her request for a religious exemption.

87.　　The Defendant announced Covid-19 vaccination policy and procedures via email on October 5, 2021. It stated: "we maintain our belief that vaccination is the best precaution we can choose to engage safely and effectively with our clients and patients." *See* **Exhibit B.**

---

[48] *See id.* at note 43.

88.     This claim fails on its face as the head of the CDC Rochelle Walensky stated on August 6, 2021, on CNN, when referring specifically to the Covid-19 vaccines ability to fight Covid-19: "...what they [the vaccines] can't do anymore is prevent transmission."[49]

89.     Upon information and belief, the Defendant never planned to follow federal or state law requirements, discussed *infra*, that reasonable accommodations must be made for the religious observances of its employees, short of undue hardship.

90.     Upon information and belief, the Defendant denied all requests for religious accommodations.

91.     Plaintiff objects to receiving the Covid-19 vaccines because she is a Christian, she is strongly against abortion and the benefitting from an abortion in any way, and her body is the temple of the Holy Spirit. And, as a Christian, she is compelled to protect her body from defilement. Insofar as the Covid-19 vaccines also affect a person's DNA, contain carcinogens, neurotoxins, animal viruses, animal blood, allergens and heavy metals that are all proven harmful to the human body, the Plaintiff finds the taking of the vaccine to be in direct conflict with her Christian duty to protect her body as the temple of the Holy Spirit.

B.  Federal law and State law prohibiting religious discrimination.

92.     Title VII prohibits the Defendant from discriminating against employees based on their religion. This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

---

[49] https://edition.cnn.com/us/live-news/coronavirus-pandemic-vaccine-updates-08-06-21/h_61de1502e86060f5faf4477339928e33

93. Title VII "imposes upon employers a 'statutory obligation to **make** reasonable accommodation for the religious observances of its employees, short of undue hardship." *Reed v. International Union, United Automobile, Aerospace and Agricultural Implement w\Workers of America*, 569 F.3d 576, 579 (6th Cir. 2009). (emphasis added).

94. Defendant did offer to try to find Ms. Isensee a fully remote position, at a much lower pay range, but no such position was ever offered to Ms. Isensee.

*95.* A prima facie case of religious discrimination based on a failure to accommodate requires a plaintiff to show "(1) a bona fide religious practice conflicts with an employment requirement, (2) he or she brought the practice to the [defendant's] attention, and (3) the religious practice was the basis for the adverse employment decision." *E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de Puerto Rica*, 279 F.3d 49, 55 (1st Cir. 2002). *See also Reed,* 569 F. 3d at 579 (6th Cir. 2009); *Smith v. Pyro Mining Co.,* 827 F.2d 1081 (6th Cir. 1987) A "bona fide religious practice" or belief is one that is "religious and sincerely held." *Id.* Title VII's definition of religion includes "all aspects of religious observance and practice, as well as belief." *Id.,* citing 42 U.S.C. § 2000e(j). Further 29 C.F.R. § 1605.1 states that religious practices include "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious values." Section 2000e(j) "leaves little room for a party to challenge the religious nature of an employee's professed beliefs." *Union Independiente*. Religious beliefs are not required to be "acceptable, logical, consistent, or comprehensible to others," and that interfaith differences as to what is scripturally acceptable are "not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences." *Id.*

96.    Ms. Isensee carried each of these elements as outlined throughout this complaint. Specifically:

      a.    Her religious practice of not putting anything into her body that in part came from aborted fetal cells and violated her covenant with God to maintain her body as a temple for the Holy Spirit conflicted with Defendant vaccine policy;

      b.    Ms. Wellman put Defendant on notice via her submitted form. *See* **Exhibit D**; and

      c.    The Defendant's failure to properly consider her sincerely held religious beliefs, and how they conflict with the Defendant's policies, resulted in Ms. Isensee's termination.

