Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE SOUTHERN DISTRICT OF OHIO

3                      WESTERN DIVISION

4                         *   *   *

5      NATALIE ISENEE,

6            Plaintiff,

7          vs.          CASE NO. 3:22-cv-000370-TMR-CHG

8      AMPLITY, INC.,

9            Defendant.

10                        *   *   *

11           Remote Zoom Deposition of NATALIE

12     ISENEE, Plaintiff herein, called by the Defendant

13     for examination pursuant to the Rules of Civil

14     Procedure, taken before me, Monica K. Schrader, a

15     Notary Public in and for the State of Ohio, at the

16     offices of James F. Maus, 7577 Central Parke

17     Boulevard, Suite 113, Mason, Ohio, on Monday,

18     October 9, 2023, at 10:03 a.m.

19                        *   *   *

20

21

22

23

24

25                                      EXHIBIT 1

Page 3

1   APPEARANCES:

2       On behalf of the Plaintiff:

3       By:  James F. Maus
             Attorney at Law
4            7577 Central Parke Boulevard, Suite 113
             Mason, Ohio 45050

5
        On behalf of the Defendant:

6
             Lewis Brisboi Bisgaard & Smith, LLP

7
        By:  David A. Campbell
8            Attorney at Law
             1375 East 9th Street, Suite 2250
9            Cleveland, Ohio 44114
10           and
11      By:  Bradley S. Fyffe
             Attorney at Law
12           250 East Fifth Street, Suite 2000
             Cincinnati, Ohio 45202
13
        ALSO PRESENT:

14
             Eric Green

15
                          *   *   *
16

17

18

19

20

21

22

23

24

25

Page 24

1          A.    Correct.

2          Q.    Okay.  What are your religious

3   beliefs?  We are going to look at your

4   exemption request, but what is your religion?

5          A.    I am a nondenominational

6   Christian.

7          Q.    What do you mean by

8   nondenominational?

9          A.    Just meaning that I am a Christian

10   and that I don't have any basis on

11   denomination.

12          Q.    Okay.  Now, I -- and let me -- I

13   want to ask you -- one more document.

14              (Thereupon, Exhibit 4,

15   Interrogatories, was marked for purposes of

16   identification.)

17   BY MR. CAMPBELL:

18          Q.    I am going to show you Exhibit 4.

19   I just want to bring it up on my screen.  Do

20   you remember going through some discovery

21   responses in this case where you answered some

22   written questions from Amplity?

23          A.    No.

24          Q.    Let me show you a document.  Have

25   you seen -- and I will scroll through.  It's 52

Page 28

1          A.    Charlotte was the rep in Illinois

2     for Chicago.

3          Q.    Okay.  Same position as you?

4          A.    Correct.

5          Q.    And she also cited a religious

6     exemption?

7          A.    That, I am not sure of.  But I do

8     know she was toying with the possibility of

9     getting vaccinated and ultimately decided not

10    to.  So ultimately, she got fired as well.

11         Q.    Okay, same position.  And so is

12    there anybody in your position -- it sounds

13    like you were pretty familiar with the others

14    who held your position at the time of your

15    discharge; is that right?

16         A.    Correct.

17         Q.    Is there anybody in your position,

18    your former position at the time of your

19    discharge from Amplity, who were granted either

20    a medical or religious exemption and were

21    permitted to continue working in your former

22    position without a COVID-19 vaccination?

23         A.    No.

24         Q.    So to your knowledge, your

25    employer was consistent in that -- and I am not

```
                                              Page 38

 1              THE WITNESS:  But that was based on
 2   his father.
 3              MR. MAUS:  Generally object for this
 4   deposition.  Okay, go ahead.
 5              MR. CAMPBELL:  That's fine.  We will
 6   note it for the record.
 7   BY MR. CAMPBELL:
 8        Q.   And are they not -- are your
 9   children, aside from that one at birth
10   vaccination for your first son, are they not
11   vaccinated due to your religious beliefs?
12        A.   Correct.
13              MR. MAUS:  Objection.
14   BY MR. CAMPBELL:
15        Q.   Let me ask you, do you go to a
16   church?
17        A.   I do.
18        Q.   What search?
19        A.   Salem Church.
20        Q.   Say that again.
21        A.   Salem Church.
22        Q.   Can you spell the first word?
23        A.   S-A-L-E-M.
24        Q.   Okay.  So Salem Church, okay.
25   Where is that located?
```

Page 39

1          A.    Dayton, Ohio.

2          Q.    How long have you been going to

3    Salem Church?

4          A.    I switched over about a year and a

5    half ago.

6          Q.    Okay.  So sometime in 2022?

7          A.    It was probably the beginning of

8    2022, correct.

9          Q.    Okay.  Where did you attend prior

10   to Salem Church?

11         A.    New Vision Church.

12         Q.    How long did you attend New

13   Vision?

14         A.    I was there for several months.  I

15   was attending with my mom until she could no

16   longer attend due to health.

17         Q.    Okay.  And did you attend church

18   prior to New Vision?

19         A.    Yes.  Prior to that, I was going

20   to Ginghamsburg Church in Tipp City.

21         Q.    Okay.  Can you say this again?

22   Spell that first word.

23         A.    G-I-N-G-H-A-M-S-B-U-R-G, I

24   believe.

25         Q.    Okay.  And how long did you go to

Page 41

1  verify -- okay.  So this one just listed -- I
2  was a little confused.  So this is the Industry
3  Lab, and then the Eversana is what you listed
4  here as the two employers, correct?
5          A.   Correct.
6          Q.   Now, let me just verify -- and
7  you -- and as we said here with respect to the
8  noneconomic damages, you haven't seen any
9  medical professionals for any noneconomic
10 damages, right?
11              MR. MAUS:  Objection.  Go ahead.
12              THE WITNESS:  Correct.
13              MR. MAUS:  I'm sorry.  Go ahead and
14 answer.
15 BY MR. CAMPBELL:
16         Q.   Okay.  And then let me just verify
17 some of these admissions just so I understand.
18 Okay, we'll go through it.  But you were aware
19 that Amplity's written policies prohibited
20 religious discrimination?
21         A.   Correct.
22         Q.   And did you go through and answer
23 these yourself?
24         A.   Yes.
25         Q.   Let me just ask you a couple where

Page 42

1   it says -- is this account specialist position,

2   the Biosimilar account specialist position, was

3   that your final position you held with your

4   employer?

5           A.   With Amplity, yes.

6           Q.   Okay.  And you agree that it's

7   customer facing?

8           A.   Correct.

9           Q.   Okay.  Now, let me just ask you a

10  little bit about some of these just so I

11  understand.  So No. 6 asks you to admit that

12  many of Amplity's customers, vendors, and

13  partners implemented vaccination policies.  You

14  admit in part.  So did you see that some of

15  those customers, vendors, and partners had

16  vaccination policies?

17          A.   I was working remote a hundred

18  percent.  So the fact that the vendors and

19  partners required vaccination policies for

20  their own employees was null and void.  All of

21  my -- everything was based on Zoom calls.

22              So I was doing all of my calls and

23  my daily check-ins with my offices and my

24  meetings from home.  I sold a rheumatology

25  product and a oncology product.  And, again, it

Page 44

1    imagine the Court is going to call me regarding a
2    criminal case I have.  Could I have 10 minutes?
3    I'm sorry.
4              MR. CAMPBELL:  We will come back at
5    11:10.
6              MR. MAUS:  Okay, thanks.  Sorry that
7    I'm getting these calls.
8              MR. CAMPBELL:  Okay.
9              (Recess taken.)
10   BY MR. CAMPBELL:
11         Q.   We are back on the record.  Do you
12   have anything to correct or supplement from our
13   last session?
14         A.   No.
15         Q.   Now, I was asking you when we left
16   about the question regarding whether Amplity's
17   customers, vendors, and partners implemented
18   vaccination policies and whether you were aware
19   of those, and you admitted that in part.  Do
20   you agree that at least some of Amplity's
21   customers, vendors, and partners implemented
22   vaccination policies?
23         A.   Correct.
24         Q.   And let me ask you, what is
25   Organon, O-R-G-A-N-O-N?

Page 45

1          A.    Organon was the client that I was
2     working for.
3          Q.    And what does that client do?
4          A.    They were the pharmaceutical
5     company that I was ultimately working for.
6     Amplity is just the contracting company.
7          Q.    Did you know if Organon had
8     implemented a vaccination policy for COVID-19?
9          A.    I did, and they allowed for
10    exemptions.
11         Q.    Okay.  Well, you understand that
12    so did Amplity's policy, correct?
13         A.    They -- they allowed us to file
14    exemptions, but they did not allow exemptions,
15    two different things.
16         Q.    And we'll get into it more.  But,
17    I mean, from -- and we will review the policy.
18    But just because your exemption was denied does
19    not mean that other employees did not get
20    exemptions granted, right?
21         A.    Sure.
22         Q.    Okay.  I mean, you don't know,
23    right?  You only know your three coworkers,
24    right?
25         A.    Correct.

Page 51

1          Q.    Okay.  And on No. 11, admit the
2     Defendant conferred with you regarding the
3     exemption request.  And we are going to go
4     through the documents.  But you did have
5     communications with Ms. McAndrews, M, lower
6     case C, capital A, N-D-R-E-W-S, throughout the
7     exemption review process, right?
8          A.    Yes.  She responded to a handful
9     of emails.
10          Q.    Okay.  And you submitted your
11     exemption request, and we are going to look at
12     it.  But it stated that you could provide
13     additional documents to support your religious
14     beliefs, right?
15          A.    Yes.  I didn't think it was
16     necessary.
17          Q.    Okay.  You didn't submit anything
18     else beyond your initial exemption request,
19     right?
20          A.    Correct.
21          Q.    And on 13, you do know as to your
22     position based on your former position at the
23     time of your discharge, based on your
24     discussions with your former coworkers, you do
25     know that the vaccination policy was applied

Page 55

1   Employee Handbook, was marked for purposes of
2   identification.)
3   BY MR. CAMPBELL:
4           Q.   I am going to show you Exhibit 5,
5   the Amplity handbook.  Can you see my screen?
6   Can you see my screen?
7           A.   Yes.
8           Q.   Did you receive a copy of this
9   handbook, the US Colleague Handbook, during
10  your time with Amplity?
11          A.   Sure.
12          Q.   Okay.  And we talked about it,
13  that it did at least in writing prohibit
14  religious discrimination?
15          A.   Yes.
16          Q.   And it did provide you with
17  complaint procedures?
18          A.   Yes.
19          Q.   Aside from your termination, did
20  you ever believe there was any other religious
21  discrimination that you suffered from during
22  your employment at Amplity?
23          A.   No.
24          Q.   Okay.  And let me just verify.
25  When I look at your file, it looks like your

Page 56

1  original -- just so we can put some time frames

2  on this -- that your original hire date with

3  Amplity was March 4th, 2015; is that correct,

4  to the best of your knowledge?

5          A.    Incorrect.  It was January 4th.

6          Q.    Okay.  January 4th, 2015?

7          A.    2020.

8          Q.    2020, okay.  January 4th, 2020, is

9  when you are saying you were hired by Amplity?

10          A.    Correct.

11          Q.    Okay.  And then you worked until

12  your termination, December 10th, 2021?

13          A.    Correct.

14          Q.    Okay.  And did you always hold the

15  Biosimilar account specialist position during

16  your employment with Amplity?

17          A.    Yes.

18          Q.    Okay.  So let me -- just to --

19  just to put one more -- just to confirm that

20  date, let me show you another document.

21              (Thereupon, Exhibit 6, letter dated

22  12/10/2021, was marked for purposes of

23  identification.)

24  BY MR. CAMPBELL:

25          Q.    I am going to show you what's been

Page 57

1    marked as Exhibit 6.  Have you seen Exhibit 6

2    before today?

3            A.    Yes.

4            Q.    Okay.  Is this your termination

5    letter -- termination notice of December 10,

6    2021?

7            A.    Yes.

8            Q.    Okay.  Before the vaccination

9    policy went into place with Amplity, did you

10   have any issues, concerns, problems during your

11   employment?

12           A.    No.

13           Q.    Okay.  Who did you report to at

14   Amplity?

15           A.    I reported to Scott Van Etten

16   until he left a few months prior to me leaving,

17   and then Susan Grant took over for him for the

18   last few months of my employment.

19           Q.    Okay.  And did you have any

20   problems with either of those two supervisors?

21           A.    No.

22           Q.    And let me now take you to the

23   vaccination policy that you produced, just one

24   second.  I am going to show you what's been

25   marked as Exhibit 7.

Page 58

1             (Thereupon, Exhibit 7, email, was

2     marked for purposes of identification.)

3     BY MR. CAMPBELL:

4             Q.    Can you see my screen?

5             A.    Yes.

6             Q.    Okay.  Did you get notice of the

7     Amplity COVID vaccination plan via email on

8     October 5th, 2021?

9             A.    Yes.

10            Q.    Okay.  Did you partake in this

11    survey that's referenced in the email?

12            A.    I did.

13            Q.    Okay.  And when did you, I guess,

14    start hearing that Amplity may implement a

15    mandatory COVID-19 vaccination policy?

16            A.    I believe we received the survey a

17    couple weeks prior.  But Scott, who was my

18    manager at the time, told us on a conference

19    call that it was coming down the pipeline.

20            Q.    Okay.  I'm sorry, go on.  You were

21    going to answer further?

22            A.    Oh, I said probably a month prior

23    to it actually being rolled out.

24            Q.    Okay.  What do you recall from

25    that discussion?

Page 65

1    what the vaccine could do to you negatively?

2            A.    Correct.

3            Q.    Okay.  What did you find

4    health-wise of a negative standpoint of the

5    COVID-19 vaccine?

6                  MR. MAUS:  Objection.  Go ahead.

7                  THE WITNESS:  Well, there were no

8    studies based on the COVID vaccine, but there were

9    a lot of side effects and a lot of friends and a

10   lot of people on the Internet that said that they

11   were having side effects in regards to the COVID

12   vaccine.  And, again, I went and looked for the

13   prescribing information, of which there was none.

14                  And ultimately, I am a pharmaceutical

15   rep.  I sell based on a PI for the prescribing

16   information.  And I was not going to put something

17   in my body that, again, was against my religious

18   belief and that I didn't know what was in it.  The

19   pharmacist couldn't tell me what was in it.

20   Nobody could tell me what was in this foreign

21   object.

22   BY MR. CAMPBELL:

23           Q.    Now, let me ask you, like, for

24   your children, measles, mumps, rubella, did you

25   do that same analysis for them?

```
 1                 MR. MAUS:  Objection.  Go ahead.
 2                 THE WITNESS:  I did.  I sat down with
 3      my -- their nurse practitioner.
 4      BY MR. CAMPBELL:
 5           Q.   And you concluded -- you concluded
 6      that the risk of taking those vaccines would
 7      outweigh the benefits?
 8           A.   Correct.
 9           Q.   Okay.  What other medical
10      procedures, if any, have you turned down during
11      your life due to your religion?
12                 MR. MAUS:  Objection.  Go ahead.
13                 THE WITNESS:  I -- nothing other than
14      vaccines.
15      BY MR. CAMPBELL:
16           Q.   Nothing other -- now, let me ask
17      you, as a -- are you still involved in
18      pharmaceutical sales?
19           A.   I am, with Evoke Pharmaceuticals.
20           Q.   Okay.  Does it -- I guess how do
21      you feel if you are selling pharmaceuticals and
22      then I guess saying that you did your own
23      independent Internet search and you conclude
24      that a pharmaceutical based on that search
25      would -- you shouldn't take it?  I mean, how
```

Page 68

1                    MR. MAUS:  And I object to the

2      question.

3      BY MR. CAMPBELL:

4            Q.   Well, let's look at your exemption

5      request so I can understand.  Let me just make

6      sure -- we are going to label this as

7      Exhibit 8.

8                    (Thereupon, Exhibit 8, Request for

9      Religious Exemption Related To COVID-19 Vaccine,

10     was marked for purposes of identification.)

11     BY MR. CAMPBELL:

12           Q.   Let me just label it to make sure

13     I don't get confused.  I am going to show you

14     what's been marked as Exhibit 8.  Can you see

15     my screen?

16           A.   Yes.

17           Q.   Okay, so I'll scroll into this.

18     Did you fill this out yourself?

19           A.   I did.

20           Q.   Did you have any assistance?

21           A.   No.

22           Q.   Did you look on the Internet for

23     exemption requests?

24           A.   Yes.

25           Q.   Okay.  Did you mirror any of

Page 69

1  those?

2            MR. MAUS:  Objection.  Go ahead.

3            THE WITNESS:  I just took bits and

4  pieces of information from some of them.

5  BY MR. CAMPBELL:

6       Q.   Okay.  I'm sorry, I cut you off.

7  What were you saying?

8       A.   I said I took bits and pieces of

9  information from others.  But ultimately, I

10 wrote my own.

11      Q.   Okay.  And it said can you provide

12 documentation to support your beliefs and need

13 for an accommodation.  You never did that,

14 right?

15      A.   No.

16      Q.   And then that's your signature?

17      A.   Yes.

18      Q.   Okay.  Let me ask you then -- so

19 this one is -- now, it starts on the law,

20 right?  There is a lot of law in this request,

21 right?

22      A.   Yes.

23      Q.   How did the law, I guess, play

24 into your religious belief?

25            MR. MAUS:  Objection.  Go ahead.

1  citations from the Internet.  And then I got

2  my -- like the three -- my three statements in

3  the middle off of the Internet.

4          Q.    Okay.  These three little -- one

5  little I, two little I, three little I?

6          A.    Correct.

7          Q.    And then who is Darin Bolden?

8          A.    Was my pastor at the time.

9          Q.    What church were you attending on

10  September 12th, 2021?

11         A.    New Vision Church.

12         Q.    Did New Vision Church have any

13  formal statement as to the vaccination?

14         A.    No.

15         Q.    Okay.  Did Mr. Bolden talk to you

16  about this document?

17         A.    Yeah, we sat down.

18         Q.    Okay.  And did he agree or

19  disagree with it?

20         A.    He agreed.

21         Q.    He agreed, okay.  Did he tell you

22  that he had signed others?

23         A.    No.

24         Q.    How did you know that he would

25  sign?

Page 72

1          A.    I sat down with him.

2          Q.    Okay.  Did he say anything about

3    it in the church about the vaccination?

4          A.    No.

5          Q.    Okay.  And let's just go through

6    some of it with this.  Now, we go through --

7    the Bible -- we follow, it looks like we have

8    referenced the Bible.  It looks like the first

9    paragraph -- and I'm going to go based on my

10   understanding as paragraph 1, okay?  So that

11   one is pretty legal, right, paragraph 1?

12         A.    Correct.

13         Q.    Paragraph 2 and 3 and 4 cite the

14   Bible, right?

15         A.    Correct.

16         Q.    Okay.  And then paragraph 5, we

17   also have the -- outlines the fact that God

18   created body both fearfully and wonderfully,

19   right?

20         A.    Uh-huh.

21         Q.    Okay.  Where did you get COVID-19

22   shots work as gene therapy?

23         A.    They are MRNA vaccines, which

24   means they mutate your DNA.

25         Q.    So you believe that the COVID-19

Page 74

1   BY MR. CAMPBELL:

2          Q.   Okay.  And then it goes into --

3   this paragraph here at the bottom of page 1 is

4   really just looking at your Internet research,

5   right, on the vaccine?

6          A.   Correct, based on what they were

7   saying as far as the survivability rate.

8          Q.   So this is where you are saying I

9   don't think it's going to kill me, so I am not

10  going to be worried about COVID-19?

11              MR. MAUS:  Objection.  Go ahead.

12              THE WITNESS:  Correct.

13  BY MR. CAMPBELL:

14         Q.   Did you actually get COVID?

15         A.   No.

16         Q.   Okay.  Have you ever been tested?

17         A.   No.

18         Q.   And then the fetal stem cell

19  lines, where did you learn that?

20         A.   From multiple sources on the

21  Internet.  There were multiple sources that

22  stated that there were fetal stem cells that

23  were in the MRNA COVID vaccines.

24         Q.   Okay.  Now, are you familiar with

25  the Catholic Church's stance on abortions --

1   my religious beliefs.

2           Q.   And like, for example, you go in

3   and you get treatment for, like, sinus

4   infections and you just had a colonoscopy.

5   None of the things that the doctors or the

6   health care centers, any of the antibiotics,

7   any of the medications they give you, anything

8   they do during surgeries or anything like that,

9   none of that bothered you, just vaccination?

10              MR. MAUS:  Objection.

11              THE WITNESS:  Ultimately, I weigh out

12  the risk based on all of the information that I am

13  given from my physician and to see if it's going

14  to help me in the long run or if I can do it

15  alternatively based on diet or exercise, and I

16  make that choice one-on-one.

17  BY MR. CAMPBELL:

18          Q.   Okay.  Well, that sounds like you

19  are just making an informed medical decision

20  and not making a religious decision.

21              MR. MAUS:  Objection.

22              THE WITNESS:  I mean, I pray about

23  everything.  I mean, it's based on my religion,

24  again, for the vaccines.  I have not had to go

25  down that road for any major medical issues.

1          A.   Correct.

2               MR. CAMPBELL:  And why don't we --

3     it's 11:55.  Why don't we take a short break.  I

4     don't think we are going to be that long.  I think

5     we will be done probably a little after

6     o'clock.  So why don't we take a short break and

7     come back at 12:05 and just go straight through

8     lunch.  Does that work for the two of you?

9               THE WITNESS:  Sure.

10              MR. CAMPBELL:  We will come back at

11    12:05.

12              (Recess taken.)

13    BY MR. CAMPBELL:

14         Q.   We are back after a short break,

15    back on the record.  Do you have anything to

16    restate or change from your prior testimony?

17         A.   No.

18         Q.   Okay.  Well, I just want to take

19    you through then this exemption request

20    policy -- or procedure just to verify as to it.

21    And it looked like you were communicating with

22    Karen McAndrews during the process, right?

23         A.   Correct.

24         Q.   Okay.  Is there anybody else from

25    Amplity that you were communicating with during

Page 83

1  this process?

2       A.   I found out about Emily and

3  Charlotte at the beginning of December, so we

4  were put in contact -- Emily and I were put in

5  contact through Karen -- or excuse me, Kelly

6  Lambert.

7       Q.   Okay.  And I guess I wasn't tight

8  enough with my question.  Were you talking to

9  anybody else who was acting on behalf of

10 Amplity other than Ms. McAndrews?

11      A.   No.

12      Q.   Okay.  So let me show you, first

13 of all, just so we can have an understanding.

14 We had talked about your admission responses.

15 And just to verify, can you see my screen?

16           (Thereupon, Exhibit 9, job

17 description, was marked for purposes of

18 identification.)

19 BY MR. CAMPBELL:

20      Q.   Exhibit 9, the immunology

21 specialty representative, was that your

22 position at the time of your termination?

23      A.   Correct.

24           MR. MAUS:  Can I see the date on

25 that?

Page 84

1    BY MR. CAMPBELL:

2           Q.    I am scrolling through it.  Have

3    you seen this document before today?

4           A.    I believe so.

5           Q.    Okay.  And what were you selling

6    as an immunology specialist?

7           A.    Biosimilars.

8           Q.    What does that mean?

9           A.    I was selling biologics, but they

10   were called Biosimilar.

11          Q.    What were they treating?

12          A.    I was -- for -- I had rheumatology

13   and oncology, so cancer and rheumatology.

14          Q.    And you moved into the role you

15   said January 2020?