97.    Once an employee has made out a prima facie case of discrimination, the employer must show that it **offered** a reasonable accommodation, or that reasonable accommodation would be an undue burden. *Stanley v. Lawson Co.,* 993 F. Supp. 1084 (N.D. Ohio 1997) (emphasis added).

98.    The Defendant failed both exceptions once Ms. Isensee carried her burden by establishing a prima facie case.

99.    The Defendant did not offer Ms. Isensee an accommodation of any kind, other than the willingness to accept her resignation, which is no accommodation at all.

100.    Nor did the Defendant ever claim that providing Ms. Isensee an accommodation would be an undue burden. Even though they had numerous opportunities to do so both in email and phone conversations with Ms. Isensee as well as multiple unemployment hearings that the Defendant was noticed.

26

101.    "An employer must . . . present evidence of undue hardship" and not "rely merely on speculation," *Smith v. Pyro Min. Co.,* 827 F.2d 1081, 1085-86 (6th Cir. 1987). The lack of substantive content in the Defendant's justification of their denial of Ms. Isensee's religious exemption demonstrates that the Defendant cannot show undue hardship.

102.    Merely stating that the Defendant believed vaccination provided the "best precaution we can choose to engage safely and effectively with our clients and patients" (*See* **Exhibit B)** is not sufficient to meet the Defendant's obligation under Title VII to establish undue hardship. Establishing "undue hardship" requires assessment of actual circumstances at the employer's place of business and of proposed and potential accommodations. The Defendant's rote justification, and failure to answer simple questions about how they determined Ms. Isensee's accommodation request failed, demonstrates that the Defendant did not do the required analysis of assessing undue hardship.

103.    Furthermore, Ms. Isensee contacted all the offices she called on and 100% of them offered religious exemptions to their employees and would have accepted a religious exemption provided to her from her employer.

104.    Per information and belief, not one business partner/sales location that Ms. Isensee visits informed the Defendant that they would require Ms. Isensee to be vaccinated in order for her to do her job.

105.    Taking all the communications from the Defendant as a whole, it is clear that their policy was simple: in order for Ms. Isensee to remain employed in her current role she had to be vaccinated. No exceptions.

106.    No accommodations were offered, no undue burden was ever evaluated.

107.     There is an argument to be made that there was the *attempt* at an accommodation in finding Ms. Isensee another position within Amplity or one of their business partners. However, no such offer was ever made.  Attempting to accommodate does not satisfy the Defendant's obligations of offering an accommodation(s).

108.     Undue burden analysis must start with an analysis of proposed accommodations. The Defendant did not offer, nor identify any *actually available* accommodations. Therefore, the Defendant did not reach the first step of analyzing undue burden.

109.     Additionally, at the time of evaluating Ms. Isensee's religious accommodation request, and at the time of her eventual termination, the Defendant never stated that providing Ms. Isensee an exemption to the Covid-19 vaccine would cause any type of burden, let along an undue burden.

110.     Ms. Isensee unknowingly conducted an undue burden analysis herself when she contacted her business partners and confirmed that they all provided their employees legal opportunities at religious exemptions and that none of them would require her to be vaccinated in order for her to call on their offices and continue her work.

111.     Ms. Isensee's undue burden analysis included the company Amplity contracted with, Organon.

112.     At one point Ms. McAndrews claimed that Amplity was unable to provide religious exemptions because of Organon's vaccine requirements. However, Ms. Isensee contacted workers at Organon who confirmed that religious exemptions were provided to Organon employees who had similar employee contact as Ms. Isensee.

28

113. In-so-doing, Ms. Isensee proved there was no undue burden in granting her a religious exemption to the Covid-19 vaccines and her maintaining her current position.

114. Moreover, the Defendant clearly could have considered accommodations as dictated by the EEOC. In the EEOC Covid-19 guidelines, they provide "examples of reasonable accommodations or modifications that employers may have to provide to employees who do not get vaccinated due to disability; religious beliefs, practices, or observance; or pregnancy." Reasonable accommodations the EEOC has identified as potentially not imposing an undue hardship on the employer include requiring the unvaccinated employee entering the workplace to:

(1) wear a face mask,

(2) work at a social distance,

(3) work a modified shift.