16          A.    January 4th, 2020.

17          Q.    Okay, January 4th, 2020.  And up

18   until March 15, 2020, were you visiting

19   customers in person?

20          A.    Yes.

21          Q.    And then during COVID, were you

22   and your coworkers during the pandemic remote?

23          A.    100 percent remote.

24          Q.    Okay.  And did your supervisors

25   advise you and others that that was going to be

Page 87

1          Q.   And then she says:  Unfortunately,
2    Amplity has no current openings that are a
3    hundred percent remote at this time.  Did I
4    read that right?
5          A.   Yes.
6          Q.   Okay.  And so sometime before
7    December 10, 2021, is when you sat down with
8    Ms. McAndrews to review other alternative
9    positions at Amplity, right?
10         A.   Correct, I discussed that.  I said
11   we had a 15 to 30 minute Zoom call.
12         Q.   Okay.  Now, let me look at -- I am
13   going to take you to Exhibit 11.
14              (Thereupon, Exhibit 11, email, was
15   marked for purposes of identification.)
16   BY MR. CAMPBELL:
17         Q.   This is another communication
18   between you and Ms. McAndrews.  This one is an
19   email that you sent November 24, 2021, right?
20         A.   Yes.
21         Q.   Now, I saw here, first of all, you
22   were letting her know that you were unaware
23   that she was asking for some additional
24   documentation to support your religious
25   exemption, right?

Page 88

1          A.    Correct.

2          Q.    Did you ever after this

3    November 24 send her any additional

4    documentation?

5          A.    No, she never -- she never sent me

6    anything else -- she never requested any

7    further information from me.

8          Q.    Okay.  Now, I was surprised by

9    this.  It says I have contacted all my

10   hospitals that I call on, and they are allowing

11   their employees to file religious exemptions.

12   Did you tell them who -- did you say, hey, I am

13   Natalie Isensee and I want to talk to you about

14   whether I am going to be allowed to come on the

15   property?

16         A.    No, I said -- I just asked in my

17   meetings with the -- my contacts for my

18   position if they were allowing their employees

19   to file exemptions.

20         Q.    Did you ask them about vendors?

21         A.    No, I didn't ask about vendors.  I

22   asked about their employees.

23         Q.    Did you ask about credentialing?

24         A.    No.

25         Q.    And were you told by Amplity to

1          A.    Correct.

2          Q.    So, first of all, the Exemption

3    Review Board found that you did not submit

4    enough information to support a sincerely held

5    religious belief, correct?

6          A.    Correct.

7          Q.    You disagree with that?

8          A.    I disagree.

9          Q.    Okay.  And she says on 11/15, she

10   had emailed you additional questions to review

11   and respond to.  You confirmed that and then

12   you never responded to them, right?

13         A.    I honestly don't recall the

14   additional questions.  That's why I asked in a

15   later email if they could be re-sent.

16         Q.    Okay.  And then we get into the

17   exemption request and say even if you did have

18   a sincerely held religious belief that your

19   position could not accommodate you without the

20   COVID-19 vaccination, right?

21              MR. MAUS:  Objection.  Go ahead.

22              THE WITNESS:  That's what it says,

23   correct.

24   BY MR. CAMPBELL:

25         Q.    And it's talking about regular

Page 107

1    STATE OF OHIO          )

2    COUNTY OF MONTGOMERY )  SS: CERTIFICATE

3              I, Monica K. Schrader, a Notary

4    Public within and for the State of Ohio, duly

5    commissioned and qualified,

6              DO HEREBY CERTIFY that the

7    above-named NATALIE ISENEE, was by me first duly

8    sworn to testify the truth, the whole truth and

9    nothing but the truth.

10              Said testimony was reduced to

11    writing by me stenographically in the presence

12    of the witness and thereafter reduced to

13    typewriting.

14              I FURTHER CERTIFY that I am not a

15    relative or Attorney of either party, in any

16    manner interested in the event of this action,

17    nor am I, or the court reporting firm with which

18    I am affiliated, under a contract as defined in

19    Civil Rule 28(D).

20

21

22

23

24

25

Page 108

1        IN WITNESS WHEREOF, I have hereunto set

2    my hand and seal of office at Dayton, Ohio, on

3    this 7th day of March, 2024.

4

5

6

7

8
                    _____

             MONICA K. SCHRADER

9            NOTARY PUBLIC, STATE OF OHIO

             My commission expires 4-18-2025

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

NATALIE ISENSEE,                    :
                                    :     CASE NO. 3:22-cv-000370-TMR-CHG
                                    :
            Plaintiff               :
      v.                            :     JUDGE THOMAS M. ROSE
                                    :
AMPLITY, INC.                       :     MAGISTRATE JUDGE CAROLINE H.
                                    :     GENTRY
                                    :

**DEFENDANT'S FIRST SET OF INTERROGATORIES, FIRST REQUESTS FOR PRODUCTION, AND FIRST REQUESTS FOR ADMISSIONS DIRECTED TO PLAINTIFF**

Pursuant to Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure, Defendant, Amplity, Inc. ("Defendant"), by and through its undersigned counsel, hereby propounds the following interrogatories, document requests, and requests for admissions (the "discovery requests") to Plaintiff Natalie Isensee ("Plaintiff") to be answered or otherwise responded to as required by law within thirty (30) days after service thereof.

The discovery requests which follow are to be considered as continuing, and Plaintiff is requested to provide by way of supplementary answers hereto such additional information as she or any other person acting on his behalf may hereinafter obtain which augments, changes, or otherwise modifies her answers now given to these interrogatories below.

**DEFINITIONS**

1.      "You", "yours", and "Plaintiff" means Plaintiff Natalie Isensee, as well as her agents, representatives, attorneys, and every other person acting or purporting to act on her behalf, individually or collectively.

**EXHIBIT
4**

2.      "Complaint" means and refers to the Complaint filed by Plaintiff in the captionedmatter.

3.      "Defendant" means and refers to Amplity, Inc., as well as its agents, representatives, attorneys, and every other person acting or purporting to act on its behalf, individually or collectively.

4.      "Vaccination Policy" means and refers to Defendant's vaccination policy referenced in Exhibit B to the Complaint.

5.      "Biosimilar Account Specialist" means and refers to the position you held when Defendant's vaccination policy was implemented as set forth in Exhibit A to the Complaint.

6.      "Exemption Request" means and refers to the religious exemption request referenced in Exhibit D to the Complaint.

7.      "Denial Letter" means and refers to Exhibit A to the Complaint.

8.      "Vaccination" means and refers to treatment with a vaccine to produce immunity against a disease; inoculation.

9.      "Person" includes every individual, corporation, partnership, association, or other entity, including governmental entities.

10.     The term "document" has the same meaning as used in the English language. "Document" means any medium upon which intelligence or information can be recorded or retrieved, and includes, without limitation, the original or copies of any written, recorded or graphic matter, however produced or reproduced, including but not limited to any booklet, pamphlet, periodical, letter, correspondence, e-mail, telegram, invoice, contract, purchase order, estimate, report, memorandum, inter-office communication, working paper, record, study, paper, worksheet, cost sheet, estimating sheet, bid, bill, time card, work record, chart, graph, index, data

sheet, data processing card or tape, recording, transcript thereof, photograph, object, or tangible thing and all other memorials of any conversations, meetings, and conferences, by telephone or otherwise, and any other writing or recording, which was in your possession, custody or control, in the possession, custody or control of your agents or attorneys, or which was but is no longer in your possession, custody and control, which would constitute or contain evidence relating to any matter which is relevant to the subject matter involved in this proceeding.

11.     The term "identify" when used in reference to a natural person means to state to the fullest extent possible, his or her full name, present or last known address and telephone number.

12.     The term "identify" when used in reference to a document means to describe each such document by date, subject matter, name of each person who wrote, signed, initialed, dictated, or otherwise participated in the creation of or obtaining of such document; the name of each addressee (if any); and, if it now exists, the name and address of each person having custody of such document.

13.     The term "identify" when used in reference to an act, event, occurrence, or statement of conduct (hereinafter "act") means:

        a.     to describe the event or events constituting such act;

        b.     to state the date when such act occurred;

        c.     to identify each person participating in such act;

        d.     to identify all other persons, if any, present when such act occurred;

        e.     to identify each document which in any way refers to, discusses, analyzes, comments upon or otherwise relates to such act; and

        f.     to state whether each such document now exists.

14. The terms "communication" or "communicated" mean any oral or written utterance, notation, or statement of any nature whatsoever, including, but not limited to, communication, correspondence, conversations, dialogues, discussions, interviews, consultations, agreements, and other understandings between or among two or more persons.

15. The word "or" appearing in an interrogatory should not be read so as to eliminate any part of the interrogatory but, whenever applicable, it should have the same meaning as the word "and." For example, an interrogatory which states "support or refer" should be read as "support and refer" if an answer can be made which satisfies each item.

## INSTRUCTION

1. With respect to each interrogatory, in addition to supplying the information requested, you are to identify all documents that support, refer to, or evidence the subject matter of each interrogatory and your answer thereto.

2. If any or all documents identified herein are no longer in your possession, custody, or control because of destruction, loss, or any other reason, then do the following with respect to each and every such document:

    a. describe the nature of the document (e.g., letter or memorandum);

    b. state the date of the document;

    c. identify the persons who sent and received the original and/or a copy of the document;

    d. state in as much detail as possible the contents of the document; and

    e. state the manner and date of disposition of the document.

4

3.      If you contend you are entitled to withhold from production any or all documents identified herein on the basis of the attorney-client privilege, the work-product doctrine or any other ground, then do the following with respect to each and every document:

      a.      describe the nature of the document (e.g., letter or memorandum);

      b.      state the date of the document;

      c.      identify the persons who sent and received the original and/or a copy of the document;

      d.      state the subject matter of the documents; and

      e.      state the basis upon which you contend you are entitled to withhold the document from production.

4.      If you cannot answer a particular interrogatory in full, after exercising due diligence to secure the information to do so, state and answer to the fullest extent possible, specifying and explaining your inability to answer the remainder and stating whatever information or knowledge you have concerning the unanswered portion.

5.      When an interrogatory requires you to "state the basis of" a particular claim, contention or allegation, state in your answer the identity of each and every communication and each and every legal theory which you believe supports, refers to, or evidences such claim, contention or allegation.

## INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify all persons answering or contributing to the answers to these interrogatories.

**ANSWER**: Natalie Isensee &

Emily Welcome; 218 NW Locust St. Lees Summit, MO 64064 (417) 840-3412
emnicole84@gmail.com

**INTERROGATORY NO. 2:**

Identify all persons with whom you have communicated or whom you have contacted regarding

the allegations contained in the Complaint and state when you communicated with or contacted

such persons.

**ANSWER**:

Kelly Lambert: October 2021 – December 2021

Emily Welcome: Communication from approximately December 2021 and is on-going

Charlotte Grahovac: Communication from approximately December 2021 and is on-going

Karen McAndrews (KA): address to be confirmed (likely to be contacted via defense counsel)
Communication from approximately November 2021 to December 2021.

Janice Kaiser October 2021 – December 2021 (Mother)

Carrie Dickens October 2021 – December 2021 (Sister)

Adam Dillman October 2021 – December 2021 (Fiancé)

**INTERROGATORY NO. 3:**

Identify all persons with whom you have communicated or whom you have contacted regarding

the Denial Letter and state when you communicated with or contacted such persons.

**ANSWER**:

Emily Welcome: Communication from approximately November 2021 and is on-going

Charlotte Grahovac: Communication from approximately November 2021 and is on-going

Karen Andrews: Communication from approximately November 2021 to December 2021.

Janice Kaiser October 2021 – December 2021 (Mother)

Carrie Dickens October 2021 – December 2021 (Sister)

Adam Dillman October 2021 – December 2021 (Fiance)

## INTERROGATORY NO. 4:

Identify the name, work and home address, telephone number, and e-mail address of all individuals

who have knowledge about the facts and circumstances referenced in the Complaint, including a

summary of the facts known to each individual identified.

### ANSWER:

Kelly Lambert; address TBD. Kelly is aware of the initial process of Amplity requiring vaccination and the stress applied to employees to be vaccinated.

Emily Welcome: 218 NW Locust St. Lees Summit, MO 64064 (417) 840-3412 emnicole84@gmail.com; Emily had a similar experience with having her religious exemption denied. She knows the details of the exemption process and the lack of them being granted for herself and me.

Charlotte Grahovac: 1032 Ravinia Dr. Gurnee, IL 60031 (847) 688-2535 charlotte.grahovac@yahoo.com; Emily had a similar experience with having her religious exemption denied. She knows the details of the exemption process and the lack of them being granted for herself and me.

Karen McAndrews (KA): address to be confirmed (likely to be contacted via defense counsel) karenmcandrews@amplity.com. Karen is intimately aware of the process by which Amplity denied perfectly legal exemption requests.

Janice Kaiser October 2021 – December 2021 (Mother) Contact via Plaintiff's counsel

Carrie Dickens October 2021 – December 2021 (Sister) Contactevia Plaintiff's counsel

Adam Dillman October 2021 – December 2021 (Fiancé) Contact via Plaintiff's counsel

**INTERROGATORY NO. 5:**

State whether you have obtained any oral, written, transcribed, or recorded statement from any person with knowledge of the facts relating to the allegations contained in the Complaint, or Defendant, and, if so, identify the person from whom the statement was obtained, the date the statement was obtained, and describe the content of the statement.

**ANSWER**:

**Karen McAndrews:**
- E-mail statements
  - 11/24 – back-and-forth about vaccine policy and the application of it
    - Confirmed that the Exemption Review Board did not believe the criteria of Ms. Isensee's exemption request establishing it is based upon a sincere belief that is religious in nature was met.
    - Confirmed that even if a religious exemption were approved Ms. Isensee would not be able to remain in her current position and that any unvaccinated employee would be required to be 100% remote.
  - 12/10 – Karen confirms no jobs available, no accommodation is ever made, confirms that any position with Amplity would have to be 100% remote, that Ms. Isensee's last day of leave is 12/10, and a separation letter was attached.

- Phone Calls:
  - November 15, 2021
    - Discuss reason for denial to religious exemption.
      - Question as to whether it was because her religious exemption was deemed insincere or because of the job requirements.
      - Defendant was also concerned that some unknown future job/client could require Ms. Isensee to be vaccinated.
      - Ms. Isensee's questions about why her religious exemption was deemed religiously insufficient go unanswered.
  - On or about 12/6/21
    - Discuss facts that there are no positions available for Ms. Isensee.
    - Discuss the leave process including benefits.
    - Discuss distinction between Amplity's vaccine policy that "All field-based employees need to be fully vaccinated" and the *client's* vaccine policy.
      - Ms. McAndrews confirms that Ms. Isensee is terminated because Amplity's vaccine policy when Ms. Isensee mentions that she has personal knowledge that the *client* provided religious exemptions.

**Susan Grant**

- E-mail 12/1/21 providing close out of employment process.

**Emily Welcome:**
- Multiple discussions about process of religious exemptions being denied.

**Charlotte Grahovac:**
- Multiple discussions about process of religious exemptions being denied.

**Donna, last name unknown**
- Phone call on or about 12/15/21
  - ○ Orgenon contractor confirms that vaccine exemptions were granted for both religious and medical exemption request.

## INTERROGATORY NO. 6:

Identify all documents that you contend support, refer, reflect or relate to Count I in the Complaint.

**ANSWER:**

- Amplity's vaccine mandate policy provided via 10/5/21 email
- Email chain from Ms. McAndrews and Ms. Isensee from November 23 & 24 2021
- Email from Ms. McAndrews that states Ms. Isensee's religious exemption was denied because it did not meet the criteria of being a sincerely held religious belief that justified an exemption
- Email from 12/10/21 confirming Amplity had no jobs to offer Ms. Isensee
- Ms. Isensee's religious exemption request from 10/7/21 which included attached document signed by Ms. Isensee's pastor.
- EEOC Guidelines found at: https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws

## INTERROGATORY NO. 7:

Identify all documents that you contend support, refer, reflect or relate to Count II in the Complaint.

**ANSWER:**

See No. 6

**INTERROGATORY NO. 8:**

Identify all documents that you contend support, refer, reflect or relate to the Exemption Request.

**ANSWER**:

See No. 6

**INTERROGATORY NO. 9:**

State whether you kept any diaries, journals, calendars, day planners, organizers, notebooks, recordings, or any other documentation, either written or verbal, during your employment with Defendant. If so, state the dates covered by the applicable documentation, the subject matter of the documentation, and the location of the documentation.

**ANSWER:**

None

**INTERROGATORY NO. 10:**

If you have ever been a party or a witness to any administrative charge, lawsuit, or other legal proceeding, aside from this lawsuit, including any bankruptcy proceeding, please identify the name(s) of the parties, the court or agency in which the proceeding or charge was filed, the date it was filed, the subject of the charge or proceeding, and your role in the action.

**ANSWER:**

Witness to neighbor violating restraining order, testified in violation hearing.

**INTERROGATORY NO. 11:**

If you have ever been arrested or convicted of a criminal offense (including misdemeanors), for

each such circumstance state the date of the arrest/conviction and the name of the

arresting/convicting entity.

**ANSWER:**

No

**INTERROGATORY NO. 12:**

Identify all persons whom you intend to call as witnesses at any trial or hearing of this action, and,

for each, describe the expected subject matter of each person's testimony.

**ANSWER:**

Natalie Isensee: entire process of submitting religious exemption and the root of her religious
exemption to defendant's mandatory vaccine policy.

Emily Welcome: entire process of submitting religious exemption and the process of exemptions
being denied.

Charlotte Grahovac: entire process of submitting religious exemption and the process of
exemptions being denied.

Darin Bolton: knows of sincerity of Ms. Isensee's religious beliefs.

Karen McAndrews: Knew the process by which religious exemptions were denied.

Reserve the right to call additional witnesses currently unknown to Plaintiff that have personal
knowledge of religious exemption process that are either current or former employees of
Defendant and/or Defendant contractors/agents.

**INTERROGATORY NO. 13:**

11

Identify every person who has knowledge of or support for the facts set forth in the Exemption

Request, and for each such person state the person's name, address and telephone number, and a

summary of the person's knowledge or support.

**ANSWER**:

Natalie Isensee: contract via Plaintiff attorney

Emily Welcome: 218 NW Locust St. Lees Summit, MO 64064; 417-840-3412;
emnicole84@gmail.com

Charlotte Grahovac: 1032 Ravinia Dr. Gurnee, IL 60031; 847-688-2535;
charlotte.grahovac@yahoo.com

Karen McAndrews: karen.mcandrews@amplity.com

Daren Bolden: address TBD


**INTERROGATORY NO. 14:**

Identify every Vaccination that you have obtained since January 1, 2000 and for each Vaccination

state the type of vaccination and the date of the vaccination.

**ANSWER**:

 None


**INTERROGATORY NO. 15:**

If you seek economic damages, describe with specificity any economic damage that you allege you

have suffered as a result of the actions of Defendant, indicating the nature of the economic damage

and your calculation of the amount of each item of economic damage.

**ANSWER**:

Back pay, front pay, loss of future earnings, out of pocket costs, compensatory and punitive
damages.

|  | Avg Monthly Income from Amplity | Avg Monthly Income from Industry Lab (IL) (2/7 – 6/1) | Avg Monthly Income from Eversana (EV) (5/9/22 – 2/28/23 ) | Avg Monthly Income from Eversana (EV) 3/1/22 - current |
|---|---|---|---|---|
| **Salary** | 10,330.90 | 4,716.09 | 7,083.33 | 7,295.83 |
| **Bonus** | 1706.67 | Above includes bonus | 969.24 | 1032.52 |
| **Car Allowance** | 800 | 0 | 0 | 0 |
| **Cell Phone Allowance** | 100 | 0 | 100 | 100 |
| **Total Avg Monthly Income** | 12,937.57 | 4716.09 | 8052.57 | 8438.35 |

| Month/Dates* | Amplity Income Lost | Earned Income | Loss | Total |
|---|---|---|---|---|
| **12/21** | 12,937.57 | 7,220 (from Amplity) | 5,717.57 | 5,717.57 |
| **1/22** | 12,937.57 | 0 | 12,937.57 | 18,655.14 |
| **2/22** | 12,937.57 | 3461.54 (IL) | 9,476.03 | 28,131.23 |
| **3/22** | 12,937.57 | 4615.38 (IL) | 8,322.19 | 36,453.42 |
| **4/22** | 12,937.57 | 4615.38 (IL) | 8,322.19 | 44,775.61 |
| **5/22** | 12,937.57 | 5018.21(IL) 3,269.23(EV) | 4650.13 | 49,425.74 |
| **6/22** | 12,937.57 | 3,052.31(IL) | 77.57 | 49,503.31 |

| | | 9,807.69 (EV) | | |
|---|---|---|---|---|
| **7/22** | 12,937.57 | 6,534.46 (EV) | 6,403.11 | 55,906.42 |
| **8/22** | 12,937.57 | 6,534.46 (EV) | 6,403.11 | 62,309.53 |
| **9/22** | 12,937.57 | 6,534.46 (EV) | 6,403.11 | 68,712.64 |
| **10/22** | 12,937.57 | 6,534.46 (EV) | 6,403.11 | 75,115.75 |
| **11/22** | 12,937.57 | 6,534.46 (EV) | 6,403.11 | 81,518.86 |
| **12/22** | 12,937.57 | 9,807.69** (EV) | 3,129.88 | 84,648.74 |
| **2022 Bonuses** | | 11,346.28 (EV) | | 73,302.46 |
| **1/23** | 12,937.57 | 6534.46 (EV) | 6,403.11 | 79,705.57 |
| **2/23** | 12,937.57 | 9,807.69** (EV) | 3,129.88 | 82,835.45 |
| **3/23 - Current** | 12,937.57 | 6,930.78 (EV monthly average) | 6,006.22 | 88,841.67 |
| **Average Quarterly Bonus** | | 6,195.14 | | |

**\* Dates are approximate as EV was on a two week pay period, not a monthly pay period**

**\*\* Three pay period month**

**INTERROGATORY NO. 16:**

If you seek non-economic damages, describe with specificity any non-economic damage that you allege you have suffered as a result of the actions of Defendant, indicating the nature of the noneconomic damage and your calculation of the amount of each item of non-economic damage.

**ANSWER**: Ms. Isensee has suffered from depression, emotional distress, anxiety, and a feeling of helplessness. She has to borrow money from family to pay bills and missed simple pleasures like enjoying holidays with family. She suffered from a gap in her employment and the stigma of being fired. She was shunned by co-worker friends as they were told that they could not speak with Ms. Isensee.

Additionally, Ms. Isensee's fundamental rights religious rights, as guaranteed via federal and state statutes, were violated when terminated and continue up to today as her former employer attempts to call into questions her sincerely held religious beliefs.


Economic damages * 3 = non-economic damages.

Currently: 88,841.67 * 3 = 266,525.01,


**INTERROGATORY NO. 17:**

State whether you have employed or obtained or expect to use any person as an expert witness in this lawsuit. If so, identify each person whom you expect to use as an expert witness, and describe the field of expertise in which each such expert witness is expected to testify, the qualifications of such expert witness, the substance of the facts and opinions to which each person named above as an expert witness is expected to testify, and provide a summary of the grounds for each opinion to be provided by each person named above as an expert witness.

**ANSWER:**

N/A


**INTERROGATORY NO. 18:**

If you seek non-economic damages, identify each doctor, psychiatrist, social worker, therapist, counselor, or health care provider whom you have consulted or received treatment from at any

time for any mental pain or anguish and complete and sign a copy of the attached HIPAA Compliant Medical Release for each such medical or other professional.