(4) get periodic tests for COVID-19,

(5) be given the opportunity to telework, or

(6) accept a reassignment.

*See* EEOC Covid-19 Guidance, K.2.

115. Ms. Isensee explicitly told the Defendant on numerous occasions that she was willing to comply with any and all of these accommodations.

116. Ms. Isensee even participated in trying to find employment opportunities within Amplity and/or their business partners. However, no such offer of reassignment was ever made. And therefore, while Ms. Isensee was willing to accept reassignment, the Defendant failed to ever offer a reassignment or *any* of the above accommodations.

117. Beginning in March 2020, the Defendant had the opportunity to test

29

many relevant accommodations for its employees, including daily assessments of personal health and potential exposure, availability of targeted Covid-19 testing, protocols requiring non-work when symptomatic or potentially exposed to Covid-19, contact tracing, handwashing and hygiene, and the use of PPE.

118.     Such accommodations are understood to have prevented any substantial or material transmission of Covid-19 when used.

119.     In addition, other accommodations are potentially available. For instance, the EEOC has specifically identified testing of employees before they enter the workplace. The EEOC COVID-19 Guidance states, "an employer may choose to administer COVID-19 testing to employees before initially permitting them to enter the workplace and/or periodically to determine if their presence in the workplace poses a direct threat to others." *EEOC COVID-19 Guidance*, A.6.

120.     The Defendant's vaccine mandate provided employees the illusory ability to obtain a religious exemption from the vaccine mandate.

121.     Taking into account the entire process outlined throughout this complaint, including words directly from Ms. Andrews, the conclusion is unavoidable, Ms. Isensee had no opportunity to remain employed and receive a Covid-19 vaccine accommodation.

122.     Without the Defendant conducting a proper undue hardship analysis, which would have resulted in objective evidence to prove an actual undue hardship (of which there is zero evidence) the termination of Ms. Isensee cannot be legal justified.

123.     Ms. Insensee's religious exemption easily carries her burden of providing her employer with notice that her sincerely held religious belief prohibits her from receiving a Covid-19 vaccine.

124.    Her statements are unquestionably religious in nature and there is no reason, nor evidentiary support, to believe she was insincere in her beliefs.

125.    Lastly, it was her religious beliefs that required her not to take the vaccine which ultimately resulted in her termination.

126.    Therefore, her prima facie burden as been met.

127.    The Defendant made no attempt to accommodate the Plaintiff's request for religious exemption, even though she was willing to comply with other safety precautions.

128.    The Defendant made no showing, nor ever even attempted to support, that providing the Plaintiff the requested exemption was an undue burden.

129.    Plaintiff's willingness to comply with safety measures were ignored.

130.    It is well established that Title VII and O.R.C. § 4112 "have the same evidentiary standards and general analysis." *Gibbons v. Bair Foundation,* No. 1:04CV2018, 2007 WL 582314, at *4-5 (N.D. Ohio Feb. 20, 2007) citing *Greene v. St. Elizabeth Hosp. Med. Ctr.,* 134 F.3d 371, 1998 WL 13410, at *5 (6th Cir. 1998).

131.    Given these facts, the Defendant's implementation of their vaccination policy was in violation of federal and state law.


## COUNTS

### COUNT ONE

**Violation of Title VII, 42 U.S.C. § 2000e,** *et seq.*
**Religious Discrimination-Failure to Accommodate**

132.    Plaintiff restates the foregoing paragraphs as if set forth fully herein.

133.    At all times relevant, Plaintiff was Defendant's "employee" within the

meaning of 42 U.S.C. § 2000e(f).