**ANSWER:**

Because of the lack of employment Ms. Isensee was unable to afford to pay for such medical help.

**INTERROGATORY NO. 19:**

Identify each doctor, psychiatrist, social worker, therapist, counselor, or health care provider whom you have consulted or received treatment from since 2018 and complete and sign a copy of the attached HIPAA Compliant Medical Release for each such medical or other professional.

**ANSWER:**

HIPPA to be included.

**INTERROGATORY NO. 20:**

Describe the efforts that you have taken to find alternative employment since January 1, 2021. (Question answered from date 1/1/22 as she was fired 12/21)

**ANSWER**

Ms. Isensee accepted a position at Industry Lab as a Toxicology Sales Specialist on 1/28/22 and worked there from 2/7/22 – 6/1/22. She started new position with Eversana/Evoke Pharma as a Gastroenterology Sales Specialist on 5/9/22 – current. Both positions granted Ms. Isensee's religious exemption during the interview process.

**INTERROGATORY NO. 21:**

Identify all employers that you applied for employment with, interviewed with, or were offered employment by since January 1, 2021. The identification should include the date that the action took place, the name of the employer, and the position sought or offered.

**ANSWER:**

See 20.

## **REQUESTS FOR PRODUCTION OF DOCUMENTS**

**REQUEST FOR PRODUCTION NO. 1:**

All documents that refer, reflect, or relate to your Exemption Request.

**RESPONSE:**

See Exhibit A

**REQUEST FOR PRODUCTION NO. 2:**

All documents retained on your computer(s), electronic storage device (hard drive, pin drive, etc.) cellular-telephone(s), smartphone, and personal digital assistant(s) (e.g., Palm Pilot, BlackBerry, etc.), including, but not limited to, e-mails, instant messages, or text messages between you and any other person referring, reflecting or relating to your employment with Defendant, the duties of the Biosimilar Account Specialist position, or the allegations contained in your Complaint.

**RESPONSE:**

See Exhibit B for emails.

Ms. Isensee does not keep her texts and contacted her cell phone provider who refused to provide copies of previous texts.

**REQUEST FOR PRODUCTION NO. 3:**

All documents retained on your computer(s), electronic storage device (hard drive, pin drive, etc.) cellular-telephone(s), smartphone, and personal digital assistant(s) (e.g., Palm Pilot, BlackBerry, etc.), including, but not limited to, e-mails, instant messages, or text messages between you and any other person referring, reflecting or relating to the Exemption Request.

**RESPONSE:**

See Exhibit A & B

91204222.1                                          18

**REQUEST FOR PRODUCTION NO. 4:**

All documents retained on your computer(s), electronic storage device (hard drive, pin drive, etc.) cellular-telephone(s), smartphone, and personal digital assistant(s) (e.g., Palm Pilot, BlackBerry, etc.), including, but not limited to, e-mails, instant messages, or text messages between you and any other person referring, reflecting or relating to the Denial Letter.

**RESPONSE:**

See Exhibit A & B

**REQUEST FOR PRODUCTION NO. 5:**

All documents retained on your computer(s), electronic storage device (hard drive, pin drive, etc.) cellular-telephone(s), smartphone, and personal digital assistant(s) (e.g., Palm Pilot, BlackBerry, etc.), including, but not limited to, e-mails, instant messages, or text messages between you and any other person referring, reflecting or relating to your practice of religion since January 1, 2021.

**RESPONSE:**

As noted above, Ms. Isensee does not keep her texts and does not believe that she has any of the above requested documents. However, as far as any information that she may have, *arguendo*: the Plaintiff objects. The request for documents is overbroad and seeks protected information.

Ms. Isensee has provided all the religious information that is necessary to meet the legal requirements for a religious exemption to the Defendant's mandatory vaccine policy per the EEOC guidelines. This is an overbroad request that will gather wholly irrelevant information. The EEOC guidelines allow for limited religious information gathering where there is an **objective reason** to doubt a claimant's religious beliefs.[1] The Defendant did not have an objective basis to question Ms. Isensee's religious beliefs at the time of her termination and because she has filed a lawsuit to protect her rights does not provide the Defendant the opportunity to "do through the back door what they could not do through the front door."

---

[1] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws ¶L.2.

19

**REQUEST FOR PRODUCTION NO. 6:**

All documents retained on your computer(s), electronic storage device (hard drive, pin drive, etc.) cellular-telephone(s), smartphone, and personal digital assistant(s) (e.g., Palm Pilot, BlackBerry, etc.), including, but not limited to, e-mails, instant messages, or text messages between you and any other person referring, reflecting or relating to your attendance in church since January 1, 2021.

**RESPONSE:**

As noted above, Ms. Isensee does not keep her texts and does not believe that she has any of the above requested documents. However, as far as any information that she may have, *arguendo*: the Plaintiff objects. The request for documents is overbroad and seeks protected information.

Objection per reasoning in Request for Production No. 5.

**REQUEST FOR PRODUCTION NO. 7:**

Produce each and every calendar, journal, diary, notation, or any other document, including electronic documents and e-mails, in which you recorded information relating to Defendant, the Exemption Request, any allegation in the Complaint, or any claimed item of damage.

**RESPONSE:**

There are no diaries or the like dealing with this subject.

See Exhibits A & B

See Exhibit E for pay stubs from Industry Labs as well as Tax docs

**REQUEST FOR PRODUCTION NO. 8:**

All documents that you believe refer, reflect or relate to Count I in the Complaint.

**RESPONSE:**

See Exhibits A, B, C, and G

**REQUEST FOR PRODUCTION NO. 9:**

All documents that you believe refer, reflect or relate to Count II in the Complaint.

**RESPONSE:**

See No. 8 as the evidence to prove Count I and Count II are identical.

**REQUEST FOR PRODUCTION NO. 10:**

All documents that you believe refer, reflect or relate to any Vaccination that you have received since January 1, 2000.

**RESPONSE:**

Ms. Isensee has not received any vaccines since 1/1/2000

**REQUEST FOR PRODUCTION NO. 11:**

All documents that you believe refer, reflect or relate to your job duties as a Biosimilar Account Specialist.

**RESPONSE:**

See Exhibit C

**REQUEST FOR PRODUCTION NO. 12:**

All documents that you believe refer, reflect or relate to your compliance with the Vaccination Policy.

**RESPONSE:**

See Appendix A & B

**REQUEST FOR PRODUCTION NO. 13:**

All documents that you believe refer, reflect or relate to facts set forth in the Exemption Request.

**RESPONSE:**

See Exhibit A, B & G

**REQUEST FOR PRODUCTION NO. 14:**

All documents and communications referring, reflecting, or relating to communications you have had with Defendant's employees regarding the Vaccination Policy.

**RESPONSE:**

See Exhibit B

**REQUEST FOR PRODUCTION NO. 15:**

All documents and communications referring, reflecting, or relating to communications you have had with Defendant's employees regarding the Denial Letter.

**RESPONSE:**

See Exhibit B

**REQUEST FOR PRODUCTION NO. 16:**

91204222.1                                        22

All documents and communications referring, reflecting, or relating to communications you have had with Defendant's employees regarding the Exemption Request.

**RESPONSE:**

See Exhibit A& B


**REQUEST FOR PRODUCTION NO. 17:**

All documents and communications you submitted to Defendant in response to Exhibit A to the Complaint.

**RESPONSE:**

See Exhibit B


**REQUEST FOR PRODUCTION NO. 18:**

All declarations, affidavits, or sworn or unsworn statements from any individual you consider or believe to have knowledge relevant to the claims in your Complaint.

**RESPONSE:**

None


**REQUEST FOR PRODUCTION NO. 19:**

All documents or other tangible items that refer, reflect or relate to any efforts you have taken to secure employment or work since January 1, 2021, including but not limited to unemployment compensation applications and materials, employment applications, resumes and communications between you and prospective employers.

**RESPONSE:**

See Exhibit D

91204222.1                                    23

**REQUEST FOR PRODUCTION NO. 20:**

All documents that refer, reflect or relate to the amount and source of income received by or accruing to you from January 1, 2021, through the conclusion of this lawsuit, including, but not limited to, federal and state income tax returns, W-2 forms, payroll check stubs, bank deposit slips, bank statements, unemployment and workers' compensation documents, and state or federal welfare or disability benefits documents.

**RESPONSE:**

See Exhibit E

**REQUEST FOR PRODUCTION NO. 21:**

All documents which refer, reflect or relate to each item of damages that you allege was caused by the actions of Defendant, or any of Defendant's agents, including, without limitation, any documents concerning attorneys' fees for this action.

**RESPONSE:**

See Appendix E & Int # 15. Otherwise: Objection, the only documents that meet the above requirements is either work product or protected via attorney-client privilege. Other than those mentioned in the objection, there are no such documents outside of answers to Interrogatories 15 and Appendix E.

**REQUEST FOR PRODUCTION NO. 22:**

All documents you have transmitted to or received from any federal, state or local governmental or administrative entity, that refer, reflect or relate to Defendant, any allegation in the Complaint, or any claimed item of damage.

**RESPONSE:**

91204222.1                                    24

See Exhibit F

**REQUEST FOR PRODUCTION NO. 23:**

All documents that you receive in response to any subpoena that you issue in this case.

**RESPONSE:**

None

**REQUEST FOR PRODUCTION NO. 24:**

All documents that refer or relate to any other charges, complaints, lawsuits, or other legal proceedings that you have filed, or in which you have ever been involved, including, but not limited to, any document(s) indicating the identity of your attorney(s) in that matter, the attorney(s) for the opposing parties in that matter, any pleadings or other documents filed with the Court in that matter and any deposition transcripts in that matter.

**RESPONSE:**

None

**REQUEST FOR PRODUCTION NO. 25:**

All documents that refer, reflect, or relate to any prior criminal conviction or criminal record including, but not limited to, any document(s) indicating the type of offense committed, any pleadings or other documents filed with the Court in that matter, and any document indicating any fine or prison sentence entered against you.

**RESPONSE:**

None

**REQUEST FOR PRODUCTION NO. 26:**

All documents sent to or received from any experts for purposes of or related to this action, including, but not limited to, expert reports, opinion letters, or any documents reviewed or relied upon by the experts.

**RESPONSE:**

None

**REQUEST FOR PRODUCTION NO. 27:**

For each expert witness you have retained in connection with this action, such witness's curriculum vitae.

**RESPONSE:**

None

**REQUEST FOR PRODUCTION NO. 28:**

All documents that you intend to introduce as exhibits at trial or depositions in this case, or that you intend to use as exhibits to any motion filed in this action.

**RESPONSE:**

See Exhibits A, B, G, EEOC guidelines[2]

---

[2] https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws

Plaintiff reserves the right to update this list as there could be exhibits used to respond to motions currently unknown, such as case law, that may be referenced in the future.

## REQUEST FOR PRODUCTION NO. 29:

All documents that Plaintiff identified in response to Defendant's Interrogatories that have not been produced in response to any other document request stated herein.

## RESPONSE:

None

## REQUEST FOR PRODUCTION NO. 30:

All documents that Plaintiff reviewed or relied on in answering Defendant's Interrogatories that have not been produced in response to any other document request stated herein.

## RESPONSE:

N/A

## REQUEST FOR PRODUCTION NO. 31:

All documents that Plaintiff relied upon in denying any of Defendant's Admissions that have not been produced in response to any other document request stated herein.

## RESPONSE:

N/A

## REQUEST FOR PRODUCTION NO. 32:

All documents that Plaintiff relied upon in drafting your Complaint that have not been produced in response to any other document request stated herein.

**RESPONSE:**

N/A

**REQUEST FOR PRODUCTION NO. 33:**

All documents that refer, reflect, or relate to any emotional harm that you allege was caused by Defendant's actions.

**RESPONSE:**

N/A

## REQUEST FOR ADMISSIONS

### REQUEST FOR ADMISSION NO. 1

Admit that you were aware that Defendant's policies prohibited religious discrimination.
**ANSWER:**
 Admit

### REQUEST FOR ADMISSION NO. 2

Admit that you never complained of religious discrimination during your employment with Defendant prior to January 1, 2021.
**ANSWER:**
 Admit

### REQUEST FOR ADMISSION NO. 3

Admit that you were aware of Defendant's complaint procedures during your employment with Defendant.
**ANSWER:**
Admit

### REQUEST FOR ADMISSION NO. 4

Admit that the Biosimilar Account Specialist position is customer-facing.
**ANSWER:**

Admit
### REQUEST FOR ADMISSION NO. 5

Admit that you visited customers as a Biosimilar Account Specialist.
 **ANSWER:**
 Admit

### REQUEST FOR ADMISSION NO. 6

Admit that many of Defendant's customers, vendors, and partners implemented vaccination policies.
**ANSWER:**
Admit in part. Ms. Isensee confirmed every customer, vendor and partner she visited provided for religious exemptions to the Covid-19 vaccine.

### REQUEST FOR ADMISSION NO. 7

Admit that Defendant had a legal obligation to effectively respond to the COVID-19 Pandemic.

**ANSWER:**

Ms. Isensee does have the knowledge necessary to admit or deny claim.

**REQUEST FOR ADMISSION NO. 8**

Admit that many of Defendant's customers, vendors and partners were mandated by federal, state or local law to implement vaccination policies.
**ANSWER:**
Ms. Isensee does not have the knowledge necessary to admit or deny claim.


**REQUEST FOR ADMISSION NO. 9**

Admit that your Exemption Request was based on your personal views of the efficacy of the COVID-19 Vaccination.
**ANSWER:**

Deny

**REQUEST FOR ADMISSION NO. 10**

Admit that your Exemption Request was properly denied.
**ANSWER:**

Deny
**REQUEST FOR ADMISSION NO. 11**

Admit that Defendant conferred with you regarding the Exemption Request.
**ANSWER:**

Admit it part. Ms. McAndrews did respond to a limited question about reasons for denial, however, Ms. Isensee asked numerous follow-up questions that went unanswered.


**REQUEST FOR ADMISSION NO. 12**

Admit that you were given the opportunity to submit evidence in support of the Exemption Request.
**ANSWER:**

Admit
**REQUEST FOR ADMISSION NO. 13**

Admit that the Vaccination Policy was applied to all of Defendant's employees.

**ANSWER:**
Ms. Isensee does not have the knowledge necessary to admit or deny claim.

**REQUEST FOR ADMISSION NO. 14**

Admit that you are aware of other of Defendant's employees who had exemption requests under the Vaccination Policy denied.

**ANSWER:**
Admit

**REQUEST FOR ADMISSION NO. 15**

Admit that you are aware of other of Defendant's employees who had exemption requests under the Vaccination Policy approved.
**ANSWER:**
Deny

**REQUEST FOR ADMISSION NO. 16**

Admit that you agree that all employees holding customer facing positions at Defendant required vaccinations.
**ANSWER:**
Ms. Isensee does not have the knowledge necessary to admit or deny claim.

**REQUEST FOR ADMISSION NO. 17**

Admit that you were given the opportunity to seek out other available positions within Defendant after you decided not to get vaccinated.
**ANSWER:**
Admit

**REQUEST FOR ADMISSION NO. 18**

Admit that you did not submit any additional documents or information in response to Exhibit A to the Complaint.
**ANSWER:**
Admit

**REQUEST FOR ADMISSION NO. 19**

Admit that you have no evidence of discrimination based on your religion.
**ANSWER:**
Deny

REQUEST FOR ADMISSION NO. 20

Admit that you have not suffered any damages as a result of the Vaccination Policy. ANSWER:

Deny

Respectfully submitted,

James Maus
c/o Drake Law
5247 Madison Pk
Independence, KY 41051
Ohio Bar No. 0098245
attyjamesmaus@aol.com
bkennedy@ericdeters.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 21ˢᵗ day of April, 2023, the foregoing was via email upon the following:

David A. Campbell
LEWIS BRISBOIS BISGAARD & SMITH LLP
1375 East 9th street, Suite 2250
Cleveland, Ohio 44114
Phone: (216) 298-1262 / Fax: (216) 344-9421

david.a.campbell@lewisbrisbois.com

Bradley S. Fyffe (0098055)
LEWIS BRISBOIS BISGAARD & SMITH LLP
250 East Fifth street, Suite 2000
Cincinnati, Ohio 45202
(515) 808-9911 / (513) 808-9912 (Fax)
bradley$yffe@lewisbrisbois.com

Attorney for Defendant



# U.S. COLLEAGUE HANDBOOK

**NOVEMBER 2019**

**EXHIBIT**

5

**Contents**

INTRODUCTION ................................................................................................................ 5
   Welcome to Amplity ....................................................................................................... 5
   Mission Statement .......................................................................................................... 5
   Handbook Purpose and Scope ........................................................................................ 5
   Applicability of Other laws ............................................................................................. 6
   At-Will Notice ................................................................................................................. 6
COMPANY VALUES ........................................................................................................... 6
EMPLOYMENT ................................................................................................................. 7
   Equal Employment ......................................................................................................... 7
   Employment Classifications ............................................................................................ 7
      *Non-Exempt Colleague* .............................................................................................. 7
      *Exempt Colleague* ..................................................................................................... 8
      *Regular Full-Time Colleague* ..................................................................................... 8
      *Regular Part-Time Colleague* ..................................................................................... 8
      *Temporary Colleague* ................................................................................................ 8
   Hiring Relatives .............................................................................................................. 8
CONDUCT AND BEHAVIOR ................................................................................................ 8
   Communication .............................................................................................................. 9
   Corrective Action ........................................................................................................... 9
   General Conduct Guidelines ........................................................................................... 9
   Outside Employment .................................................................................................... 11
   Workplace Relationships .............................................................................................. 11
   Sexual and Other Unlawful Harassment ........................................................................ 12
      *Other Types of Harassment* ..................................................................................... 12
      *Retaliation* .............................................................................................................. 13
      *Enforcement* ........................................................................................................... 13
      *Harassment Complaint Procedure* ........................................................................... 13
   Abusive Conduct .......................................................................................................... 14
COMPENSATION ............................................................................................................ 15
   Pay Periods .................................................................................................................. 15
   Hours of Work .............................................................................................................. 15
   Direct Deposit .............................................................................................................. 15
   Timekeeping ................................................................................................................. 15
   Overtime ...................................................................................................................... 15
   Off-the-Clock Work ...................................................................................................... 16
   Expense Reimbursement .............................................................................................. 16
   Applying for a New Position .......................................................................................... 16
   Authority to Bind the Company ..................................................................................... 16
   Bonus Program ............................................................................................................ 16
   Working from Home / Flextime / Telecommuting .......................................................... 16
BENEFITS AND LEAVE ..................................................................................................... 17
   Holidays ....................................................................................................................... 17
   Paid time Off (PTO) ...................................................................................................... 17

401k ................................................................................................................................ 21
Health, Prescription and Welfare Benefits ................................................................... 21
Continuation of Benefits (COBRA) ............................................................................... 21
   *Colleagues* ................................................................................................................ *21*
   *Qualified Beneficiaries* ........................................................................................... *22*
   *Dependent Children* ................................................................................................. *22*
**FAMILY AND MEDICAL LEAVE** ........................................................................................ **22**
Family and Medical Leave .............................................................................................. 22
Disability Leave .............................................................................................................. 25
Military Leave ................................................................................................................. 25
Un-Qualifying FMLA Leave of Absence ....................................................................... 26
Jury Duty ........................................................................................................................ 26
Witness/Crime Victim Leave ......................................................................................... 27
Bereavement Leave ......................................................................................................... 27
Unpaid Personal Leave ................................................................................................... 27
Parental Leave ................................................................................................................. 27
Colleague Referral .......................................................................................................... 27
**HEALTH, SAFETY, AND SECURITY** ................................................................................ **28**
Tobacco, Smoke and Vapor Free Workplace ................................................................. 28
Drug and Alcohol ........................................................................................................... 28
Employee Assistance Program ....................................................................................... 29
Reasonable Accommodations ........................................................................................ 29
Lactation Accommodation ............................................................................................. 30
Injury and Accident Response and Reporting ................................................................ 30
Workers' Compensation .................................................................................................. 31
Workplace Violence and Security .................................................................................. 31
Driving Safety ................................................................................................................. 31
DUI .................................................................................................................................. 33
Inclement Weather .......................................................................................................... 33
   *Designation of Emergency Closing* ......................................................................... *34*
   *Pay and Leave Practices* .......................................................................................... *34*
   *Other Work Options* ................................................................................................. *34*
**WORKPLACE GUIDELINES** ............................................................................................. **34**
Attendance and Tardiness ............................................................................................... 34
Dress Code ...................................................................................................................... 35
Colleague Privacy ........................................................................................................... 36
Communication with The Press and Media .................................................................... 36
Confidentiality and Ethics .............................................................................................. 37
Inspections and Searches ................................................................................................ 37
Office Equipment Usage ................................................................................................. 37
Electronic Assets Usage ................................................................................................. 37
Social Media ................................................................................................................... 39
   *Retaliation is prohibited* .......................................................................................... *41*
   *Media Contacts* ........................................................................................................ *41*

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-984-9100 or email compliance@amplity.com

*For More Information* .............................................................................................. *41*

Company Phone Usage and Cell Phones for Personal Use ........................................... 41

**EMPLOYMENT SEPARATION** ................................................................................. **41**

Resignation .............................................................................................................. 41

Termination ............................................................................................................. 42

Personal Possessions and Return of Company Property ............................................ 42

Severance ................................................................................................................ 42

**HANDBOOK ACKNOWLEDGEMENT** ....................................................................... **43**

**APPENDIX "A"** ...................................................................................................... **45**

**CODE OF BUSINESS CONDUCT AND ETHICS** ........................................................... **45**

Introduction ............................................................................................................ 45

Respect in the Workplace ......................................................................................... 47

Professionalism ........................................................................................................ 47

Confidential Information .......................................................................................... 47

Insider Trading Policy ............................................................................................... 48

Solicitation and Distribution ..................................................................................... 50

Conflict of Interest ................................................................................................... 50

Software and Font Licensing ..................................................................................... 51

Interacting with Health Care Professionals ................................................................ 51

Business Gifts and Meals -- Receiving ....................................................................... 52

Business Gifts and Meals – Giving ............................................................................. 52

Relationships with Competitors – Antitrust .............................................................. 52

Government Inquiries and Subpoenas ....................................................................... 53

Privacy .................................................................................................................... 54

Document Retention ................................................................................................ 54

Payments to Government Personnel / Foreign Corrupt Practices Act ......................... 54

Conflict of Laws ....................................................................................................... 55

Ethics and Reporting Irregularities ........................................................................... 55

**APPENDIX "B"** ...................................................................................................... **55**

Insurance Carrier Connections .................................................................................. 55

4

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-264-9100 or email compliance@amplity.com

## INTRODUCTION

**Welcome to Amplity**

It is a pleasure to welcome you as a colleague to Amplity, Inc. ("Amplity" or the "Company"). You are joining an organization with a reputation of providing unique commercialization solutions for our clients. Credit for our outstanding reputation comes from the hard work and dedication of every one of our colleagues and we hope that you will find satisfaction and take pride in your work here.

This handbook has been written to clearly state the Company's expectations and answer some of the questions you may have about policies that apply to the colleagues of Amplity.  Please read this handbook thoroughly.

The information contained in this handbook addresses many, but not all, of the aspects of employment with Amplity and is intended for your guidance.  This handbook supersedes all prior versions or its affiliated and related companies however Amplity retains the right to formulate policy and procedural changes to meet its business needs in accordance with applicable laws.  Amplity reserves the right to modify or amend its policies, procedures, programs, and this handbook at any time.