134. At all times relevant, the Defendant was Plaintiff's "employer" within the meaning of 42 U.S.C. § 2000e(b).

135. Plaintiff holds sincere religious beliefs that preclude her from receiving a Covid-19 vaccine.

136. Plaintiff informed her employer, the Defendant, of those beliefs and requested religious accommodations from the Defendant's vaccine mandate.

137. The Defendant failed to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with unsupported conclusions, and hypothetical claims. The Defendant failed to provide the Plaintiff with reasonable accommodations for her religious belief, instead terminating her for failing to violate her sincerely held beliefs and obtain a vaccination.

138. The Defendant thereby discriminated again the Plaintiff because of her religious beliefs.

139. By failing to offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII.

140. It is reasonable to infer from the totality of the circumstances that intended to discriminate against those seeking religious exemptions.

141. The Defendant illegally and improperly failed to offer potential accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not carry the burden required to do so. A*rguendo*, the Plaintiff effectively rebuts any claim of undue burden above, and the Defendant never claimed undue burden at the time of denying Ms. Isensee's exemption request and her subsequent termination.

142.     By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to deny Plaintiff's legitimate religious exemptions, the Defendant violated Title VII. This violation has harmed and continues to harm Plaintiff.

143.     Due to the Defendant's improper, willful, intentional, and unlawful actions, and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

### COUNT TWO

**Violation of O.R.C. § 4112, *et seq.,*
Religious Discrimination-Failure to Accommodate**

144.     Plaintiff restates the foregoing paragraphs as if set forth fully herein.

145.     Plaintiff holds sincere religious beliefs that preclude her from receiving a COVID-19 vaccine.

146.     Plaintiff informed her employer, the Defendant, of those beliefs and requested religious accommodations from the Defendant's vaccine mandate.

147.      The Defendant failed to engage in a meaningful interactive process with the Plaintiff regarding her religious accommodation request and instead only responded to Plaintiff with unsupported findings, and hypothetical claims. The Defendant failed to provide the Plaintiff with reasonable accommodations for her religious belief, instead terminating her for failing to violate her sincerely held beliefs and obtain a vaccination.

148.     The Defendant thereby discriminated again the Plaintiff because of her religious beliefs.

149.     By failing to offer any reasonable accommodation, the Defendant's discriminatory actions were intentional and/or reckless and in violation of O.R.C. § 4112, *et seq.*

150.    It is reasonable to infer from the totality of the circumstances that Defendant intended to discriminate against those seeking religious exemptions and never intended to provide them with a reasonable accommodation.

151.    The Defendant illegally and improperly did not offer any actual accommodations as required by state and Federal law. The Defendant cannot assert the defense of undue hardship because it did not assert or show undue hardship in declining to accommodate the Plaintiff's sincerely held religious beliefs and no undue burden exists here regardless.

152.    By discriminating against Plaintiff, because of her sincerely held religious beliefs, in their decision to deny Plaintiff's legitimate religious exemption, the Defendant violated O.R.C. § 4112, *et seq.* And this violation has harmed and continues to harm Plaintiff.

153.    Due to the Defendant's improper ,willful, intentional and unlawful actions, conducted with malice and aggregated and egregious fraud, and the subsequent harm suffered by the Plaintiff, the Plaintiff asks the Court for the relief requested in her Prayer for Relief.

**PRAYER FOR RELIEF**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the following relief:

A.  Payment for all economic damages, including, but not limited to, back pay, front pay and benefit in amounts to be determined at trial;

B.  Compensatory and consequential damages, and all non-economic damages, including for emotional duress;

C.  Punitive damages;

34

D. Statutory damages;

E. Pre-judgment and post-judgment interest at the highest lawful rate;

F. An award of reasonable attorneys' fees, costs and expenses of all litigation to the extent allowable under federal and state law;

G. Trial by jury on all triable issues; and

H. Such other relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

*/s/Glenn Feagan*_____
Glenn Feagan (Bar No. 041520)
Deters Law
5247 Madison Pike
Independence, KY 41051
Phone. (859) 363-1900
gfeagan@feaganlaw.com