In addition, colleagues are strongly encouraged to read, retain for reference, and fully comply with this handbook, along with Company policies, training, business practices, and Code of Conduct.  Colleagues who do not comply with the expectation and direction set forth in these documents are subject to progressive discipline up to and including termination of employment (herein referenced as "discipline").

**Mission Statement**

Amplity is the true partner of global healthcare companies who builds transformational solutions by challenging the boundaries of commercialisation strategies to improve the lives of patients.

**Handbook Purpose and Scope**

This handbook has been prepared to inform colleagues about Amplity's philosophy, employment practices, policies, and the benefits provided to our valued colleagues, as well as the conduct expected from them. While this handbook is not intended to be a contract, it does include some important guidelines which colleagues should know. Except for the at-will employment provisions, the handbook can be amended at any time.

This handbook supersedes and replaces all previous handbooks. No one, other than authorized management, may alter or modify any of the policies in this handbook. No statement or promise by a manager, or designee is to be interpreted as a change in policy, nor will it constitute an agreement with a colleague.

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-304-9100 or email
compliance@amplity.com

Case: 3:22-cv-00370-TMR Doc #: 24-1 Filed: 04/01/24 Page: 69 of 130 PAGEID #: 220

We ask that colleagues read this guide carefully, become familiar with the Company and our policies, and refer to it whenever questions arise.

**Applicability of Other laws**
This handbook applies to all Amplity colleagues in the United States. There may be, therefore, state or local laws that affect the application of certain policies contained herein. It is the intent of the Company to comply with all federal, state and local laws, and to the extent there is a conflict between a policy in this handbook and such a law, the law will prevail and will be applied. Additionally, nothing in this handbook is intended to infringe upon colleague rights under Section 7 of the National Labor Relations Act (NLRA) or be incompatible with the NLRA.

**At-Will Notice**
Colleagues are not hired for any definite or specified period of time even though wages are paid regularly. Colleagues are at-will with the Company and their employment can be terminated at any time, with or without cause and with or without prior notice. This policy cannot be changed by any oral modifications. There have been no implied or verbal agreements or promises to a colleague that they will be discharged only under certain circumstances or after certain procedures are followed. There is no implied employment contract created by this handbook or any other Company document or written or verbal statement or policy.

**COMPANY VALUES**

Amplity colleagues must strive to exemplify our core EPIIC values in every interaction and in every task. These values are:

**Excellence** – We set high standards. We are solution-focused and achieve outstanding results with a professional and positive attitude.
**Passion** – We love what we do. Our energy inspires, engages and motivates others.
**Integrity** – We are open, honest and transparent. We do the right thing with courage and understanding.
**Innovation** – Our ideas set us apart. We are curious and bold and challenge traditional ways of working.
**Collaboration** – We are better together. We actively seek the participation of others to achieve greater outcomes.

This Handbook should be read in the context of these values. If there is a situation that is not directly addressed by this Handbook, then any decisions will be guided by our EPIIC Values.

**EMPLOYMENT**

**Equal Employment**
It is the policy of the Company to provide equal employment opportunities to all qualified individuals and to administer all aspects and conditions of employment without regard to the following:

- Race
- Color
- Age
- Sex
- Sexual orientation
- Gender
- Gender identity
- Religion
- National origin
- Pregnancy
- Physical or mental disability
- Military or veteran status
- Citizenship and/or immigration status
- Genetic information, including family medical history
- Family care leave status
- Use of a guide or support animal
- Any other protected class, in accordance with applicable federal, state, and local laws

The Company takes allegations of discrimination, intimidation, harassment and retaliation very seriously and will promptly conduct an investigation when warranted.

Equal employment opportunity includes, but is not limited to, employment, training, promotion, demotion, transfer, leaves of absence, compensation and termination. Improper interference with the ability of Amplity colleagues to perform their job duties will not be tolerated.

**Employment Classifications**
The Company has established the following classifications for compensation and benefit purposes only. A colleague's manager will inform the colleague of their classification, status, and responsibilities at the time of hire, re-hire, promotion or at any time a change in status occurs. These classifications do not alter the employment at-will status.

<u>Non-Exempt Colleague</u>
A non-exempt colleague is someone who, because of certain job duties and salary level is eligible to receive overtime pay (time and a half) for working more than 40 hours in a work week.

<u>Exempt Colleague</u>
An exempt colleague is someone who, because of certain job duties and salary level is not eligible to receive overtime pay.

<u>Regular Full-Time Colleague</u>
A colleague who is scheduled to work no less than 100% of the scheduled work hours in a workweek on a fixed work schedule (not less than 40 hours). The colleague may be exempt or non-exempt and is generally eligible for all employment benefits offered by the Company.

<u>Regular Part-Time Colleague</u>
A colleague who is scheduled to work less than 40 hours in a workweek and may be eligible for some benefits if they are scheduled to regularly work at least 30 hours a week.

<u>Temporary Colleague</u>
A colleague who is scheduled to work on a specific need of the Company. The colleague will not receive any benefits.

**Hiring Relatives**
The Company can decide to hire family members of current or past colleagues, but family members cannot be within another family member's organization. The Company reserves the right to transfer or terminate any family member that is deemed to be in a position of actual or apparent conflict.

For purposes of this policy, "relative" is defined as spouse, domestic partner, child, child of domestic partner, parent, sibling, grandparent, grandchild, aunt, uncle, first cousin, or corresponding in-law or "step" relation.

The involvement of your relatives with competitors, suppliers, potential suppliers, or clients may result in an actual or apparent conflict of interest.  As a general rule, you should not do business with your relatives because it creates an appearance of favoritism and unfairness.  Such an appearance could compromise our reputation for dealing with our suppliers and Clients on the basis of quality, service, price, and other appropriate factors.

In situations where a business relationship with an enterprise employing a relative of an Amplity colleague seems appropriate, all relevant circumstances must be disclosed to and approved by the colleague's manager and the Amplity Legal department prior to the undertaking of such a relationship or transaction.

**CONDUCT AND BEHAVIOR**

1.  To report a compliance or legal issue, call the Compliance Helpline at 1-800-364-9100 or email compliance@amplity.com

Case: 3:22-cv-00370-TMR Doc #: 24-1 Filed: 04/01/24 Page: 72 of 130 PAGEID #: 223

**Communication**

Communication is a two-way street. Amplity has an open-door policy whereby any colleague is encouraged to speak to any manager on any matter. Amplity leaders are dedicated to being available and attentively listening to colleagues. The bottom line is that we cannot implement change if we are unaware of the need for change.

**Corrective Action**

A high level of job performance is expected of each and every colleague. In the event that a colleague's job performance does not meet the standards established for the position, colleagues should seek assistance from their manager to attain an acceptable level of performance. If colleagues fail to respond to or fail to make positive efforts toward improvement, corrective action may ensue, including termination of employment.

It is the policy of the Company to regard discipline as an instrument for developing total job performance rather than as punishment. Corrective action is one tool the Company may select to enhance job performance. The Company is not required to take any disciplinary action before making an adverse employment decision, including discharge. Corrective action may be in the form of a written or verbal warning, notice(s) of inadequate job performance, suspension, discharge or in any combination of the above, if the Company so elects. The Company reserves its right to discipline, and the manner and form of discipline, at its sole discretion.

If colleagues violate established Amplity procedures, guidelines, or exhibit behavior that violates commonly accepted standards of honesty and integrity, Amplity Values, or creates an appearance of impropriety, the Company may elect to administer disciplinary action.

**General Conduct Guidelines**

Orderly and efficient operation of the Company requires that colleagues maintain proper standards of conduct and observe certain procedures. These guidelines are not intended to be all-inclusive. Amplity views the following as examples of inappropriate behavior:

1.  Failure to follow the policies outlined in this handbook.
2.  Negligence, carelessness or inconsiderate treatment of Company clients and/or their matters/files.
3.  Theft, misappropriation or unauthorized possession or use of property, documents, records or funds belonging to the Company, or any client or colleague; removal of same from Company premises without authorization.
4.  Possession of a firearm or other weapon on Company premises (which includes parking areas) or while on Company business.
5.  Sleeping on the job.
6.  Failure to adhere to Amplity's Code of Conduct Policy

7. Obtaining unauthorized confidential information pertaining to clients or colleagues.
8. Changing or falsifying client records, Company records, personnel or pay records, including time sheets without authorization.
9. Willfully or carelessly damaging, defacing or mishandling property of a client, the Company or other colleagues.
10. Entering Company premises without authorization.
11. Willfully or carelessly violating security, safety, or fire prevention equipment or regulations.
12. Unauthorized use of a Company vehicle for personal business.
13. Conduct that is illegal under federal, state, or local law.
14. Creating a disturbance on Company premises.
15. Use of foul or abusive language, threatening, intimidating, coercing, or interfering with the job performance of other colleagues.
16. Any rude, discourteous or un-businesslike behavior, on or off Company premises, and which adversely affects the Company services, operations, property, reputation or goodwill in the community or interferes with work.
17. Insubordination or refusing to follow instructions from a manager; refusal or unwillingness to accept a job assignment or to perform job requirements.
18. Failure to observe scheduled work hours, failure to contact a manager in the event of illness or any absence within 60 minutes of the scheduled start of work; failure to report to work when scheduled; abuse of sick leave or any other leave of absence.
19. Leaving the office during work hours without notification/ and or manager approval; unauthorized absence from assigned work area during regularly scheduled work hours.
20. Recording time for another colleague or having time recorded to or by another colleague.
21. Use or possession of intoxicating beverages or illegal use or possession of narcotics, marijuana or drugs (under state, federal or local laws), on Company premises during working hours or reporting to work under the influence of intoxicants or drugs so as to interfere with job performance.
22. The use of any "open flame" including candles and incense.
23. Illegal gambling on Company premises.
24. Soliciting, collecting money, vending, and posting or distributing bills or pamphlets during working hours in work areas.
25. Falsification of one's employment application, medical or employment history.
26. Failure to cooperate in a reasonable investigation.
27. Performance which in the Company's sole discretion does not meet the requirements of the position.
28. Conduct which the Company deems reflects adversely on the colleague or the Company in its sole discretion.

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-324-9160 or email compliance@amplity.com

Case: 3:22-cv-00370-TMR Doc #: 24-1 Filed: 04/01/24 Page: 74 of 130 PAGEID #: 225

**Outside Employment**

Colleagues are expected to devote the time and attention necessary to perform their assigned job duties. Colleagues may engage in outside work or activities as long as it does not interfere or create a conflict of interest, or have the appearance of interfering or creating a conflict of interest, with the colleague's ability to satisfactorily perform their job duties and meet the scheduling demands and other work requirements of the Company, or fulfill the responsibilities set forth by the Company.  If the Company determines that outside work or activity is interfering with Company performance, the colleague may be asked to terminate or modify the outside work/activity if he/she wishes to remain with the Company.  No colleague may take an outside job, either for pay or as a donation of personal time, with a customer or competitor of the Company. No colleague may work on his/her own if it competes or interferes in any way with the services Amplity provides to its Clients.

If the Company determines such competition of interference has occurred, the Company may opt to terminate the colleague's employment if Amplity, at its sole discretion, determines that the circumstances of the colleague's violation of this policy renders continued employment inappropriate.

A colleague may seek an advance determination from the Legal department if their outside work or activity would interfere with their ability to satisfactorily perform their job duties.

**Workplace Relationships**

Except as provided below, Company colleagues may develop friendships, date, and have relationships both inside and outside of the workplace as long as the relationships do not negatively impact work. Any relationship that interferes with the Company culture of teamwork, the harmonious work environment or the productivity of either colleague, will be addressed by management which may include applying the progressive discipline policy.  To be very clear, contact between co-workers outside of the workplace and during non-working time can have effects in the workplace and therefore all such contacts are subject to this policy.

Any behavior that negatively affects the workplace that arises because of personal relationships will not be tolerated.

The exception to this policy relates to managers.  When a manager enters into a dating, romantic, or sexual relationship with a colleague who is within their organization, there is often a perception or claim that such a relationship is or was evidence of force, favoritism, misuse of authority, or sexual harassment.  Accordingly, it is against Company policy for a dating, romantic, or sexual relationship to exist between a manager and someone who is within their organization.  If a manager finds him or herself wanting to engage in such a relationship, he or she should contact his or her Human Resources Manager to see if there is any way the reporting lines can be changed

11

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-984-9100 or email compliance@amplity.com

Case: 3:22-cv-00370-TMR Doc #: 24-1 Filed: 04/01/24 Page: 75 of 130 PAGEID #: 226

but there are no guarantees. If a relationship is uncovered that has not been reported, the manager is subject to disciplinary action.

Additionally, any alteration of a colleague's terms and conditions of employment (such as pay raises, promotions, and advancement) that is made for any reason other than merit in the best interests of the Company is prohibited.

**Sexual and Other Unlawful Harassment**

Sexual harassment and unlawful harassment are prohibited behavior, is against Company policy, and will not be tolerated. The Company is committed to providing a work environment free of inappropriate and disrespectful behavior, intimidation, communications and other conduct directed at an individual because of their sex, including conduct that may be defined as sexual harassment.

Applicable federal and state law defines sexual harassment as unwanted sexual advances, requests for sexual favors, or visual, verbal, or physical conduct of a sexual nature when: (1) submission of the conduct is made a term or condition of employment; or (2) submission to or rejection of the conduct is used as basis for employment decisions affecting the individual; or (3) the conduct has the purpose or effect of unreasonably interfering with the colleague's work performance or creating an intimidating, hostile, or offensive working environment. The following list contains examples of prohibited conduct. They include, but are not limited to:

- Unwanted sexual advances;
- Offering employment benefits in exchange for sexual favors;
- Making or threatening reprisals after a negative response to sexual advances;
- Visual conduct such as leering, making sexual gestures, or displaying sexually suggestive objects, pictures, cartoons, or posters;
- Verbal conduct such as making or using derogatory comments, epithets, slurs, sexually explicit jokes, or comments about any colleague's body or dress;
- Verbal abuse of a sexual nature, graphic verbal commentary about an individual's body, sexually degrading words to describe an individual, or suggestive or obscene letters, notes, or invitations;
- Physical conduct such as touching, assault, or impeding and/or blocking movements;
- Retaliation for reporting harassment or threatening to report harassment.

Sexual harassment on the job is unlawful whether it involves coworker harassment, harassment by a manager, or harassment by persons doing business with or for the Company, such as clients, customers or vendors.

<u>Other Types of Harassment</u>

Prohibited harassment on the basis of race, color, religion, national origin, ancestry, physical or mental disability, veteran status, sexual orientation, age, genetic

information, or any other basis protected under local, state or federal law, includes behavior similar to sexual harassment, such as:

- Verbal conduct such as threats, epithets, derogatory comments, or slurs;
- Visual conduct such as derogatory posters, photographs, cartoons, drawings, or gestures;
- Physical conduct such as assault, unwanted touching, or blocking normal movement;
- Retaliation for reporting harassment or threatening to report harassment.

Retaliation

It is against Company policy and unlawful to retaliate in any way against anyone who has in good faith lodged a harassment complaint, has expressed a concern about harassment, including sexual harassment, or has cooperated in a harassment investigation. Therefore, the initiation of a complaint in good faith will not under any circumstances be grounds for disciplinary action.

Enforcement

All managers are responsible for:

- Reporting any complaints of misconduct to Human Resources or Legal so they may be investigated and resolved internally (even if the complainant says they do not wish to make a "formal" report);
- Taking and/or assisting in prompt and appropriate corrective action when necessary to ensure compliance with the policy, and;
- Conducting themselves in a manner consistent with the policy.

Harassment Complaint Procedure

The Company's complaint procedure provides for an immediate, thorough and objective investigation of any claim of unlawful or prohibited harassment, appropriate disciplinary action against one found to have engaged in prohibited harassment, and appropriate remedies for any victim of harassment. A claim of harassment may exist even if the colleague has not lost a job or some economic benefit.

If you feel you have been subjected to the conduct prohibited under this policy, or who has knowledge of such conduct, must report this information as soon as possible. A colleague may make a report to:

1. Manager
2. Human Resources
3. Compliance Help Line: 1-800-344-9100 (Toll Free, 24/7)
4. Compliance Help Email: compliance@amplity.com

Colleagues are not required to report any prohibited conduct to a manager who may be hostile, who has engaged in such conduct, who is a close associate of the person who has engaged in the conduct in question, or with whom the colleague is uncomfortable discussing such matters. Complaints regarding harassment or retaliation may be reported verbally or in writing. Any individual who makes a complaint that is not in good faith or demonstrated to be intentionally false may be subject to discipline.

All reported incidents of prohibited harassment will be promptly investigated. When the investigation is complete, a determination regarding the reported harassment will be made and appropriate communication will be made to the parties involved. During the investigation, confidentiality will be preserved to the fullest extent possible without compromising the Company's ability to conduct a good faith and thorough investigation.

If the Company determines that prohibited harassment has occurred, the Company will take effective remedial action commensurate with the circumstances. Appropriate action will also be taken to deter any future harassment. If a complaint of prohibited harassment is substantiated, appropriate disciplinary action, up to and including discharge, will be taken.

The Company recognizes that actions that were not intended to be offensive may be taken as such. A colleague who believes that they have been subjected to harassment or discrimination by anyone is encouraged, but not required, to promptly tell the person that the conduct is unwelcome and ask the person to immediately stop the conduct. A person who receives such a request must summarily comply with it and must not retaliate against the colleague for rejecting the conduct. The Company encourages, but does not require, individuals to take this step before utilizing the above complaint procedure.

**Abusive Conduct**
Abusive conduct means malicious conduct of an employer or colleague in the workplace that a reasonable person would find hostile, offensive, and unrelated to an employer's legitimate business interests. Abusive conduct may include repeated infliction of verbal abuse, such as the use of derogatory remarks, insults, and epithets, verbal or physical conduct that a reasonable person would find threatening, intimidating, or humiliating, or the gratuitous sabotage or undermining of a person's work performance. A single act may be enough to constitute abusive conduct if it is especially severe and egregious.

The Company considers abusive conduct in the workplace unacceptable and will not tolerate it under any circumstances. Colleagues should report any abusive conduct to a manager with whom colleagues are comfortable speaking, the Compliance department or to Human Resources. All complaints will be treated seriously and investigated promptly. During the investigation process the Company will attempt to maintain confidentiality to the fullest extent possible.

It is a violation of Company policy to retaliate or otherwise victimize a colleague who makes a complaint or a witness who serves in the investigation of the abusive conduct allegation.

**COMPENSATION**

**Pay Periods**
The standard seven-day payroll workweek for the Company will begin at 12:01 a.m. Monday and end at midnight the following Sunday night. *The designated pay period for all colleagues is bi-weekly. All required deductions such as federal, state, and local taxes; social security laws and regulations; other applicable laws and regulations; and all authorized voluntary deductions, such as health insurance contributions, will be withheld automatically from colleague's paychecks.  All pay statements are available through the ADP website.  Every colleague should review their paystub for accuracy on a regular basis.  If you find an error, report it to the Payroll department so they can take the necessary steps to research the issue.

*This is the new policy effective January 1, 2020. For information on the current policy, contact Human Resources.

**Hours of Work**
The Company's core business hours are Monday to Friday, 8am to 5pm.  Colleagues are expected to be at their work area, ready to work in accordance to their specific scheduled time. Colleagues will be given their core hours upon hire and at the time of any change in position. If the normal core hours are changed or if the Company changes its operating hours, colleagues will be given written notice to facilitate any personal planning.

**Direct Deposit**
Direct deposit of your pay is available and recommended to aid in the efficient disbursement of your pay and potentially eliminate delayed or lost mail.

**Timekeeping**
Non-exempt colleagues are required to clock in/out for time off and other leave tracking purposes.  Exempt colleagues are required to track their time by project for client billing and tracking.

**Overtime**
The Company complies with all applicable federal and state laws with regard to payment of overtime work. Non-exempt colleagues are paid overtime at the rate of one and one-half times the regular rate of pay for all hours worked over 40 in a work week.

Colleagues are required to work overtime when assigned. Non-exempt colleagues are not permitted to work overtime or unscheduled time without prior authorization from

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-294-9100 or email compliance@amplity.com

Case: 3:22-cv-00370-TMR Doc #: 24-1 Filed: 04/01/24 Page: 79 of 130 PAGEID #: 230

their manager. This includes clocking in early, clocking out late, or working through the scheduled lunch period. Working unauthorized overtime or the refusal or unavailability to work overtime is not acceptable work performance, and is subject to discipline, including but not limited to termination.

**Off-the-Clock Work**
Non-exempt colleagues must accurately record all time worked, regardless of when and where the work is performed. Off-the-clock work (engaging in work assignments or duties that are not reported as time worked) is prohibited. No member of management may request, require, or authorize non-exempt colleagues to perform work without compensation. This includes checking email on personal or work issued devices after work hours. Any possible violations should be reported promptly to a manager or member of management.

**Expense Reimbursement**
Refer to Amplity's Travel & Expense policy posted on the Team Amplity site.

**Applying for a New Position**
Colleagues may apply for another posted position in the Company. Colleagues have no seniority, preference or bumping rights over any other colleague or outside applicant, and the Company has no obligation to transfer any colleague who applies for another position.  For those colleagues in a client contracted role, they are required to work with their team for a period of 18 months before applying or transferring to a new team/client.  Any exception to this 18-month rule must approved by the applicable Amplity HR Leader for the business line.

**Authority to Bind the Company**
Unless given authority by the Company in writing, no Colleague has the right to bind the Company to any promise, contract or obligation within or outside the Company.

**Bonus Program**
Certain colleagues are eligible to participate in Company sponsored bonus programs. Consult with your manager or Human Resources to determine eligibility and the details of the applicable program.

**Working from Home / Flextime / Telecommuting**
The Company may make flexible work arrangements for colleagues whose departments and jobs are suited to it. With senior management, the department manager's approval, and based on business needs, you may be allowed to begin and end your workday earlier or later than "normal working hours" or arrange to telecommute. A flexible work arrangement is a benefit, not a privilege.  To maintain a flexible work arrangement, colleagues must be meeting performance expectations, ensure business needs are met and adhere to attendance and punctuality policies. Colleagues with unsatisfactory

performance or who are on a performance improvement plan may lose any flexible work arrangements previously granted.

Flextime and telecommuting are strictly at the discretion of senior management and are neither a Company-wide benefit nor an entitlement.

The following guidelines apply to telecommuting arrangements:

- Telecommuting does not change the conditions of employment or required compliance with policies;
- A colleague's compensation and benefits will not change as a result of telecommuting;
- A specific work schedule, including days, hours and core hours, must be agreed upon in advance;
- Colleagues must be on site as necessary to attend meetings, training sessions, or similar events or occurrences;
- Colleagues must maintain a normal work load;
- Colleagues must have a safe, alternate work location suitable for the performance of work, including internet access, telephone facilities, a place to uninterrupted work conversations, and a general lack of distractions; and
- Colleagues need to meet regularly with their manager (at least once per quarter or as performance dictates) to review progression of telecommuting and discuss continuance.

**BENEFITS AND LEAVE**

**Holidays**

Regular full-time colleagues are entitled to paid holidays observed by the Company.  The Company will announce the list of applicable holiday days prior to the start of each calendar year.  The Company reserves the right to update and change their holiday calendar on an annual basis.

No holiday pay will be paid to a colleague who is on an unpaid status, on any leave or absent due to workers' compensation.

**Paid time Off (PTO)**

**Eligibility**

Full-time and part-time colleagues are eligible for vacation time.  Temporary colleagues and interns are not eligible for paid vacation time.

**Vacation Accrual**

All regular full-time colleagues are eligible to accrue vacation time, up to the yearly maximum based on their tenure with the Company.  Part-time colleagues accrue

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-204-9100 or email compliance@amplify.com

vacation on a prorated basis. Vacation days are accrued on a monthly basis for each full month worked. Vacation time is posted to the colleague's accrued paid time off balance after completing each full month of service.

NEW HIRES: Vacation accrual begins on the first day of the month after you are hired, and your annual accrual is prorated to your date of hire. If a colleague is hired on the first of the month, he/she will accrue vacation time after completing that month of service. Colleagues who begin employment after the first of the month will begin to accrue vacation at the completion of the subsequent month following the date of hire.

Examples:  A colleague who is hired March 1st will begin to accrue vacation in March. A colleague who is hired on March 2nd through March 31st will start accruing his/her vacation on April 30; the last day of the full completed month.

RE-HIRES: If your employment ends and you are rehired within 30 days, your previous service history will be credited for the purpose of calculating vacation. All other policy provisions apply. Colleagues having interruptions in service which exceed 30 days, start as new hires, with no previous service credit for the purpose of calculating vacation.

**Part Time Accrual Schedule**
Vacation benefits for part time colleagues are prorated based on the number of hours worked per week.

**Colleague Status Changes**
Vacation time is not accrued while a colleague is on a disability, military, family, or any other unpaid leave of absence or a paid leave of absence other than vacation, sick, holiday, and paid bereavement. A colleague who receives increased vacation benefits due to a promotion or length of service will receive additional vacation accrual on the first of the month following the month the change becomes effective.

**Payment of Vacation**
Vacation pay is computed at the current salary rate in effect at the time the vacation is taken and not part of any overtime calculation. Colleagues are not permitted to receive pay in lieu of vacation time.

**Scheduling Vacation**
Your manager is responsible for approving your vacation. A colleague requesting to take vacation time must submit a Time Off Request in in our Time Reporting System. The Company will deduct the unaccrued vacation days from your last paycheck, should your employment with the Company be terminated prior to accruing the vacation days used. You and your manager are responsible for reviewing available vacation days in the Time Reporting System and managing appropriately. Vacation time must be used in either four (4) or (8) hour increments. Vacation time cannot be taken in hourly increments.

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-XXX-9100 or email compliance@amplity.com

Case: 3:22-cv-00370-TMR Doc #: 24-1 Filed: 04/01/24 Page: 82 of 130 PAGEID #: 233

Colleagues requesting vacation time are required to give notice using following guidelines:

| Vacation Requested | Advance Notice Required |
|---|---|
| 1-2 Days | Two (2) full business days |
| 3-4 Days | Two (2) weeks |
| 5+ Days | Thirty (30) days |

**Carryover**

**Yardley & Langhorne Colleagues**
Colleagues may carry over a maximum of five (5) vacation days, manager approval may be required where applicable. The days will automatically carryover within the Time Reporting System. Carryover days must be used no later than March 31st of the following year. Any carry-over days not used by March 31st will be forfeited. In the event that you are terminated, carry over vacation will not be paid out. Carryover vacation, or any paid time off, may not be taken during a two week notice period whether separation is voluntary or involuntary.

**Field Colleagues**
This policy does not allow Field colleagues to carry over their unused vacation days into the next year; except where state laws require otherwise. You will lose accrued vacation days if you don't use them in the current calendar year. Exception to this policy is not being able to use vacation time due to being away from work on an approved paid leave of absence during the same calendar year and not having sufficient time to take eligible vacation time, or your leave extends beyond the calendar year. In these instances, up to 5 days may be approved to carry-over and must be used within 3 months after returning to work. Note: if you use more vacation days in a calendar year than you accrue, the negative balance will carry over into the next year.

**Holidays and Shutdown of Operations during Vacation**
When a company holiday falls during a scheduled vacation, it is not counted as a vacation day. If a colleague is taking previously scheduled vacation when the Company is closed due to inclement weather or for other emergency and safety measures, such time will still count towards vacation days taken.

**Payment Upon Termination**
Since vacation days are accrued on a monthly basis, when a colleague leaves the company, the vacation days paid out will be prorated based on monthly accruals. There is no credit given for the month if employment terminates before the last day of the month. Payment for days accrued but not taken will be included in the colleague's final check. Any unaccrued vacation days that a colleague has taken will be deducted from

their final check upon termination. Colleagues must be actively at work on their last day of service. Colleagues cannot utilize vacation time in lieu of notice of resignation. If a colleague does not give appropriate notice, is not actively working for Amplity during the notice period, or is terminated for cause, the colleague foregoes payment for any accrued vacation time in accordance with state law.

**Flex Days**

**Yardley & Langhorne Colleagues**

Nine (9) Flex days are granted per calendar year; on a pro-rated basis for new hires. A colleague's manager must approve these days in advance. In cases of emergencies, notification needs to occur prior to scheduled start times. Notifications which happen on the same day of the absence will be considered as unscheduled occurrences.

**Field Colleagues**

Field colleagues are not eligible for Flex Days. Field colleagues receive five (5) personal days per calendar year; on a pro-rated basis for new hires. A colleague's manager must approve these days in advance. In cases of emergencies, notification needs to occur prior to scheduled start times. Personal days may be taken in full day or half day increments. Colleagues are allowed to take up to two (2) Personal Days in any calendar week. Personal days may be combined with vacation days for consecutive days away from work. Personal days cannot be carried over into the next calendar year, paid in lieu of taking the day, or paid upon termination.

**Unscheduled Absences and Tardy/Leave Early Occurrences**

Unpaid days are not permitted. Vacation, Personal, and/or Flex days, if available, should be used for time off to receive pay. Should any unpaid days occur, colleagues will be subject to disciplinary action.

Colleagues are expected to report to work on time according to their regularly worked scheduled and work their entire scheduled work day. Excessive Tardy/leave early occurrences will be subject to disciplinary action.

**Sick Time**

Sick days are intended to cover unexpected personal illness or injury. Colleagues receive five (5) sick days per calendar year; on a pro-rated basis for new hires. Colleagues must inform their manager of any absence prior to their start time. If a colleague is out sick for consecutive days, they must report each absence to their manager. Note, any planned appointments or medical procedures do not count as a sick day.

If a colleague is out for three (3) consecutive days or more or is admitted to a hospital for an overnight stay, Human Resources must be notified, and proof of illness or injury will be required. In such instances, colleagues will be asked to supply a note from their medical provider to Human Resources authorizing their return to work. If a colleague is

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-XXX-9100 or email compliance@amplity.com

Case: 3:22-cv-00370-TMR Doc #: 24-1 Filed: 04/01/24 Page: 84 of 130 PAGEID #: 235

unable to provide a doctor's note, they will be required to utilize Vacation, Personal, and/or Flex days for the days off from work.  In instances where a colleague is out for six consecutive (6) days or longer, please contact Human Resources, as this will be considered Short Term Disability and any accrued vacation or sick days will need to be applied.

**401k**
The Company offers a 401(k) plan to qualifying colleagues. Contact Human Resources for details about the 401(k) plan.  Most new colleagues are eligible to participate in the 401k plan from date of hire, subject to the terms of the vesting schedule found in the summary plan description.

**Health, Prescription and Welfare Benefits**
The Company complies with all applicable federal and state laws with regard to benefits administration. Colleagues who regularly work 30 hours or more per week may be eligible for enrollment in health, prescription, and other Company sponsored health and wellness plans.  The Company reserves the right to change or terminate health plans or other benefits at any time. Contact Human Resources for details about the Company's current offerings.

New qualifying colleagues will be eligible for participation in the Company's health and wellness plans on the first of the month after completing 30 days of employment.  Any colleague who is rehired within 30 days from their last termination date will be effective the first of the month coinciding with or following their date of rehire.  *This is the new policy effective January 1, 2020. For information on the current benefits eligibility, contact Human Resources.

**Continuation of Benefits (COBRA)**
Under the federal Consolidated Omnibus Budget Reconciliation Act (COBRA), qualifying colleagues may be allowed to continue their health insurance benefits, at the colleague's expense, for up to 18 months after experiencing a qualifying event as outlined below. Longer periods of coverage may be available dependent upon the qualifying event.

To qualify for COBRA continuation coverage, a colleague must have a qualifying event that causes the colleague to lose group health coverage. The following are qualifying events for:

Colleagues
- Termination of employment
- Reduction in numbers of hours worked

Qualified Beneficiaries
- Loss of coverage by the colleague because of one of the qualifying events listed above
- Covered colleague becomes eligible for Medicare
- Divorce or legal separation of the covered colleague
- Death of the covered colleague

Dependent Children
- Loss of coverage because of any of the qualifying events listed for spouses
- Loss of status as a dependent child under the plan rules

**FAMILY AND MEDICAL LEAVE**

**Family and Medical Leave**
The Company abides by the federal Family and Medical Leave Act ("FMLA") and grants unpaid leaves of absence to workers who qualify for certain medical and family-related reasons. The Company also abides by any state and local leave laws. The more generous of the laws will apply to the colleague if the colleague is eligible under both federal and state laws.

Please note that there are many requirements, qualifications, and expectations under these laws, and each colleague's situation is different. While the basic rules around FMLA are provided below, you should contact Human Resources to determine what leave to which you may be entitled.

The FMLA requires that eligible colleagues be given up to 12 weeks of unpaid, job-protected leave in any 12-month period for certain family and medical reasons. The 12-month period is a rolling period measured backward from the date a colleague uses any FMLA leave, except for leave to care for a covered service member with a serious illness or injury. For those service members, the leave entitlement is 26 weeks in a single 12-month period, measured backward from the date a colleague first takes that type of leave.

The FMLA defines eligible colleagues as those who (1) have worked for the Company for at least 12 months; (2) have worked for the Company for at least 1,250 hours in the previous 12 months; and (3) work at or report to a worksite which has 50 or more colleagues or is within 75 miles of Company worksites that taken together have a total of 50 or more colleagues.

**Basic Leave Benefit.** The FMLA requires covered employers to provide up to 12 weeks of unpaid, job-protected leave to eligible colleagues for the following reasons: (1) for incapacity due to pregnancy prenatal medical care, or child birth; (2) to care for the colleague's child after birth or placement or adoption or foster care; (3) to care for the

colleague's spouse, son or daughter, or parent who has a serious health condition; or (4) for a serious health condition that makes the colleague unable to work.

**Benefits and Protections During FMLA Leave**. During FMLA leave, the Company will maintain the colleague's health coverage under any "group health plan" on the same terms as if the colleague had continued to work. The colleague must pay the same portion per month, via check due the first of the month, as they paid while working. Colleague will be notified the amount due to the Company upon notification of taking the leave.

Upon return from FMLA leave, most colleagues will be restored to their status as existing immediately prior to the leave.  If entitled to reinstatement, the returning colleague will be placed in his or her original position or an equivalent position with equivalent pay, benefits, and other employment terms. However, a colleague on FMLA leave does not have any greater right to reinstatement or to other benefits and conditions of employment than if the colleague had been continuously employed during the FMLA leave period.

Certain highly compensated "key colleagues" also may be denied reinstatement.

Use of FMLA leave cannot result in the loss of any employment benefit that accrued prior to the start of a colleague's leave.

**Definition of Serious Health Condition**. A serious health condition is an illness, injury, impairment, or physical or mental condition that involves either an overnight stay in a medical care facility or continuing treatment by a health care provider for a condition that either prevents the colleague from performing the functions of the colleague's job or prevents the qualified family member from participation in school, work, or other daily activities.

Subject to certain conditions, the continuing treatment requirement may be met by a period of incapacity of more than three consecutive calendar days combined with at least two visits to a health care provider or one visit and a regimen of continuing treatment, or incapacity due to pregnancy, or incapacity due to a chronic condition. Other conditions may meet the definition of continuing treatment.

**Use of Leave.** A colleague does not need to use this leave entitlement in one block. Leave can be taken intermittently or on a reduced work schedule when medically necessary. Colleagues must make reasonable efforts to schedule leave for planned medical treatment so as not to unduly disrupt the employer's operation. Leave due to qualifying exigencies also may be taken on an intermittent or reduced work schedule basis.

To report a compliance or legal issue, call the Compliance Helpline at 1-800-XXX-9100 or email compliance@amplity.com

**Substitution of Paid Leave for Unpaid Leave.** The Company requires colleagues to use any accrued PTO and sick days during an unpaid FMLA leave taken because of the colleague's own serious health condition or the serious health condition of a family member or to care for a seriously ill or injured family member in the military. In addition, the colleague must use any accrued PTO (but not sick days) during FMLA leave taken to care for a newborn or newly placed child or for a qualifying exigency arising out of a family member's active duty status in support of a contingency operation. In order to use paid leave for FMLA leave, colleagues must comply with the Company's normal paid leave procedures found in its vacation and sick leave policies.

**Colleague Responsibilities.** Colleagues must provide 30 days advance notice of the need to take FMLA leave when the need is foreseeable. When 30 days' notice is not possible, the colleague must provide notice as soon as practicable and generally must comply with the Company's normal call-in procedures. The Company may delay leave to colleagues who do not provide proper advance notice of the foreseeable need for leave, absent unusual circumstances preventing the notice.

Colleagues must provide sufficient information for the Company to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. Sufficient information may include that the colleague is unable to perform job functions, the family member is unable to perform daily activities, the need for hospitalization or continuing treatment by a health care provider, or circumstances supporting the need for military family leave. Colleagues also must inform the Company if the requested leave is for a reason for which FMLA leave was previously taken or certified. Colleagues also are required to provide a certification and periodic recertification supporting the need for leave. The Company also may require a second, and if necessary, a third opinion (at the Company's expense) and, when the leave is a result of the colleague's own serious health condition, a fitness for duty report to return to work. The Company also may delay or deny approval of leave for lack of proper medical certification.

**Company Responsibilities.** The Company will inform colleagues requesting leave whether they are eligible under the FMLA. If they are, the notice will specify any additional information required as well as the colleagues' rights and responsibilities. If colleagues are not eligible, the Company will provide a reason for the ineligibility.

The Company will inform colleagues if leave will be designated as FMLA-protected and the amount of leave counted against the colleague's FMLA leave entitlement. If the Company determines that the leave is not FMLA-protected, the Company will notify the colleague.

**FMLA Military Family Leave entitlements.** Eligible colleagues with a spouse, son, daughter, or parent on active duty or called to active duty status in the National Guard or Reserves in support of a contingency operation may use their 12 weeks leave

entitlement to address certain qualifying exigencies. Qualifying exigencies may include addressing issues that arise from (1) short notice of deployment (limited to up to seven days of leave); (2) attending certain military events and related activity; (3) arranging childcare and school activities; (4) addressing certain financial and legal arrangements; (5) attending certain counseling; (6) spending time with covered military family members on short-term temporary rest and recuperation leave (limited to up to five days of leave); (7) attending post-deployment reintegration briefings; (8) arranging care for or providing care to a parent who is incapable of self-care; and (9) any additional activities agreed upon by the employer and colleague that arise out of the military member's active duty or call to active duty.

The FMLA also includes a special leave entitlement that permits eligible colleagues to take up to 26 weeks of leave to care for a covered service member during a single 12-month period. A covered service member is a current member of the armed Forces, including a member of the National Guard or Reserves, who has a serious injury or illness incurred in the line of duty on active duty that may render the service member medically unfit to perform his or her duties and for which the service member is undergoing medical treatment, recuperation, or therapy; or is in outpatient status; or is on the temporary disability retired list.

**No work during FMLA leave**. Colleagues may not perform work for self-employment or for any other employer during an approved leave of absence, except when the leave is for military or public service or when the Company has approved the employment and the colleague's reason for FMLA leave does not preclude the outside employment.

### Disability Leave
The Company provides Company paid short-term and long-term disability leave for its fulltime colleagues, including those colleagues regularly working 30 hours a week. Contact Human Resources for details about the applicable plans. These leave programs offer compensation for those who qualify but do not offer job protection not otherwise required by the FMLA or other applicable law.

### Military Leave
If colleagues are on an extended military leave of absence, they are entitled to be restored to their previously held position or similar position, if available, without loss of any rights, privileges or benefits provided the colleague meets the requirements specified in the Uniformed Services Employment and Reemployment Rights Act ("USERRA").

A colleague who is a member of the reserve corps of the armed forces of the United States or of the National Guard or the Naval Militia will be granted temporary leave of absence without pay while engaged in military duty as required by state employment law. A letter from the colleague's commanding officer is required to establish the dates of duty.

**Un-Qualifying FMLA Leave of Absence**

The company will, at its discretion, make provisions for leaves of absences for unqualifying FMLA/unpaid leaves of absence, recognizing personal situations that may make a leave necessary.

A colleague who takes an unqualifying FMLA/unpaid leave of absence will be placed on a personal leave of absence and may return to their position within 30 days.  The Company will make an effort to reinstate colleagues to their former or similar jobs and compensation level upon return from a 30-day leave.   Should the unqualifying FMLA/unpaid leave of absence exceed 30 days, the colleague's position may no longer be held, based on the needs of the business.  In the event of leave of absence due to a birth of a child, the colleague's position will be held for 6-8 weeks based on approved disability.

Should unqualifying FMLA/unpaid leave of absence exceed 30 days, the colleague's employment will be terminated unless a request for additional leave time is submitted in writing to the Manager and HR, for consideration.  Colleagues may be granted additional unpaid leave with the approval of management and HR for up to an additional 30 days, based on business needs.   During this leave, the Company will maintain all of the colleague's current health and welfare benefits coverage under any "group health plan" on the same terms as if the colleague had continued to work. The colleague must continue to pay the same portion per month, via check due the first of the month, in order for benefits to continue. The colleague will be notified of the amount due to the Company upon initiating the personal leave.  Colleagues who fail to pay their benefit premiums in time and in full, benefits will be terminated.

Should unqualifying FMLA/unpaid leave of absence exceed 90 days, employment and benefits termination will occur.

**Jury Duty**

If a colleague is summoned to report for jury duty, they should notify their manager and submit a copy of the original summons for jury duty to their manager and Human Resources.  Their manager will need to ensure the data is captured correctly in our time and attendance system.  The Company reserves the right to request that they seek to be excused from or request postponement of jury service if the absence from work would create a hardship to the Company.

Colleagues are to report to work on any day, or portion thereof that is not actually spent in the performance of jury duty. For each day of jury duty, a certificate of jury service shall be certified by the Court.  Upon completion of Jury Duty, colleagues must submit all certificates to Human Resources.

**Witness/Crime Victim Leave**
To the extent required by applicable law, a colleague who attends court as a witness to a crime, or to appear with a child in court as a parent or guardian, or as a victim or a family member of a victim will be granted leave without pay for such time as it is necessary. The Company may request proof of the need for leave.

**Bereavement Leave**
A colleague who wishes to take time off due to the death of a family member should notify his or her manager immediately. Bereavement leave, up to 5 days, will be granted unless there are unusual business needs or staffing requirements.

**Unpaid Personal Leave**
Colleagues who require time off in addition to vacation may request a personal leave of absence without pay for up to a maximum of 30 days but is only granted in limited circumstances.

All regular colleagues are eligible to apply for an unpaid personal leave of absence. Job performance, absenteeism, departmental requirements and length of service will all be taken into consideration before a request is approved. Ordinarily, a colleague who has been employed for less than 180 days will have their request denied.

The colleague must return to work on the scheduled return date or be considered to have voluntarily resigned from his or her employment. Extensions of leave will only be considered on a case-by-case basis.

Please contact Human Resources for more information on request procedures.

**Parental Leave**
Eligibility:
All regular fulltime colleagues who are new moms or dads. Colleagues must have one (1) year of service to be eligible for this program.

New parents will receive two (2) weeks paid leave of absence within 90 days of birth or adoption of a child. Parental Leave will run concurrent with FMLA.

**Colleague Referral**
Amplity offers an incentive award to current colleagues who refer quality candidates, provided that they are subsequently hired for designated open positions.

Guidelines:
- Qualified candidates must apply online, submit their resume, select "Employee Referral" and enter the colleagues name
- Once hired, the referral must be employed for a minimum of six (6) months

- Both the new colleague and referring colleague must be employed by the company at the time of the referral payout
- Colleagues are not eligible for the bonus if they are the hiring or reporting manager
- If the candidate previously worked for the Company, they will not be considered a referral
- If there has been any direct contact between a candidate and the company, prior to the referral, no bonus will be given
- A colleague is ineligible when referring an immediate family member; defined as spouse/partner, parent, step-parent, sibling, step-sibling, child and step-child
- The Company reserves the right to interpret and resolve any disputes which may arise

Colleagues should contact Human Resources with any questions.

**HEALTH, SAFETY, AND SECURITY**

**Tobacco, Smoke and Vapor Free Workplace**
Smoking, vaping, electronic cigarettes, chewing tobacco and the use of any tobacco based or vapor products are not permitted in any Company buildings, facilities, work sites, work meetings and events, or company vehicles at any time. Colleagues who come to work with an odor of smoke or vapor may be asked to leave if the odor is distracting to others.

**Drug and Alcohol**
The Company is dedicated to providing colleagues with a workplace that is free of drugs and alcohol. For the safety of our colleagues and clients, the Company reserves the right to test any colleague as permitted under state, federal, or local laws. This may be done in cases where the colleague's job carries a risk of injury or accident due to such use, or if there is an apparent inability to perform the duties required of that position. Specific jobs may, at the Company's discretion, require regular drug testing.

Any colleague found to use, sell, possess or distribute drugs that are illegal under state, federal or local laws, including marijuana, or any unauthorized drugs (including excessive quantities of prescription or over-the-counter drugs) while on the Company premises, performing Company-related duties, or while operating any Company equipment is subject to disciplinary action, up to and including termination of employment. Any suspected illegal drugs confiscated will be turned over to the appropriate law enforcement agency.

The possession and use of marijuana is prohibited by the Company even if you live in a state where medical or recreational marijuana is permitted.

Any colleague taking medication should consult a medical professional to determine whether the drug may affect their personal safety or ability to perform the essential functions of the job and should advise their manager of any job limitations. Upon notification of job limitations, the Company will make reasonable efforts to accommodate the limitation.

The moderate use of alcohol at Company approved meetings, with business meals, travel, and entertainment or in an appropriate social setting is not prohibited by this policy.

To the extent any federal, state or local law, rule, or regulation limits or prohibits the application of any provision of this policy, then to the minimum extent necessary and only for that geographical area, this policy is deemed to be amended in compliance.

**Employee Assistance Program**

The Company provides all colleagues with access to an Employee Assistance Program ("EAP"), which provides a third-party resource for, including but not limited to, counseling, personal or work-related issues, second health care opinions, financial counseling and referral for substance abuse at no cost to colleagues. Rehabilitation will be at the colleague's expense except to the extent the colleague's medical insurance option covers rehabilitation. Participation in the EAP does not relieve the colleague from fulfilling his/her job requirements. The fact that a colleague is participating or has participated in the EAP will be kept confidential and will not be disclosed except on a need-to-know basis.

See Appendix "B" for details.

**Reasonable Accommodations**

It is the policy of the Company to comply with all the relevant and applicable provisions of the federal Americans with Disabilities Act ("ADA") and as well as state and local laws concerning the hiring and employment of individuals with temporary and ongoing disabilities. The Company will not discriminate against any qualified colleague or job applicant because of a person's physical or mental disability with respect to any terms, privileges or conditions of employment, including, but not limited to hiring, advancement, discharge, compensation and training.

Colleagues who become disabled should notify Human Resources if the conditions of the disability impair their ability to perform the essential functions of their position. Where necessary and feasible, reasonable accommodations will be made for qualified disabled colleagues to perform the essential functions of the job in question, as long as the accommodation does not cause the Company undue hardship. The Company will attempt to make reasonable accommodations for colleagues who have work-related limitations stemming from pregnancy, childbirth or a related medical condition. This may include temporary transfer to a less strenuous or less hazardous position, if a

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-XXX-9100 or email compliance@amplity.com

Case: 3:22-cv-00370-TMR Doc #: 24-1 Filed: 04/01/24 Page: 93 of 130 PAGEID #: 244

colleague so requests upon the advice of their health care provider, as long as the accommodation does not cause the Company undue hardship.

All colleagues are required to comply with safety standards. Applicants who pose a direct threat to the health or safety of other individuals in the workplace, which cannot be eliminated by reasonable accommodation, will not be hired. Current colleagues who pose a direct threat to the health of safety of the other individuals in the workplace will be placed on appropriate leave until a decision has been made by management in regard to the colleague's immediate employment situation.

**Lactation Accommodation**
The Company provides a supportive environment in the workplace to enable breastfeeding colleagues to express breast milk during work hours for up to one year following the birth of a child. Accommodations under this policy include a place, other than a bathroom, that is shielded from view and free from intrusion from co-workers and the public which may be used by a colleague to express breast milk. Discrimination and harassment of breastfeeding mothers in any form is unacceptable and will not be tolerated.

**Injury and Accident Response and Reporting**
In the event that a colleague becomes injured or witnesses an injury during working hours, they must report it immediately to the nearest available manager or Human Resources.

When any accident, injury, or illness occurs while a colleague is at work, regardless of the nature or severity, the colleague must contact Human Resources and report it as soon as possible. Reporting should not be allowed to delay necessary medical attention. Once the accident is reported, follow-up will be handled by Human Resources.  The colleague may not return to work without the permission from Human Resources.

In addition to compliance with safety measures imposed by federal Occupational Safety and Health Act ("OSHA") and state law, the Company has an independent interest in making its facilities a safe and healthy place to work. The Company recognizes that colleagues may be in a position to notice dangerous conditions and practices and therefore encourages colleagues to report such conditions, as well as all non-functioning or hazardous equipment, to a manager immediately. Appropriate remedial measures will be taken when possible and appropriate.

Colleagues will not be retaliated or discriminated against for reporting of accidents, injuries, or illnesses, filing of safety-related complaints, or requesting to see injury and illness logs.

**Workers' Compensation**

The Company provides insurance for all work-related injuries or illness. Colleagues must contact Human Resources to report an incident. The carrier governs all insurance benefits provided by the Company.

**Workplace Violence and Security**

It is the intent of the Company to provide a safe workplace for colleagues and to provide a comfortable and secure atmosphere for customers and others with whom the Company does business. The Company has zero tolerance for violent acts or threats of violence.

The Company expects all colleagues to conduct themselves in a non-threatening, non-abusive manner at all times. No direct, conditional, or veiled threat of harm to any colleague or Company property will be considered acceptable behavior. Acts of violence or intimidation of others will not be tolerated. This includes bullying of other colleagues. Any colleague who commits or threatens to commit a violent act against any person while on Company premises will be subject to immediate discharge.

Colleagues within the Company share the responsibility in identification and alleviation of threatening or violent behaviors. Any colleague who is subjected to or threatened with violence, or who is aware of another individual who has been subjected to or threatened with violence, should immediately report this information to their manager or designee. Any threat reported will be carefully investigated and colleague confidentiality will be maintained to the fullest extent possible.

No firearms or weapons are allowed in the workplace, concealed or not.

**Driving Safety**

The safety and well-being of our colleagues is of critical importance to the Company. We therefore each have a responsibility to not only protect ourselves when on the road but also should do our part to protect those around us. Colleagues that are required to routinely drive on Company business will be expected to consistently follow all the safety procedures below.

1. All colleagues are expected to wear seat belts at all time while in a moving vehicle being used for Company business, whether they are the driver or a passenger.
2. Use of handheld devices, whether personal or Company-owned, while behind the wheel of a moving vehicle is strictly prohibited. This includes the use for making or receiving phone calls, sending or receiving text messages or e-mails, and downloading information from the web. If a colleague needs to engage in any of these activities while driving, they must pull over to safe location and stop the vehicle prior to using any device.

3. Although use of cell phones under any circumstances is strongly discouraged while driving, the use of hands-free technology may be warranted in emergency circumstances only.
4. The use of other handheld electronic devices, such as iPads, iPods, laptops, electronic readers, and the like are strictly prohibited while driving a vehicle on Company business.
5. Engaging in other distracting activities including, but not limited to, eating, putting on makeup, shaving, or reading, is also strongly discouraged while driving, even when in slow-moving traffic.
6. The use of alcohol, drugs, or other substances including certain over-the-counter cold or allergy medications that in any way impair driving ability is prohibited.
7. All colleagues are expected to follow all driving laws and safety rules, such as adherence to posted speed limits and directional signs, use of turn signals, and avoidance of confrontational or offensive behavior while driving.
8. All passengers must be approved by management in advance of travel.
9. Colleagues should never allow anyone to ride in any part of the vehicle not specifically intended for passenger use and/or any seat that does not include a working seat belt.
10. Colleagues must promptly report any accidents to local law enforcement as well as to the Company in accordance with established procedures.
11. Colleagues are also required to report any moving or parking violations received while driving on Company business and/or in Company vehicles.
12. Insurance, valid driver's license and the passing of a motor vehicle record check every 6 months, must be maintained current as a term and condition of continuing employment in positions that require driving.

Colleagues are not to drive a personal vehicle for Company business unless authorized to do so. If the job requires a colleague to operate their personal vehicle, the colleague shall be required to submit proof of a current and valid state driver's license and must adhere to the guidelines provided in Amplity's Fleet policy.

If a colleague is involved in an automobile accident or receives a moving violation while on Company business (in a personal or Company vehicle) they must report the accident to their manager within 48 hours. Colleagues should also notify the proper local authorities while at the scene of the accident, request that a police report be generated and obtain such documentation once available.  Colleagues should not admit liability or guilt and should not apologize or say they are sorry under any circumstances, even if they believe they are at fault.

Colleagues receiving a company-provided fleet vehicle should adhere to all aspects of the Amplity Fleet Policy document as posted on the Team Amplity site.

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-344-9100 or email compliance@amplity.com

Case: 3:22-cv-00370-TMR Doc #: 24-1 Filed: 04/01/24 Page: 96 of 130 PAGEID #: 247

**DUI**

The company has a vital interest in maintaining safe working conditions for all colleagues. Those who are impaired because of alcohol may create a dangerous environment to themselves and others.

Any colleague that drives a vehicle as a main function of their role, whether a company fleet vehicle or those that receive car allowance, who is formally charged with a DUI, will face immediate termination.

**Inclement Weather**

This policy establishes guidelines for Company operations during periods of extreme weather and similar emergencies. The Company will remain open in all but the most extreme circumstances. Unless an emergency closing is announced, all colleagues are expected to report to work. However, the Company does not advise colleagues to take unwarranted risks when traveling to work in the event of inclement weather or other emergencies. Each colleague should exercise their best judgment with regard to road conditions and other safety concerns.

If weather or traveling conditions delay or prevent a colleague's reporting to work, their manager should be notified as soon as possible. If possible, such notification should be made by a telephone conversation directly with the manager. If direct contact is not possible, leaving a detailed voicemail message or message with another colleague is acceptable.

A colleague who does not report to work due to severe weather will be paid as follows:
- Late:
  - Non-Exempt:  If the colleague arrives late but is able to complete at least six (6) hours before the end of his/her scheduled shift, he/she will be paid for the full shift.  PTO can be used to cover any additional hours needed to complete the six (6) hour minimum.

  - Exempt: Exempt colleagues pay is not impacted since they are paid on a salary basis and are expected to get their jobs done whether less or more than 40 hours is required in any given week.

- Absent:
  - Non-Exempt:  If a colleague fails to report to work, he/she can use PTO for the day (subject to availability).
  - Exempt: If a colleague fails to report to work, he/she can use PTO for the day (subject to availability).  Remote and exempt colleagues will be expected to continue working from home if their job duties allow.

<u>Designation of Emergency Closing</u>
Only by the authorization of designated managers will the Company cease operations due to emergency circumstances. If severe weather conditions develop during working hours, it is at the discretion of Management to release colleagues. Colleagues will generally be expected to remain at work until the appointed closing time.

<u>Pay and Leave Practices</u>
In the event that the Company voluntarily closes during the day, whether a partial or full-day closing, all normally scheduled hours lost due to the closing will be paid to all colleagues who come in to work.

Colleagues who were already scheduled for PTO, must use PTO for the day.

Remote and exempt colleagues will be expected to continue working from home if their job duties allow.

<u>Other Work Options</u>
Managers may approve requests for colleagues to temporarily work from home, if doing so allows completion of work assignments.

**WORKPLACE GUIDELINES**

**Attendance and Tardiness**
All colleagues are expected to be reliable and punctual in reporting for scheduled work at the beginning of the work day and returning from approved breaks and lunch periods in a timely manner. Absenteeism and lateness place an extra burden on other colleague and our ability to meet all of our client needs.

Regular and reliable attendance is considered an essential function of each colleague's position.  It is the responsibility of each colleague to report to work on time for all scheduled work hours. All time taken should be recorded in the time and attendance system. It is each individual department manager's responsibility to keep track of their colleague's attendance and to manage unsatisfactory performance.  Failure to comply with the Attendance and Tardiness policy with result in corrective action.

If a colleague is ill, injured, or an unexpected emergency arises which prevents them from coming to work, the colleague must notify their manager no later than 60 minutes before the start of their scheduled work day. If a colleague's manager or designee is not available, the colleague should contact a member of management. If a colleague is physically unable to contact the Company, they should direct another person to make the contact on their behalf. Leaving a message with a fellow colleague is not considered proper notification.

When colleague calls in absent, they are to advise the Company of their expected date of return. Management reserves the right to require proof of illness, injury or accident, including a doctor's statement or notice for any temporary disability. HR must be notified in the event a colleague is absent due to illness, injury or any type of temporary disability to ensure colleague receive proper notification of rights under the law.

Repeated absences, excessive absences (excused or unexcused) or a pattern of absences are unacceptable job performance. If a colleague is absent for three consecutive days and has not provided proper notification, the Company will assume that the colleague has abandoned their position and may be treated as having voluntarily terminated employment with the Company.

If a colleague becomes ill at work, they should notify their manager immediately. If a colleague is unable to perform their job tasks, they may be sent home for the remainder of the day or until able to work again.

Colleagues shall be at their workstation ready to begin work at the start of their scheduled work time or resumption of work duties. If colleagues are not prepared, they will be considered tardy. Excessive tardiness, whether excused or unexcused, constitutes unacceptable work performance.

All absences are to be arranged as far in advance as possible. This includes vacations and time off for other reasons. If a doctor or dental appointment must be scheduled during the workday, it should be scheduled as early in the morning or as late in the afternoon as possible. Additionally, if a last-minute absence is unplanned or occurs last minute due to a medical need, the time off will be counted as a sick day.

**Dress Code**
The Company requires all colleagues to present a professional image to the public and clients. Accordingly, colleagues must wear appropriate attire while at the office or conducting Company business.

Clothing should be clean and neat in appearance. Colleagues should consider their level of client and public contact, visitors scheduled to be in the office, and the types of meetings they are scheduled to attend in determining what attire is appropriate.

The Company wishes to provide a work environment that is free of safety hazards, offensive behavior and harassment of any kind. Therefore, the following are generally not acceptable:

- Bare feet, flip flops, sneakers, tennis shoes
- Shorts, spandex, sweats, or work out attire
- Tank tops, spaghetti straps, bare shoulders
- Pants or skirts worn below the waistline, exposing skin or undergarments

- Skirts too short or exposed midriffs
- Sexually provocative clothing or exposed undergarments
- Clothing with offensive slogans or pictures
- Clothing with rips or holes, or showing excessive wear and tear
- Any clothing or accessories that would present a safety hazard
- Visible tattoos that are inappropriate in content
- Visible piercings, facial rings or gauges
- Any clothing or accessories that are provocative or otherwise distracting, or styles not appropriate for business hours
- Tight clothing that outlines the silhouette or undergarments

All colleagues are expected to maintain clean and appropriate oral and bodily hygiene. Hair (including facial hair) should be clean and neat. Accessories should be moderate and businesslike and should not interfere with a colleague's work. The excessive use of perfume or cologne is unacceptable, as are odors that are disruptive or offensive to others or may exacerbate allergies or sensitivities.

Any colleague whose appearance does not meet these standards may be counseled. If the appearance is unduly distracting or the clothing is unsafe, the colleague may be sent home to correct the situation.

Reasonable accommodation will be made for colleagues sincerely held religious beliefs and disabilities whenever possible, consistent with the business necessity. If you would like to request an accommodation or have other questions about this policy, please contact your manager or Human Resources.

### Colleague Privacy
The Company collects only personal information about colleagues that relates to their employment. Only people with a business-related need are given access to this information, and Human Resources must authorize any release of the information to others. Personal information, other than that required to verify employment or to satisfy legitimate investigatory or legal requirements, will be released outside the Company only with the colleague's prior written approval.

If a colleague has access to any Confidential Information of any kind, from any source, including private colleague information, they are responsible for acting with integrity. Unauthorized disclosure or inappropriate use of confidential information will not be tolerated and will subject the violator to disciplinary action.

### Communication with The Press and Media
All media inquiries should be referred to one of the executive officers to respond if necessary. The information contained in the Company's files is confidential and must be protected from disclosure. If you are not sure, do not disclose.

This policy covers all forms of responses to the media, including off-the-record and anonymous statements.

**Confidentiality and Ethics**
See Appendix "A" and the Code of Conduct.

**Inspections and Searches**
Any items brought to or taken off of Company premises, whether property of the colleague, the Company, or a third party, are subject to inspection or search unless prohibited by state law. Desks, lockers, workstations, work areas, computers, USB drives, files, e-mails, voice mails, etc. are also subject to inspection or search, as are all other assets owned or controlled by the Company. The Company may monitor any telephone conversation colleagues have on Company owned or controlled equipment, premises, or property. Any inspection or search conducted by the Company or its designees may occur at any time, with or without notice.

**Office Equipment Usage**
When using Company property, including computer equipment or other office equipment, exercise care, perform required maintenance, and follow all operating instructions, safety standards, and guidelines.

Colleagues should notify their manager or IT if any equipment or machines appear to be damaged, defective, or in need of repair. This prompt reporting could prevent the equipment's deterioration and could also help prevent injury to colleagues or others, or potential loss of integrity of any data stored on the device. If colleagues have questions about the maintenance and care of any workplace equipment, they should speak with their manager.

If colleagues use or operate equipment improperly, carelessly, negligently, or unsafely, they may be disciplined or even discharged. In addition, colleagues may be held financially responsible for any loss to the Company because of such mistreatment.

Colleagues are to keep their work area neat and clean and use normal care in handling Company property and report any broken or damaged equipment to their manager at once so that proper repairs can be made.

Colleagues may not use any Company property for personal purposes or remove any Company property from the premises without prior permission from Human Resources.

**Electronic Assets Usage**
The Company recognizes that use of the internet has many benefits for the Company and its colleagues. The internet and email make communication more efficient and effective. Therefore, colleagues are encouraged to use the internet appropriately if required by their job. Use of the internet for non-work purposes should be held to a

To report a compliance or legal issue, call the Compliance Helpline at 1-800-384-9100 or email compliance@amplity.com

reasonable limit; determined by management. Non-work internet usage may be prohibited. If colleagues have questions about what constitutes reasonable usage, they should not hesitate to contact their manager.

The following guidelines have been established for using the internet and email in an appropriate, ethical, and professional manner:

- Colleagues are prohibited from placing any passwords or restrictors on any document, computer, or computer software without the prior permission of their manager. Any password or restrictor must be revealed to and maintained by a second authorized source. Removing, changing, deleting, or erasing any Company information without the appropriate authorization is strictly prohibited
- Company internet and email access may not be used for transmitting, retrieving, or storing of any communications of a defamatory, discriminatory or harassing nature, or materials that are obscene or X-rated. No messages with derogatory or inflammatory remarks about an individual's race, age, disability, religion, national origin, physical attributes, sexual preference, or any other federal or state protected status shall be transmitted. Harassment of any kind is prohibited.
- Disparaging, abusive, profane, or offensive language (materials that would adversely or negatively reflect upon the Company or be contrary to the Company best interests) and any illegal activities including piracy, cracking, extortion, blackmail, copyright infringement, and unauthorized access to any computers on the internet or email are forbidden.
- Copyrighted materials belonging to entities other than the Company may not be transmitted by colleagues on the Company's network. All colleagues are responsible for appropriate use and transmission of other company's copyrighted materials.
- Colleagues should not use the system in a way that disrupts its use by others. This includes but is not limited to streaming of any video, unless work-related, streaming of music unless approved by management, sending or receiving many large files, and sending email messages to an excessive number of users or sending emails that are not work-related in content.
- The internet is full of useful programs that can be downloaded, but some of them may contain computer viruses or spyware that can extensively damage our computers and compromise security of Company information. Colleagues should confirm with IT which files are appropriate to download.  Also, many browser add-on packages (called "plug-ins") are available to download. There is no guarantee that such will be compatible with other programs on the network and such may cause problems; therefore, colleagues should refrain from downloading such plug-ins.
- Each colleague is responsible for the content of all text, audio, or images that they place on Company drives or send over the Company's internet and email system. No email or other electronic communications may be sent which hides the identity of the sender or represents the sender as someone else. Also, be aware that the

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-364-9100 or email compliance@amplity.com

Case: 3:22-cv-00370-TMR Doc #: 24-1 Filed: 04/01/24 Page: 103 of 130 PAGEID #: 253

Company's name is attached to all messages so use discretion in formulating messages.

- Email is not guaranteed to be private or confidential. All electronic communications are Company property. Therefore, the Company reserves the right to examine, monitor and regulate email messages, directories and files, as well as internet usage. Also, the internet is not secure so colleagues should not assume that others cannot read or possibly alter messages.
- Internal and external email messages are considered business records and may be subject to discovery in the event of litigation. Be aware of this possibility when sending email within and outside the Company.

All Company-supplied technology including computer systems and Company-related work records belong to the Company and not the colleague. The Company routinely monitors usage patterns for its email and internet communications. Although encouraged to explore the resources available on the internet, colleagues should use discretion in the sites that are accessed.

Since all the computer systems and software, as well as the email and internet connection are Company-owned, all Company policies are in effect at all times. Any colleague who abuses the privilege of Company-facilitated access to email or the internet may be denied access to the internet.

**Social Media**
The Company understands that social media can be a fun and rewarding way to share a colleague's life and opinions with family, friends, and co-workers around the world. However, use of social media also presents certain risks and carries with it certain responsibilities. To assist colleagues in making responsible decisions about their use of social media, we have established these guidelines for appropriate use of social media. This policy applies to all colleagues of the Company.

For purposes of this Policy, social media includes but is not limited to blogs, microblogs, videos, podcasts, discussion forums, on-line communities, or collaborative platforms that are accessible or may become available to internal and external audiences, link sharing and social networks like Facebook, Google, LinkedIn, Twitter, Instagram, Snapchat and others.

Social Media Users should not participate in social media networks or activities during work time unless this activity is deemed necessary for a specific, approved business activity. As with all other types of Company-related activity, only approved spokespeople have the authority to speak on behalf of or about the Company.

Guidelines:
- Every Social Media User is personally responsible for the content they publish on any form of social medial.  Once posted, all comments become public, and are the

property of these social networks and are easily traceable indefinitely by a large number of people, both internally and externally.

- Social Media Users must be sure that they are honest and accurate when posting information and correct quickly any mistakes in this regard. Never post any information or rumors that you know to be false about the Company, coworkers, clients, vendors, or anyone associated with the Company.
- All rules regarding confidential and proprietary business information apply in full to Social Media.
- Social Media Users are prohibited from expressing any policy or statement as the view of the Company or of any individual in their capacity as a colleague of Amplity or otherwise on behalf of Amplity.
- Never disclose information that is a proprietary, confidential, private or sensitive about the Company, Colleague or Clients.
- Permission to reproduce any copyrighted text, photos, graphics, videos or other material owned by the Company or others must be obtained prior to use. If you post or publish information that you have obtained elsewhere, make sure you have the right to use it and that you specify the source of the information.
- Do not use social media to monitor colleagues' or potential colleagues' personal social media activities.
- Colleague must follow all applicable Amplity policies, federal, state, and local laws and regulations when using social media.
- Any information that cannot be disclosed through a conversation, a note, text or an e-mail also cannot be disclosed in Social Media. Any conduct that is impermissible under the law if expressed in any other form or forum is impermissible if expressed through Social Media. For example, posted material that is discriminatory, harassing, obscene, defamatory, libelous, abusive, indecent, hateful, embarrassing or violent is forbidden. Company policies apply equally to colleague social media usage.
- Colleagues should be respectful of others in any environment, including when using social media. Colleague should be fair and courteous to fellow colleague, clients, vendors, or people who work on behalf of the Company. Any harassment, bullying, discrimination, or retaliation that would not be permissible in the workplace is not permissible online, even if it is done after hours, from home and on home or personal devices.
- Sharing or forwarding existing approved content is acceptable, but not creating new company-related content without proper review and approval.
- For personal participation on social media sites, Social Media Users should not use their Company email address when registering or posting on social media sites. Doing so could cause or mislead others to believe that the colleague is a spokesperson of the Company.
- Social Media Users shall not endorse any vendors or contractors on behalf of the Company except when approved by Corporate and Legal.
- Whether a colleague is posting something on his or her own or someone else's Social Media, a colleague must not disclose any fact or express any opinion that

1.  To report a compliance or legal issue, call the Compliance Helpline at 1-800-364-9100 or email compliance@amplity.com

could be interpreted as negative or critical of the Company or a Company client.  If you have such facts or hold such opinions, please report such to the legal department or call the Compliance Hotline.   This is necessary to preserve the Company's good will in the marketplace.

- Failure to follow these guidelines may result in disciplinary action, including legal action.


Acknowledgment
There will be times when Company events and activities will take place, in addition to team meetings, conferences, and trainings, etc.  The Company may take photographs and videos, so colleagues are advised that their likenesses and voices may end up on our Company website or used in other internal or external communications and promotions.

Retaliation is prohibited
The Company prohibits taking negative action against any colleague for reporting a possible deviation from the policy or for cooperating in an investigation.

Media Contacts
Colleagues should not speak to the media on the Company's behalf without contacting Human Resources. All media inquiries should be directed to them.

For More Information
If a colleague has questions or needs further guidance, they should contact their manager or Human Resources.

**Company Phone Usage and Cell Phones for Personal Use**
The telephones of the Company are primarily for calls for Company business. All colleagues are required to be professional and conscientious at all times when using Company phones. The use of Company phones and personal cell phones or other devices during working hours should be held to a reasonable limit. Reasonableness of cell phone usage will be determined by management.

Colleagues may not audio or video record (which includes taking photographs or otherwise capturing an image) other colleagues, presentations, phone calls, conferences, etc. at any time.

**EMPLOYMENT SEPARATION**

**Resignation**
Colleagues are requested to provide a minimum of two weeks' written notice of their intent to resign. A colleague's notice of resignation to voluntarily terminate employment with the Company should be submitted to their manager. The manager must notify HR

41

of the resignation. Human Resources will then contact the colleague to schedule an exit interview prior to their last day.

A colleague is not permitted to take vacation, flex days or personal days after notifying the Company of resignation, regardless if the time off had already been approved.  Their manager will reject any time off scheduled during their notice period from the time and attendance system.

**Termination**
All employment with the Company is at-will employment. This means that the colleague has not been hired for a specified duration, but that they can terminate their employment with the Company, or the Company can terminate the employment relationship at any time, with or without cause, and with or without prior notice. A colleague's at-will employment status cannot be changed by any oral modifications.

**Personal Possessions and Return of Company Property**
Any Company property issued to colleagues, such as computer equipment, keys, tools, parking passes, badges, Company credit cards, etc. must be returned to the Company at the time of employment separation. Colleagues may be responsible for any lost or damaged items. Upon separation of employment colleagues are to remove their personal possessions from all Company property.

**Severance**
All regular Amplity colleagues may be eligible to receive severance in accordance with this policy.  While the Company reserves the right to determine, on a case-by-case basis, whether a colleague is eligible for severance pay, the following circumstances will make an individual ineligible to receive severance:

- Voluntary resignation
- Retirement
- Termination for misconduct, or violation of company policies, procedures, or Code of Conduct
- Colleague with a written contract that provides for severance or termination benefits or set termination date
- Refusal to accept another comparable or reasonable position, as determined by Human Resources, taking into account the colleague's skills, experiences, compensation level, and commuting distance

The amount of severance pay will be based on length of service, calculated from the colleague's service date to their last working day.  One (1) week's severance pay will be paid for each year or partial year of service, up to a maximum of 20 weeks of severance. Colleague with less than one (1) year of service, will be credited as least one (1) year of service for purposes of this policy.

The amount of severance will be based on the colleague's annual base salary (exclusive of incentive compensation, bonus). All amounts paid under this policy will be paid in a lump-sum, less all applicable deductions, including federal, state, and local taxes. Severance payments will be provided to the colleague in accordance with all applicable federal, state, and local laws, and in accordance with the Company's payroll processes. Colleague will receive their lump sum payment based on their current payroll method of payment; direct deposit or manual check. A fully executed separation and release agreement in a form provided by the Company will be required before any severance is paid.

## HANDBOOK ACKNOWLEDGEMENT

I acknowledge receipt of the Company's handbook. I agree to and understand the policies that govern our work for legal and compliance matters. I agree to follow the guidelines and policies set forth in the handbook and any amendments to the handbook along with the other policies and procedures of the Company.

I understand that I am not being hired for any definite period of time even though my wages are paid regularly. I further understand that I am an at-will colleague and my employment can be terminated at any time, with or without cause and with or without prior notice either by the Company or myself. No promises or representations have been made to me that I can be disciplined or discharged from my employment with the Company only under certain circumstances or after certain events. I also understand that neither the handbook nor any policy of the Company is a guarantee or promise of employment or continuing employment. I am aware that Company policy requires colleagues to be hired at-will and this policy cannot be changed by any oral modifications.

I am aware that the contents of the colleague handbook are presented as a matter of information and that except for the at-will provisions, the handbook can be amended at any time. I realize that nothing in this handbook is intended to infringe upon my rights under Section 7 of the National Labor Relations Act (NLRA) or any federal, state or local law. Additionally, I am hereby made aware that under the Defend Trade Secrets Act I may not be held criminally or civilly liable under federal or state trade secret laws if I disclose a trade secret to a government official or attorney solely for the purpose of reporting or investigating a violation of law, or in a complaint or document filed in a lawsuit, if that filing is made under seal.

I understand and agree that the handbook is for informational purposes only and is not intended to create a contract, nor is it a contract of employment or continuing employment between myself and the Company.

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-364-9100 or email compliance@amplity.com

_____

Signature

_____

Printed Name

_____

Date

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-364-9100 or email compliance@amplity.com

Case: 3:22-cv-00370-TMR Doc #: 24-1 Filed: 04/01/24 Page: 108 of 130  PAGEID #: 259

APPENDIX "A"

| POLICY/PROCEDURE NO. CMP-001 | CODE OF BUSINESS CONDUCT AND ETHICS |
|---|---|
| VERSION 1.0 | Effective November 25, 2019 |
| REPLACES | All prior versions |

## CODE OF BUSINESS CONDUCT AND ETHICS

### Introduction

Amplity, Inc. ("Amplity" or the "Company") requires the highest standards of ethical business practices and socially responsible conduct from all of its directors, officer, and all other colleagues, consultants, and contractors (each, a "Colleague") and therefore has adopted this Code of Conduct (the "Code").  Among other things, this Code is intended to implement as Company policy and expand upon two important principles to which the Company is committed: (i) compliance with Compliance Program Guidance for Pharmaceutical Manufacturers published by the Office of Inspector General, United States Department of Health and Human Services ("HHS-OIG Guidance"), including the seven key elements of an effective compliance program as described therein; and (ii) compliance with all applicable industry standards that apply to the Company and its clients, including, as applicable, the Pharma Code on Interactions with Healthcare Providers, the AdvaMed Code of Ethics on Interactions with Health Care Professionals, the IFPMA Code of Practice, and the APBI Code of Practice.

Maintaining these standards is an essential part of our effort to be recognized by the pharmaceutical, biotech, and healthcare industries as the leading Contract Commercial Organization and a true partner, to ensure that our business is run ethically, in compliance with relevant laws and regulations, and in a manner that furthers our goal of improving patient outcomes.  As a leader in our industry, both in what we do and how we do it, Amplity's compliance program furthers our belief that our activities should benefit patients, enhance the practice of medicine, comply with all applicable legal standards, and not interfere with the independent judgment of HCPs.

Any interpretation of the provisions of this Code, as well as interactions with clients and healthcare providers not enumerated within this Code should be made with the following principles in mind: (i) Company Colleagues shall not use any unlawful inducement to sell, lease, recommend or arrange for the sale, lease or recommendation of any product or service of the Company or any of its clients; and (ii) each Colleague and shall maintain the highest standards of honest and ethical conduct in all dealings with other Colleagues, clients, and other third parties, including any government or regulatory agency.

1. To report a compliance or legal issue, call the Compliance Helpline at 1-800-344-9100 or email compliance@amplity.com

Case: 3:22-cv-00370-TMR-Don #: 24-1 Filed: 04/01/24 Page: 109 of 130   PAGEID #: 260

The Code of Conduct, as well as all laws, regulations, guidelines, and Amplity's policies/procedures should be observed by everyone in our work environment or acting on behalf of the Company. No one, regardless of position, will be allowed to compromise adherence to the Code of Conduct, laws, regulations, business standards, policies/procedures. Failure to comply with the Code of Conduct, or applicable laws, regulations, policies/procedures can result in serious damage to our standing with our customers, legal or regulatory action against the company and/or individual colleagues, and disciplinary action (including termination of employment).

If you have any questions about the Code of Conduct or about any policies or practices of Amplity, you should raise the questions to a manager or the Chief Compliance Officer. Our Chief Compliance Officer is readily available and responsive to colleagues when questions arise about adherence to the applicable laws, regulations, policies, or the Code of Conduct.

The Amplity Code of Conduct is intended to ensure that we meet our compliance goals in today's health care and business environment. The Code of Conduct is designed to provide general guidance, and supplement other policies and procedures adopted by Amplity.

**ANY COLLEAGUE WHO FAILS TO COMPLY WITH THIS CODE SHALL BE SUBJECT TO DISCIPLINARY ACTION UP TO AND INCLUDING TERMINATION.   THE APPLICABLE TERMS OF THIS CODE SHOULD BE INCORPORATED INTO EVERY CONTRACTOR'S AGREEMENT WITH THE COMPANY.  EVERY COLLEAGUE IS REQUIRED TO NOTIFY THEIR MANAGER or AMPLITY CONTACT, THE LEGAL DEPARTMENT, OR CALL THE AMPLITY ETHICS HOTLINE AT 800-344-9100 IF THEY VIOLATE THIS CODE OR KNOW OF ANOTHER COLLEAGUE OR CONTRACTOR WHO HAS OR IS VIOLATING THIS CODE.**

All Colleagues are required to comply with this Code as part of their employment with the Company.  Violations of the Code may lead to disciplinary action, up to and including termination of employment.

All colleagues are responsible for being knowledgeable of the Company's most current policies at all times and for reporting any violations of this policy of which they become aware.  Reports can be made to your Amplity manager, your primary Amplity contact, the appropriate Human Resources Representative, the Legal Department, or by contacting the Compliance hotline by phone 1-800-344-9100 or by email compliance@amplity.com.

**AMPLITY HAS A STRICT NON-RETALIATION POLICY.  AMPLITY WILL NOT CONDONE ANY RETALIATION OR REPRISAL AGAINST A COLLEAGUE WHO IN GOOD FAITH REPORTS A POSSIBLE VIOLATION OF LAW, REGULATION, COMPANY POLICY, OR THE CODE.**

**Respect in the Workplace**

All Colleagues must treat with respect all other Colleagues and all others with whom they come in contact on behalf of the Company.  Amplity does not allow any kind of discrimination, harassment, or victimization.  Amplity is an equal opportunity employer in all aspects of its relationship with Colleagues, from recruitment and performance evaluation, to interpersonal relations.  All decisions about Colleagues must be made without regard to race, religion, age, national origin, sex, color, disability, marital status, pregnancy status, sexual orientation, or any other protected class under applicable federal, state, and local laws.

Further, it may be illegal to ask prospective colleagues about their salary history or their criminal history.  It is the policy of Amplity to not ask prospective candidates their salary history. Respect in the workplace extends to Company property.  All Colleagues should treat our company's property, whether material or intangible, with respect and care.

**Professionalism**

All Colleagues must show integrity and professionalism in the workplace.  All Colleagues must dress and groom appropriately for their role and with respect for those with whom they deal on behalf of the Company.  At no times may a Colleague work while under the influence of alcohol, marijuana, or any other drug and all Colleagues are required to comply with the Company's Drug Use Policy as set forth in the Colleague Handbook.

**Confidential Information**

In connection with your employment or contract with Amplity, you will have access to confidential and proprietary information and trade secrets of Amplity and its clients.

There may be no disclosure of confidential information or trade secrets to anyone outside the Company without authorization from the Chief Executive Officer, General Counsel, Chief Financial Officer, Executive Vice-President of Commercial Solutions, or Executive Vice-President of Medical and Remote Engagement Services. Confidential information may include internal reports, policies, procedures, all information about clients and their projects, and other business-related communications. Trade secrets may include information regarding the development of systems, processes, products, design, instruments, formulas and technology.

It is a Colleague's duty and responsibility to safeguard all confidential information and trade secrets. This includes the dissemination of information by any available means, including but not limited to telephone, fax, and email.

If a Colleague is contacted by a third-party with a request for any information regarding the Company, a Company client, a Colleague, a former Colleague, or any client, the inquiry must be forwarded to a senior manager, Human Resources, or the Legal department.

Within the Company, confidential information shall be disclosed and/or discussed only on a "need to know" basis.  As a general rule, Colleagues working with one client generally do not need to know confidential information regarding another client. Conversations of a confidential nature must never be held within earshot of others without a need to know or clients.   Amplity may represent products from different clients that compete with each other at the same time in compliance with Amplity's Competitive Product Representation Policy.

Pursuant to the Defend Trade Secrets Act, Colleagues shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law. Colleagues further shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding if such filing is made under seal. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to court order.

**Insider Trading Policy**

Colleagues may come into possession of material, nonpublic information regarding publicly traded securities, for example information about a client. Trading in such securities while in the possession of such material, nonpublic information is a violation of federal and state securities laws that prohibit insider trading. Insider trading also includes "tipping," in which a person passes along material, nonpublic information to a third party who makes a trade. Violation of insider trading laws by colleagues can result in civil and criminal liability, not only for the violator, but also for the Company itself and the members.

The purposes of this policy are to: (i) educate Colleagues as to what constitutes unlawful securities trading and "tipping" (defined below); (ii) articulate the Company's policy that such unlawful trading and tipping by Colleagues are prohibited; and (iii) institute a procedure to make it unlikely that such trading or tipping will occur.

It is against Company policy and a violation of law to make use of confidential information for personal advantage in securities trading. Specifically, colleagues may not buy or sell any publicly traded stock, bond, option, or other security if the Company possesses material, nonpublic information about the security or its issuer. It is also unlawful to disclose (or "tip") material, nonpublic information to another person who subsequently makes trades using that information. To minimize such liability, colleagues may not disclose material, nonpublic information to any other person, other than those persons employed or engaged by the Company who have a need to know the

information in order to perform their duties. In addition, colleagues should avoid recommending to any person the purchase or sale of client (or client-related) securities.

 **"Material"** means any information relating to a company with publicly traded securities, its business operations, or its securities that would likely affect the market price of any of its securities or that would likely be considered important by a reasonable investor in determining whether to buy, hold, or sell such securities. Although it is impossible to list all types of information that might be deemed material under particular circumstances, information dealing with the following subjects is often found to be material: earnings estimates; dividends; major new discoveries or advances in research; proposals or agreements for mergers, acquisitions, tender offers, and sales of substantial assets; changes in debt ratings; significant write-downs of assets; liquidity problems; extraordinary management changes; public offerings; and significant litigation or government investigations. If you are uncertain whether particular information is material, you should consult with the Compliance Department at compliance@amplify.com or by phone at 1-800-344-9100.

Information is "nonpublic" if it has not been disclosed generally to the public. Information is considered to have been made public if it has been published in newspapers or other media or has been the subject of a press release, *and* sufficient time has passed following the dissemination so as to give the public time to absorb the information. Thus, you may not attempt to "beat the market" by trading simultaneously with, or shortly after, the official release of material information.

In unusually sensitive situations, colleagues should consider taking extraordinary precautions to prevent misuse or unauthorized disclosure of information. Such measures, in the appropriate situation, might include the following:

(a)     Use of code names to disguise the identity of one or more parties;

(b)     Non-routine conflict checks (*e.g.*, including pertinent party names as part of a longer list that also includes non-pertinent ones; using the correct party names but describing an innocuous transaction); and

(c)     Maintaining the files in a secure location to which access is restricted.

If you believe a particular situation may require additional safeguards, you should consult with Compliance at 1-800-344-9100 / compliance@amplify.com or Human Resources humanresources@amplify.com.

The restrictions in this policy apply to all colleagues, even those who are completely unaware of the material, nonpublic information in question. The restrictions also apply to the spouse and minor children, domestic partner and any minor children of domestic partners of any colleagues and any accounts or entities over which he or she or members of his or her family have investment discretion or influence (such as a trust).

The restrictions extend to part-time colleagues of the Company and continue to apply even after the individual leaves the Company. In addition, some transactions are exempted from the securities laws; you should contact Compliance with any questions about such exemptions.

The consequences of insider trading violations (including tipping) can be severe. Civil penalties can include fines of up to three times the profit gained, or the loss avoided, and criminal penalties can include fines of up to $5 million and jail sentences of up to twenty years. In addition, any colleagues who violate this policy will be subject to appropriate disciplinary action, which may include termination of employment.

In order to prevent insider trading and the appearance of insider trading, Colleagues may not trade in shares of any client on whose account they are working or have worked in the prior 12 months without the approval of the Legal Department.  Client shares within a mutual fund, ETF, index fund, or similar vehicle is allowed if individual positions within such vehicle are not selected by the Colleague.

**Solicitation and Distribution**
The Company prohibits solicitation and the distribution of literature during the working time of either Colleague: the solicitor or the Colleague being solicited. In addition, the Company prohibits solicitation and distribution in working areas at all times. This does not preclude Colleagues from using their approved breaks and rest periods to solicit or distribute literature outside of working areas.  All solicitation and distribution are subject to the Company's harassment and discrimination policies.

Individuals not employed by the Company are prohibited from soliciting or distributing literature on Company property at all times.

Failure to adhere to this policy may result in discipline, up to and including termination of employment.

**Conflict of Interest**
The Company is judged by the collective and individual performance of its Colleagues. The Company has a particular interest in preserving its reputation and the reputation of its Colleagues for the utmost honesty and integrity. Thus, the Company holds itself and its Colleagues to the highest standards of lawful and ethical conduct.

Colleagues must be very careful that their relationship with clients or vendors and other activities do not subject them or the Company to questions or undue criticism. Colleagues must refrain from engaging in any activity that could be in conflict with their status as a Company Colleague. This includes the use of a Colleague's position with the Company for personal profit, advantage, or entering into transactions or relationships where it may appear that a Colleague has a conflict of interest, are improperly benefiting from an affiliation with the Company, or are violating laws governing

1.  To report a compliance or legal issue, call the Compliance Helpline at 1-800-364-9100 or email compliance@amplity.com

fiduciary relationships. Good judgment should supplement these provisions to avoid even the appearance of impropriety.

If a Colleague has questions about the propriety of a transaction or activity, they should seek guidance from their manager, Compliance, or Human Resources. If necessary, Colleagues should seek written approval before proceeding.

**Software and Font Licensing**
The Company regulates Colleagues' use of its computer software made available for business purposes on the Company's computer networks.

Licensed software or related documentation may not be duplicated, either on Company premises or elsewhere, unless expressly authorized by written agreement with the licensor and/or the Company and may not be provided to anyone outside of the Company. Colleagues should be aware that the illegal duplication of software may result in the filing of criminal copyright charges by the owners of the copyrights and can subject both the Colleague and the Company to liability. Such conduct also violates the Company's Acceptable Use Policy and such violations may result in disciplinary actions against any colleague or contractor who violates it.

All software and fonts acquired by the Company will be licensed by the Company or the Company's personnel. Colleagues may not load unauthorized software or fonts on any Company computers. In the event that the Company discovers unauthorized software or fonts on its computer network, such unauthorized software or fonts will be immediately uninstalled, and the Colleague(s) involved in such installation may be subject to discipline for violation of this policy.

**Interacting with Health Care Professionals**
Strict laws and regulations govern our interactions with health care professionals, which include physicians, nurses, hospital or medical office staff, and anyone involved in prescribing, administering, purchasing or recommending our products.  We must ensure compliance with these rules and never interfere with a health care professional's independent medical judgment.  In the U.S., the Anti-Kickback Statute (and similar state laws) prohibit offering or providing anything of value to induce someone to prescribe, furnish, or recommend a product reimbursed by a federal health care program, such as Medicare or Medicaid.  Certain arrangements involving the exchange of value with health care professionals, such as carefully-designed consulting or other personal services agreements, can be appropriate under the law.  No colleague may provide a health care professional with anything of value including, but not limited to, a gift, grant, consulting arrangement, speaking engagement, clinical study support, meals, entertainment, or cash or cash-equivalents, or payment of any kind, unless consistent with a written company policy governing the particular situation or prior approval from Legal or Compliance. Certain state laws also prohibit these items.

1. Case: 3:22-cv-00370-TMR-Dmo #: 24-1 Filed: 04/01/24 Page: 115 of 130 PAGEID #: 266
To report a compliance or legal issue, call the Compliance Helpline at 1-800-364-9100 or email
compliance@amplity.com

These rules apply to interactions you may have on behalf of Amplity or on behalf of an Amplity client. Amplity clients may have their own rules on interacting with healthcare providers which must be followed with regard to interactions on their behalf.

**Business Gifts and Meals -- Receiving**
The Company wants at all times to avoid the appearance of impropriety in the acceptance of gifts from vendors, business contacts, or clients. It is the policy of the Company that Colleagues are prohibited from either directly or indirectly asking, demanding, exacting, soliciting, or seeking anything of value for themselves or for any other person or entity.

Colleagues are also prohibited from either directly or indirectly accepting, receiving, or agreeing to receive anything that has a value of $50 or more for themselves or for any other person or entity (other than paychecks from the Company) for, or in connection with any transaction or business of the Company. Colleagues may attend business meals valued at $100 or less. Cash gifts are prohibited. Exceptions must be approved by the Legal department. If a Colleague is promised, offered, or given anything of value from any vendor, prospective vendor, other business contact, client, prospective client, or competitor for, or in connection with any transaction or business of the Company, colleagues are to advise their manager, or Human Resources at once.

**Business Gifts and Meals – Giving**
Colleagues, with the approval of their manager, may provide business gifts or meals to clients, prospective clients, or other business partners under the same guidelines as for receiving gifts and meals set forth above. Further, Colleagues must be mindful to comply with any client or partner codes of conduct that may provide lower limits or may prohibit gifts and meals entirely.

**Relationships with Competitors – Antitrust**
The Company is committed to free and open competition in the marketplace. Colleagues must avoid actions that would be contrary to laws governing competitive practices in the marketplace, including UK and U.S. federal and state antitrust laws. Such actions include misappropriation and/or misuse of a competitor's confidential information or making false statements about the competitor's business and business practices.

In general, U.S. and UK antitrust laws forbid agreements or actions "in restraint of trade." All colleagues should be familiar with the general principles of the U.S. and UK antitrust laws, as well as similar laws in any other jurisdiction in which the Company does business.

The following is a summary of actions that are violations of applicable antitrust laws:
• Price Fixing. The Company may not agree with its competitors to raise, lower or stabilize prices or any element of price, including discounts and credit terms.

• Allocation of Business. The Company may not agree with its competitors to divide or allocate markets, territories or customers.
• Monopolies. The Company may not engage in any behavior that can be construed as an attempt to monopolize.
• Boycott. The Company may not agree with its competitors to refuse to sell or purchase products from third parties. In addition, the Company may not prevent a client from purchasing or using non-Company products or services.
• Tying. The Company may not require a customer to purchase a product that it does not want as a condition to the sale of a different product that the customer does wish to purchase.

Colleagues should exercise caution in meetings with competitors. Any meeting with a competitor may give rise to the appearance of impropriety. As a result, if you are required to meet with a competitor for any reason, you should obtain the prior approval of the Legal department.

Colleagues must also be cautious when attending meetings of professional organizations and trade associations at which competitors are present. Attending meetings of professional organizations and trade associations is both legal and proper, if such meetings have a legitimate business purpose. At such meetings, you should not discuss pricing policy or other competitive terms, plans for new or expanded facilities or any other proprietary, competitively sensitive information.

Violations of antitrust laws carry severe consequences and may expose the Company to substantial civil damages, criminal fines and, in the case of individuals, prison terms. Whenever any doubt exists as to the legality of a particular action or arrangement, it is your responsibility to contact the Legal department promptly for assistance, approval and review.

**Government Inquiries and Subpoenas**
It is Amplity's policy to fully cooperate with any and all government inquiries and investigations. Accordingly, Colleagues should never alter or destroy any documents, nor should they provide false or misleading statements to a government investigator or cause / attempt to cause another Colleague to do the same. If an Amplity Colleague receives an inquiry or request (e.g. subpoena, letter, telephone call, email, in person visit) from any governmental agency, the Colleague is required to immediately notify the Legal department. Amplity documents must not be provided to any governmental agency without the prior review by and approval of the Legal department.

Any subpoena or document request received by any Colleague on behalf of a party other than a governmental must also be forwarded to the Legal department immediately. Amplity documents must not be provided to any third party without the prior review by and approval of the Legal department.

**Privacy**

Although not a covered entity under the Health Insurance Portability and Accountability Act, Amplity strives to implement best practices with respect to privacy and security of the personal information of Colleagues, Contractors, HCPs, and any other individual. To that end, Amplity requires Colleagues to apply the "minimum necessary" standard with regard to such personal information. The minimum necessary standard seeks to limit the use or disclosure of, and requests for, personal information to the minimum necessary to accomplish the intended purpose.

Colleagues shall make themselves familiar with and shall adhere to the policies of the clients with whom they work and the establishments with which they do business (e.g. hospitals, medical centers, HCPs' offices). Amplity colleagues shall not use, disclose or request personal information in a manner that violates this policy, the policy of the client or other establishment, or state or federal laws. Amplity colleagues who may view personal information in the regular course of their employment (e.g. during a on a sales call) shall not use or disclose such to third parties without the approval of the Legal department. Any Amplity Colleague who receives personal information in the regular course of their employment must ensure that such does not be made visible to other colleagues and shall be redacted if necessary, to ensure compliance with the minimum necessary standard. All personal information must be stored in a secure area and all documents containing such shall be deleted or destroyed when the information is no longer needed.

No Amplity colleague may enter into a "Business Associates" or other agreement containing privacy obligations without the approval of the Legal Department. In cases where Amplity has entered into a Business Associates agreement or subcontract, the terms of such agreement must be strictly complied with.

**Document Retention**

Documents are created in everything you do as a Company Colleague – even emails are documents. All documents should be saved in the appropriate archive system. The Company's Document Retention Policy will tell you which documents must be saved and for how long.

**Payments to Government Personnel / Foreign Corrupt Practices Act**

Colleagues engaged in international activities need to be aware of and understand the laws that address interactions with others, particularly considering the complexities of legal and cultural differences in the many countries in which we do business. All countries prohibit bribery of their public officials. The U.S. and many other countries also prohibit bribery of officials of other countries, for example the US Foreign Corrupt Practices Act and the UK Bribery Act ("Anti-Bribery Laws"). Anti-Bribery Laws, among other things, prohibit the payment of any type of kickback to a foreign official, political party, or any third party to secure or maintain a business advantage. Anti-Bribery Laws apply to all of Amplity's business transactions. In simple terms, it is a violation of Anti-

1.    To report a compliance or legal issue, call the Compliance Helpline at 1-800-364-9100 or email compliance@amplity.com

Case: 3:22-cv-00370-TMR Doc #: 24-1 Filed: 04/01/24 Page: 118 of 130  PAGEID #: 269

Bribery Laws to make or offer a bribe to government officials or others engaged in commercial transactions. It is also a violation to offer money or anything of value to a third party while knowing that some or all of the payment will be passed on to a foreign official for an improper purpose. Compliance with Anti-Bribery Laws is part of Amplity's commitment to good business ethics and compliant practices.

No Amplity Colleague, Contractor, or other person acting on Amplity's behalf has the authority to offer, promise, make or facilitate the making of payments to a foreign official to induce that official to affect any government act or decision in a manner that will assist Amplity or any of its clients.  Further, every Colleague is required by both Amplity policy and applicable law to keep books, records, and accounts that accurately and fairly reflect all transactions and disposition of Amplity assets.

**Conflict of Laws**
In the event that Amplity's Code of Conduct conflicts with a local, state or federal law, the local, state or federal law must be followed. Also, to the extent that any law is more restrictive than this Code, that law must be followed.
If a colleague believes that any such conflict exists, he/she must notify the Legal department immediately.

**Ethics and Reporting Irregularities**
It is the responsibility of each Colleague to immediately report any and all ethical violations and irregularities indicating actual or suspected existence of loss, fraud, embezzlement, or similar impairment of Company funds or property and suspicious persons or activity.

A Colleague with actual or constructive knowledge of any irregularity and the Colleague must report it to their Human Resources, the Legal department, or to the Amplity Ethics Hotline.  Failure to do so is a violation of Amplity Policy.

_____
Signature

_____
Printed Name

_____
Date

**APPENDIX "B"**

| Carrier | Group # | Website | Contact # |
|---|---|---|---|
| **Medical / Rx** | | | |

To report a compliance or legal issue, call the Compliance Helpline at 1-800-364-9100 or email compliance@amplity.com

| United Healthcare<br>• Choice Plus PPO Premier (AY4Y)<br>• Choice Plus PPO Standard (AY39)<br>• Choice Plus HDHP (AY4S) | 917140 | www.myuhc.com | 1-866-414-1959 |
|---|---|---|---|
| **Vision** | | | |
| United Healthcare<br>• High Vision Plan<br>• Low Vision Plan | 917140 | www.myuhc.com | 1-866-414-1959 |
| **Dental** | | | |
| Delta Dental<br>• Comprehensive DPPO (00001)<br>• Basic DPPO (00002) | 19081 | www.deltadentialins.com | 1-800-932-0783 |
| **Life and AD&D Insurance** | | | |
| Securian<br>• Basic Life<br>• Voluntary Life<br>• Voluntary AD&D | • 70390<br>• 70390<br>• 70391 | www.securian.com | 1-866-293-6047 |
| **Disability (STD/LTD)** | | | |
| The Hartford<br>• Short Term Disability<br>• Long Term Disability | • 697575<br>• 681588 | www.thehartford.com | 1-860-547-5000 |
| **Critical Illness and Accident Insurance** | | | |
| The Hartford<br>• Voluntary Accident Insurance<br>• Voluntary Critical Illness Insurance | 681588 | www.thehartford.com | 1-860-547-5000 |
| **Flexible Spending Accounts (FSA)** | | | |
| WageWorks<br>• Health Care FSA<br>• Dependent Care FSA | 47480 | www.wageworks.com | 1-877-924-3967 |
| **Healthcare Savings Account (HSA)** | | | |
| Benefit Wallet<br>*For use with enrollment in the UHC HDHP | JPK | www.mybenefitwallet.com | 877-472-4200 |
| **Employee Assistance Plan / Advocacy** | | | |
| Health Advocate | | https://members.healthadvocate.com/ | 1-866-799-2691 |
| **ADP Workforce Now and MyLife Advisors** | | | |
| | W7Z | workforcenow.adp.com | 1-855-547-8508 |
| **Employment Verification** | | | |
| The Work Number | 145032 | www.theworknumber.com | 1-866-604-6572 |

**From:** Team Amplity <TeamAmplity@amplity.com>
**Sent:** Tuesday, October 5, 2021 2:02 PM
**To:** DL_GN_ALL EMPLOYEES <all.employees@amplity.com>; DL_GN_ALL CONSULTANTS <all.consultants@amplity.com>
**Subject:** Amplity COVID Vaccination plan

Team,

Thank you for your responses to our brief survey on the COVID vaccination requirements. We heard from almost 500 of our colleagues globally. While our focus is on our US field teams, this gave us great insight to the thoughts and concerns of our global team. As expected, the results varied. While 70% of our team is in support of a vaccine requirement, 30% do not support. Of those 30%, many are vaccinated already but expressed concern about our company taking this stance.

That said, we maintain our belief that vaccination is the best precaution we can choose to engage safely and effectively with our clients and patients. We will move forward and require COVID vaccination for our **US field-based colleagues**. This is applicable to colleagues that engage in healthcare facilities and / or client facilities to perform the duties of their job. To support this requirement, we will ask colleagues to provide proof of vaccination unless the individual obtains an approved exemption to accommodate medical needs or sincerely held religious belief. **Colleagues that work 100% remote are not required to show proof of vaccination**. However, this is applicable to any colleague that will be required to participate in any in-person training or sales meetings.

Additionally, when we begin to engage in our **Langhorne, PA US office**, we will require either COVID vaccination or a negative COVID test within 72 hours of planned time in our office locations.

For our **UK office**, please continue to follow the guidelines in place which includes self-declaration and lateral flow testing prior to visiting the office.

For those in **Italy**, from October 15th you will be required to have and show your "green pass". We are currently working towards ensuring we have a process to carry out the relevant checks.

For our US colleagues, we will partner with our EAP provider Health Advocate to maintain vaccination records. We will provide instruction for how to upload vaccine cards in the coming weeks.

- Individuals who are fully vaccinated will be asked to upload their proof of vaccination by November 1, 2021. A colleague is considered "fully vaccinated" if at least 14 days have passed since the employee received the last dose.

- Individuals who are not fully vaccinated will be asked to upload their proof of vaccination by December 1, 2021. This provides 8 weeks to become fully vaccinated or receive approval for an accommodation.

- Any new employees will have 2 months after their hire date to become fully vaccinated or receive approval for an accommodation.

**EXHIBIT**

**7**

- After December 1, 2021, colleagues who have taken steps to comply with the policy but have not completed the vaccination process may have schedules changed or adjusted, and will be required to comply with appropriate protocols as adopted by Amplity or our clients.

- After December 1, 2021, colleagues who do not meet requirements of this policy as applicable to their role, will be placed on unpaid leave and their status will be evaluated periodically.

To confirm an employee has received a vaccination, colleagues must present written evidence of immunization from an authorized provider. When submitting proof of vaccination, colleagues will not be asked, and should NOT submit any personal medical information or family history. Our EAP provider Health Advocate will maintain confidentiality of any vaccination information provided.

To assist any employee who has a qualifying medical condition or objects to being vaccinated on the basis of a sincerely held religious belief or practice, we will engage in an interactive process to determine if a reasonable accommodation can be provided that does not create an undue hardship on our business and/or does not pose a direct threat to the health or safety of others in the workplace and/or to the colleague.

To request an exemption for bonafide medical or sincerely held religious reasons or to speak about implementing a workplace accommodation, please submit your request to humanresources@amplity.com. The Human Resources team will facilitate our engagement in the interactive process with you to identify a mutually acceptable accommodation outcome.

Many of our US clients have already communicated a vaccination requirement. We will continue to work with our clients on their vaccination requirements, protocols, and timelines as they arise.

We thank you in advance for your support.

### Becky O'Loughlin

**Chief People Officer**

**w:** www.amplity.com
**e:** becky.oloughlin@amplity.com
**p:** (215) 205-1539



**Request for Religious Exemption Related to COVID-19 Vaccine**

Amplity Health (hereinafter the "Company") is committed to providing equal employment opportunities without regard to any protected status and a work environment that is free of unlawful harassment, discrimination, and retaliation. As such, the Company is committed to complying with all laws protecting employees' religious beliefs and practices. When requested, the Company will provide an exemption/reasonable accommodation for employees' religious beliefs and practices which prohibit the employee from receiving a COVID-19 vaccine, provided the requested accommodation is reasonable and does not create an undue hardship for the Company or pose a direct threat to the health and/or safety of others in the workplace and/or to the requesting employee.

To request an Exemption related to the Company's COVID-19 vaccination policy, please complete this form and return it to Human Resources (humanresources@amplity.com). This information will be used by Human Resources or other Company officials to engage in an interactive process to determine eligibly for and to identify possible accommodations. If an employee refuses to provide such information, the employee's refusal may impact the Company's ability to adequately understand the employee's request or effectively engage in the interactive process to identify possible accommodations.

1

EXHIBIT

8



**Part 1 – To Be Completed by Employee:**

Name: Natalie Isensee

Date of Request: 10/7/21

Please explain why you are requesting an Exemption:

Religious beliefs. please see attached letter

In some cases, the Company will need to obtain additional information and/or documentation about your religious practice(s) or belief(s). We may need to discuss the nature of your religious belief(s), practice(s) and accommodation with your religion's spiritual leader (if applicable) or religious scholars to address your request for an exception.

**If requested, can you provide documentation to support your belief(s) and need for an accommodation?**

✓ Yes _____ No

**If no, please explain why:**

**Verification and Accuracy:**

I verify that the information I am submitting in support of my request for an accommodation is complete and accurate to the best of my knowledge, and I understand that any intentional misrepresentation contained in this request may result in disciplinary action.

I also understand that my request for an accommodation may not be granted if it is not reasonable, if it poses a direct threat to the health and/or safety of others in the workplace and/or to me, or if it creates an undue hardship on the Company.

Signature: Natalie Isensee

Print Name: Natalie Isensee     Date: 10/7/21

2

# Vaccine Administration Religious Exemption Form

**Demand for Religious Exemption from Covid-19 Vaccination**

To whom it may concern,

Based on my understanding of Title VII of the Civil Rights Act, the Emergency Use Authorization Act, the First Amendment to the United States Constitution, and other federal and state laws, I choose to exercise my right to demand a religious exemption to the requirement that I be vaccinated using the Covid-19 shots. This demand for an exemption is based on my deeply held religious beliefs pursuant to my reliance on teachings in the Holy Bible.

The Bible says, "Therefore to him that knoweth to do good, and doeth *it* not, to him it is sin" (James 4:17 KJV). My personal convictions are inspired by my study and understanding of the Bible, and personally directed by the true and living God. I am personally convicted that I should not receive any of the three Covid-19 shots presently authorized by the FDA under the Emergency Use Authorization.

It is not my responsibility to force my personal religious convictions regarding this matter on other persons as I believe whether to receive a Covid-19 shot is personal decision to each person (Romans 14). Where scripture does not expressly instruct on a particular matter, I believe that I am required to search the Scripture myself for related truths (Romans 15:4) and to seek personal guidance from the Holy Spirit (Acts 2:38-39; Romans 8). If I fail to submit to the personal convictions that the Holy Spirit and Scripture has impressed upon me, I will be sinning against God. I have personally searched the Scripture and sought guidance from the Holy Spirit to come to my decision.

The Bible states that the body is the Temple of the Holy Spirit. We are commanded to take good care of it, not to defile it, and certainly not introduce something into it that could potentially harm it (1 Corinthians 3:16-17, 1 Corinthians 6:19-20, 2 Corinthians 5:10, and 2 Corinthians 7:1).

The Bible also outlines the fact that God created the body both "fearfully and wonderfully." (Psalm 139:13-16). The Covid-19 shots work as gene therapy. By manipulating genetic operations, the Covid-19 shots alter what God made (literally assuming the position of God), which I believe to be a sinful practice under these circumstances. These vaccines (by the very disclosure of the vaccine manufacturers) contain carcinogens, neurotoxins, animal viruses, animal blood, allergens, and heavy metals. As the Covid-19 shots are still in the experimental phase of study, I do not believe it would be right for me to introduce these substances into my body because they have not sufficiently been proven to me to be safe and effective. Rather, I believe they may be harmful to my body.

It is worthwhile to provide some context to these assertions by noting that COVID-19, being untreated, has a survivability rate of 99.98% under 50 years of age. Over 50, the survival rate is 99.5%. These are numbers provided by the CDC. This continues to lend credibility to the fact that it would be sinful to seek to undertake a superfluous procedure when the risk of death is substantially low. Therefore, based on guidance from the Holy Spirit and the Holy Bible, I cannot conscientiously take the Covid-19 shots under these circumstances.

Perhaps the most notably significant reason why the acceptance of these vaccines would be considered sinful centers around the fact that fetal stem cell lines from aborted babies were used in either the initial development and/or testing of the Covid-19 shots.[1] By receiving the Covid-19 shots presently available, I believe it would constitute a complicit action in the act of abortion. I believe that abortion is murder and is strictly prohibited in the Bible (Exodus 20:13; Psalm 139:13-16; Jeremiah 1:5; Isaiah 49:15). Psalm 127:3 says that "Children are a heritage from the LORD, offspring a reward from him." The fact that aborted stem cells were involved in the origination of the three Covid-19 shots make the consumption of this vaccine an unthinkable act to me.

In addition to the religious exemption demanded, I have the legal right to be exempted from the vaccine mandate based on Federal Food, Drug, and Cosmetic Act.

Some COVID-19 vaccines are merely authorized, not approved or licensed, by the federal government; they are Emergency Use Authorized (EUA) only. The Federal Food, Drug, and Cosmetic Act states that individuals to whom EUA products are administered must be informed—

(I) that the Secretary has authorized the emergency use of the product;

(II) of the significant known and potential benefits and risks of such use, and

of the extent to which such benefits and risks are unknown; and

(III) of the option **to accept or refuse administration** of the product, of the

consequences, if any, of refusing administration of the product, and of the

alternatives to the product that are available and of their benefits and risks.

Title 21 U.S.C. § 360bbb-3(e)(1)(A)(ii)(I-III).

Accordingly, the federal court held that the U.S. military could not mandate EUA vaccines to soldiers. *Doe #1 v. Rumsfeld,* 297 F.Supp.2d 119 (2003). The court held: "...the United States cannot demand that members of the armed forces also serve as guinea pigs for experimental drugs." *Id.* at 135. No court has ever upheld a mandate for an EUA vaccine, nor will they do so with the Covid-19 vaccine which has not been licensed or approved by the FDA.

In addition, young women are concerned that this vaccine may impact their ability to have children or affect an unborn child.

Date: 10/6/21

Date: 9-12-2021

Signed: _Natalie Isensee_

Name (print): Natalie Isensee

Pastor's Signature: _Darin Belde_ (optional)

Pastor (print): DARIN BOLDEN (optional)

---

[1] https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/COVID-19_Vaccine_Fetal_Cell_Handout.pdf; ; https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf; https://www.health.nd.gov/sites/www/files/documents/COVID%20Vaccine%20Page/COVID-19_Vaccine_Fetal_Cell_Handout.p.



**Immunology Specialty Representative**
**Biologics**
**Buy and Bill**

**Amplity Health has a rewarding opportunity for an Immunology Biologic Specialty Representative in the Cincinnati, OH market.**

**We are seeking high performing immunology specialty representatives for an opportunity to become a member of a select team.  The ability to navigate complex health systems and work in a matrix environment will also be important in this role.**

In partnership with one of our leading and long- standing premier pharmaceutical partners, we have a current opening in this market.  Utilize your office based buy and bill experience, coupled with biologic, and any GI/Rheum, immunology experience to grow your career.

**Education/Experience**

- ï Minimum of a Bachelor's Degree from accredited college or university.
- ï 3 years pharmaceutical sales experience required
- ï 2 years office based buy and bill experience required, 3+ years of office based buy and bill experience preferred
- ï 3+ years of specialty sales experience selling biologics; in the areas of Immunology, Rheumatology or Gastroenterology a plus
- ï Solid understanding of the hospital environment, infusion centers and Account Management
- ï In-depth knowledge of the process around billing codes, reimbursement, support and medical benefits dynamics, knowledgeable of the managed care environment and how a product can be approved and obtained based on a policy
- ï Understand verification of benefits for patient coverage
- ï Experience working collaboratively with Account Executives around contracting
- ï Ability to work cross functionally with client's internal sales matrix
- ï Capable of developing business plans for the geography
- ï Ability to Implement national strategies and programs
- ï Ability to travel as needed within this regional territory required
- ï Successful completion of pre-employment BI and drug screen required
- ï Experience working with Medicare Part B preferred

**Values**

These are our company values that we expect all candidates and potential employees to embody as these values strongly underpin our culture:

- ï **E**xcellence
- ï **P**assion
- ï **I**ntegrity
- ï **I**nnovation
- ï **C**ollaboration

**Performance Competencies**

These are core traits we look for in all candidates and potential employees. They are assessed throughout the interview process:

- ï Innovation
- ï Drive for Results
- ï Planning

130467227.1

EXHIBIT

9



- ï  Interpersonal skills/Collaboration
- ï  Communication skills
- ï  Customer focus

**From:** Karen McAndrews
**Sent:** Friday, December 10, 2021 6:49 PM
**To:** NATALIE ISENSEE <natalie.isensee@amplity.com>
**Cc:** Erica Smith <erica.smith@amplity.com>
**Subject:** RE: Check In

Hi Natalie:

I was hoping to speak with you over the phone, but I understand you were unavailable. I learned that R1952 was filled (the neuroscience role that was a non-Amplity position). Unfortunately, Amplity has no current openings that are 100% remote at this time. As we had discussed, there may be some openings in the future; however, we do not have an anticipated timeframe of when these may become available. I have learned that new openings we had anticipated are now on hold. I have forwarded your resume to the Talent Acquisition team and they will reach out when a role does become available that you are qualified for. With this in mind, Amplity is not able to keep you on an LOA indefinitely, therefore, Amplity has decided to end your employment, effective today, 12/10/21. Your benefits will continue through the end of the month. After that, you will be eligible to receive COBRA benefits. Please find attached a separation letter for further information. Thank you for your time working at Amplity. Our hope is that you will secure employment with us again in the near future. I wish you all the best.

Karen

**From:** NATALIE ISENSEE <natalie.isensee@amplity.com>
**Sent:** Friday, December 10, 2021 10:34 AM
**To:** Karen McAndrews <karen.mcandrews@amplity.com>
**Subject:** Check In

Good morning Karen,

   Today is my last day of PTO. I have yet to hear back from you regarding next steps. Should I continue to look for an inside sales or remote role? I have yet to hear back about the roles we discussed. Also, when is unpaid leave up? When we spoke on the phone you said that it was currently extended to the end of December but would check to see if it could be extended to the end of January so that I could continue my benefits through the company. Is that still the case? I would appreciate this information so that I can have a better understanding of what my next steps need to be.

Thanks,

Natalie Isensee

Biosimilar Account Specialist

**EXHIBIT**

**10**

**From:** Karen McAndrews <karen.mcandrews@amplity.com>
**Sent:** Wednesday, November 24, 2021 11:49:11 AM
**To:** NATALIE ISENSEE <natalie.isensee@amplity.com>
**Cc:** Erica Smith <erica.smith@amplity.com>
**Subject:** RE: Mandate

Hi Natalie:

On 10/5, Amplity communicated our vaccination policy stating that we will continue to work with our clients on their vaccine requirements, protocols and timelines. Additionally it stated that anyone who does not meet the requirements would be place on unpaid leave and their status evaluated periodically. As you know, Organon shared their vaccination policy back in September.

On 11/12, I notified you of Amplity's inability to accommodate your request for exemption in your current role and reviewed the following information;

- To be eligible for an exception, you must first establish that your refusal to be vaccinated is based upon a sincere belief that is religious in nature. At that time, the Exemption Review Board did not believe this criteria was met. Note: On 11/15, I emailed you additional questions to review and respond to.

- However, I explained that even if your exemption request is approved, Amplity is not able to provide a reasonable accommodation for your current role.

  - The Biosimilar Account Specialist role requires regular in-person engagements with HCPs in medical offices and facilities to successfully perform in the job. Engaging in these interactions unvaccinated and on behalf of the company puts you and the company at great risk.
  - Targets in the role's territory require vaccination now or will require in the near future to access. These in-person visits are the primary mission of the company, and to avoid those visits would change the fundamental nature of the company and its services – leading to an undue hardship on Amplity.
  - In addition, effective November 24, Organon requires vaccination of Amplity employees representing their product before calling on health care facilities and physicians' offices.

- During our conversation, I also explained that you had 3 options to consider;

  - If you choose to respond to the additional questions and are able to obtain and approved exemption, Amplity will be happy to work with you on identifying a 100%-remote role at Amplity that you are qualified for.

  - There is also the opportunity to still get vaccinated; if interested, we will establish an urgent timeline to complete and determine if and for how long you can successfully complete your role remotely until fully vaccinated

  - If the first 2 suggestions are not options for you, we will take that as your voluntary resignation and partner on transition out of the company by Nov 24.

**EXHIBIT**

**12**

At this time, we not yet received the additional information requested regarding your religious exemption, or your intent regarding any of the options presented to you. As I had explained, we are happy to work with you on finding another job within Amplity that is 100% remote that you are qualified for. If this is the case, please let me know when you are available so we can set up time to understand your qualifications and review any roles that we may have open now or in the future for your consideration.

Again, as stated in on our policy, anyone who does not meet the vaccination requirements would be place on unpaid leave. Since you do not meet the requirements at this time, we have to place you on an unpaid leave, effective 11/29. You are able to use any accrued paid time off to bridge your compensation during this time. According to Workday, you have 65.95 hours of vacation time, and 8 hours of sick time. Please let us know if you would like to use that time.

Please note that we have received your email dated 11/23. The Review Board is working in good faith on behalf of the Company based on appropriate legal advice and if you have claims, you can bring them against the Company.

Thank you for your understanding as we work through next steps. As always, please feel to reach out to me at any time.

Best regards,

Karen