1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF OHIO

3    WESTERN DIVISION AT DAYTON

4    _____

5    NATALIE ISENSEE,          :

6              Plaintiff,      :

7         -vs-                 : CASE NO. 3:22-CV-370

8    AMPLITY, INC.,            : JUDGE THOMAS M. ROSE

9              Defendant.      :

10   _____

11

12        Zoom deposition of KAREN MCANDREWS,

13   a witness herein, taken by the Plaintiff as

14   upon cross examination and pursuant to the

15   Federal Rules of Civil Procedure, via Zoom

16   videoconference, at 9:00 a.m., on Thursday,

17   March 14, 2024, before Tina M. Shell, a

18   Registered Professional Reporter and notary

19   public within and for the State of Ohio.

20

21              *  *  *  *  *  *

22

23

24

25

2

1              <u>QUICK REFERENCE INDEX</u>

2              WITNESS: KAREN MCANDREWS

3

4                      DX   CX   RDX   RCX

5    BY: MR. MATTHEWS          4          57

6    BY: MR. CAMPBELL     48

7

8                      <u>EXHIBITS</u>

9

10           MARKED                PAGE

11   PLF'S:   1                    30

12            2                    32

13            3                    33

14            4                    35

15            5                    39

16            6                    43

17

18

19              <u>INFORMATION REQUESTED</u>

20

21                                PAGE

22   BY: MR. MATTHEWS

23              NOT APPLICABLE

24   BY: MR. CAMPBELL

25              *   *   *   *   *

3

1          A P P E A R A N C E S

2

3   ON BEHALF OF PLAINTIFF (Via Zoom)

4        Mr. Jason P. Matthews
         Attorney at Law
         Jason P. Matthews, LLC
5        130 West Second Street
         Suite 924
6        Dayton, Ohio  45402

7   ON BEHALF OF DEFENDANT (Via Zoom)

8        Mr. David A. Campbell, II
         Attorney at Law
9        Gordon Rees Scully Mansukhani
         600 Superior Avenue, East
10       Fifth Third Building, Suite 1300
         Cleveland, Ohio  44114
11
         Mr. Eric Green
12       General Counsel
         Amplity, Inc.
13       2080 Cabot Boulevard West
         Suite 100
14       Langhorne, Pennsylvania  19047

15  ALSO PRESENT (Via Zoom)

16       Ms. Natalie Isensee

17              *  *  *  *  *  *

18

19

20

21

22

23

24

25

4

1          COURT REPORTER:  Do all counsel
2    stipulate to me swearing the witness in
3    remotely?
4          MR. MATTHEWS:  Yeah, I agree.
5          MR. CAMPBELL:  Yes, I agree.
6    WHEREUPON:
7          KAREN MCANDREWS,
8    of lawful age, a witness herein, being first
9    duly sworn as hereinafter certified, was
10   examined and deposed as follows:
11          CROSS EXAMINATION
12   BY MR. MATTHEWS:
13      Q.    Thank you.  Good morning, Ms.
14   McAndrews.  My name is Jason Matthews and I'm
15   an attorney that represents Natalie Isensee
16   in a lawsuit that's been filed against
17   Amplity.  And for some reason I have trouble
18   saying Amplity so that might not come out
19   real smoothly this morning.
20          But we're here today to take
21   your deposition.  And I'm going to be asking
22   you a series of questions, and you're going
23   to be answering my questions just as if
24   you're testifying under oath in court, so it
25   is important to give an audible response to

5

1    my questions and it's important to provide a

2    truthful, accurate, and complete answer to my

3    questions to the best of your ability, okay?

4        A.    Okay.

5        Q.    So what I would like to do is, I'd

6    like to have you state and spell your name

7    for the record?

8        A.    Certainly.  Karen McAndrews,

9    K-A-R-E-N, McAndrews, M-C-A-N-D-R-E-W-S.

10       Q.    All right, thank you.  And as part

11   of the process today, as I mentioned earlier,

12   it is important to give an audible response

13   because everything that's being said on the

14   record is being taken down by Tina, our court

15   reporter.

16            It's also important for you and

17   I not to talk over one another.  So even if

18   you know where I'm going with my question,

19   please allow me to finish before you start

20   your answer, and I'm going to do my best to

21   allow you to finish your answer before I

22   start my next question, okay?

23       A.    Okay.

24       Q.    Additionally, if you need a break

25   at any point during the deposition today,

6

1    please let me know, and we can go off the

2    record and take a break.  I will most likely

3    ask that you answer the question that's on

4    the table before we break, though.

5             If you think any of my questions

6    involve a matter of attorney/client

7    privilege, please let me know, and we can go

8    off the record and have a discussion with

9    Amplity's legal counsel before we move

10   forward, okay?

11        A.   Okay.

12        Q.   Can you think of any reason why you

13   would be unable to answer my questions

14   truthfully and accurately today?

15        A.   No.

16        Q.   Okay.  Are you currently employed?

17        A.   Yes.

18        Q.   And by whom are you employed?

19        A.   Amplity Health.

20        Q.   Okay.  And how long have you been

21   employed by Amplity Health?

22        A.   I'd say about two and a half years.

23        Q.   Okay.  Do you know the date that

24   you started your employment or the, at least

25   the approximate date?

7

1    A.    It was June of 2021.  I think it
2    was June 26th, but I -- I should know that
3    but I don't have that accurate day.  But June
4    of 2021.

5    Q.    All right.  And what position do
6    you currently hold with Amplity?

7    A.    Currently I'm the director of the
8    US people team.

9    Q.    And is that the position that you
10   were hired into?

11   A.    No, I was hired into a Human
12   Resources business partner role originally.

13   Q.    And in the timeframe of October of
14   2021 through December of 2021, what was your
15   role at that time?

16   A.    I was a Human Resources business
17   partner.

18   Q.    And when were you promoted or when
19   did you transition into your current
20   position?

21   A.    It was September of 2023.

22   Q.    And, just generally, what were your
23   job duties as an HR business partner as they
24   related to requests for religious
25   accommodations?

8

1        A.    Sure.   So I supported the process.
2   So basically if anyone had any questions,
3   certainly answered questions.   If there were
4   any exemption requests, I would kind of
5   funnel that information and coordinate that
6   with the employee and the exemption review
7   board and my boss, Erica Smith, at the time.
8        Q.    And were you involved in making any
9   decisions as to whether a religious
10  accomodation request would be granted?
11       A.    No, I was not.
12       Q.    Do you know who made the decision
13  as to whether or not to grant a religious
14  accomodation at that time?
15       A.    I believe that was our Amplity
16  exemption review board.
17       Q.    Do you know who served on the
18  Amplity exemption review board?
19       A.    I do.   We had Eric Green on that
20  review board, our general counsel and chief
21  compliance officer.   We had Becky O'Loughlin
22  who was our chief people officer at that
23  time.   And we had Torben Colberg who was our
24  medical, I guess chief medical officer.
25       Q.    And, I'm sorry, what was that last

9

1  name?

2      A.   I believe it's Colberg.  He's no

3  longer here.  C-O-L-B-E-R-G.

4      Q.   Okay.  And do you recall having

5  some communications with Natalie Isensee

6  regarding her request for a religious

7  exemption?

8      A.   I do.

9      Q.   Okay.  And just so that the record

10  is clear, the exemption or the accomodation

11  that we're discussing is the accomodation of

12  not receiving the COVID-19 vaccination?

13      A.   That's correct.

14      Q.   And is it your understanding that

15  Ms. Isensee submitted a request for an

16  accomodation based on her religion not to

17  receive the COVID-19 vaccination?

18      A.   Yes, she did.

19      Q.   And did she submit that request to

20  you?

21      A.   Yes.

22      Q.   And did you review Ms. Isensee's

23  request?

24      A.   She provided a letter, sent that to

25  me, and then I forwarded that to Erica Smith

10

1    who was our director -- senior director at

2    the time.  So I didn't review it in its

3    entirety, I just forwarded the request off to

4    Erica Smith who then shared that with the

5    exemption review board.

6        Q.    Okay.  And with respect to Erica

7    Smith, she was your immediate supervisor, is

8    that correct?

9        A.    That's correct.

10       Q.    And did Ms. Smith report directly

11   to Becky O'Loughlin, the chief people

12   officer?

13       A.    That's correct.

14       Q.    All right.  And so you received Ms.

15   Isensee's accomodation request, you forwarded

16   that or transferred that to Erica Smith, and

17   do you know what happened to that

18   accomodation request after it was transferred

19   to Ms. Smith?

20       A.    Yes.  I believe it was then

21   forwarded to the exemption review board.

22       Q.    And did you have any communications

23   with anybody from the exemption review board?

24       A.    I did not.

25       Q.    And do you know whether or not the

11

1    exemption review board reviewed accomodation

2    requests for both religious exemptions and

3    disability exemptions?

4         A.   With respect to the COVID-19

5    vaccination?

6         Q.   With respect to the COVID-19

7    vaccination.

8         A.   Yes, I do believe that to be the

9    case.

10        Q.   Do you know whether the review

11   board, the exemption review board utilized

12   the same standards in determining whether a

13   religious accomodation would be approved

14   versus whether a religious -- I'm sorry, let

15   me start over.

16             Do you know whether or not the

17   review board used the same standard in

18   determining whether an accomodation based on

19   disability would be granted versus whether an

20   accomodation based on religion would be

21   granted?

22        A.   Yes, I do.

23        Q.   Okay.  And did they use the same

24   standard?

25        A.   I believe so, yes.

12

1    Q.    And do you know what standard was

2  utilized?

3    A.    So essentially the role of a

4  field-based sales employee, right, a part of

5  their essential functions of the job was for

6  in-person regular face-to-face conversations

7  with doctors in clinics, hospitals, and

8  health systems.  So it was essentially

9  reviewed based on the essential functions of

10  the job regardless of whether it was a

11  medical or a religion, you know, request for

12  exemption.

13    Q.    Okay.  Do you know if there was any

14  determination as to whether an exemption --

15  I'm sorry.  Do you know if there was any

16  consideration by the review board as to

17  whether an exemption created any type of

18  hardship for Amplity?

19    A.    Yes, that is my understanding.

20    Q.    And what was your understanding of

21  what factors were considered when determining

22  if an accomodation request posed a hardship

23  to Amplity?

24    A.    Sure.  It was -- they were looking

25  at the essential functions of the job as well

13

1    as the contractual agreements with our

2    clients, and also considering the, the

3    vaccination requirements of entering into

4    facilities, doctors' offices, and health

5    systems.

6          Q.    And as of November of 2021, were

7    sales representatives -- or I believe that

8    they were called specialty representatives,

9    is that correct?

10         A.    With this team there's different

11   teams that, that we employ, and this team was

12   an immunology sales specialist.  So they were

13   essentially field sales representatives

14   calling on, you know, cancer centers and

15   other doctors treating immunology patients.

16         Q.    And with respect to members of this

17   team who served as sales representatives or

18   specialty representatives, in November of

19   2021 were these employees, were they actually

20   going into doctors' officers and cancer

21   centers and hospitals?

22         A.    Yes.

23         Q.    Okay.  Were any of these employees

24   working fully remotely in November of 2021?

25         A.    I don't believe there was anybody

14

1    fully remote, but certainly we employed

2    individuals across the country so there may

3    have been occasions where they needed to

4    access facilities in a remote capacity.

5         Q.    Okay.  And is it your understanding

6    that as of November of 2021 that Ms. Isensee

7    was going into facilities, doctors' offices,

8    offices, cancer treatment centers, places of

9    that nature as part of her job duties?

10        A.    That was the expectation.  I can't

11   say one way or another if she specifically

12   was going into offices on a regular basis.

13        Q.    Okay.  And of the offices that she

14   was assigned to go into and the different

15   facilities that she was assigned to go into,

16   do you know whether or not any of those

17   facilities had their own requirements that

18   representatives coming into those facilities

19   be vaccinated against COVID-19?

20        A.    I can't speak specifically to the

21   targets assigned to Natalie, but what I can

22   say is those expectations or those mandates,

23   right, varied by office or hospital system.

24   And it was ever changing, right?  As the

25   vaccination became available, you know, and

15

1    offices kind of reevaluated, you know, there

2    were, there were, you know, changes with

3    respect to policies around field

4    representatives entering offices and health

5    systems.

6         Q.    And as part of your job duties as

7    an HR business partner, were you involved in

8    formulating Amplity's policy requiring

9    COVID-19 vaccinations?

10        A.    No, I was not.

11        Q.    Were you involved in formulating

12   any criteria that would be used by Amplity in

13   determining whether a religious accomodation

14   would be granted or denied?

15        A.    No, I was not.

16        Q.    Did you ever see any documents,

17   email correspondence, which discussed the

18   criteria which would be evaluated by the

19   exemption board in determining whether or not

20   an employee would be -- would receive a

21   religious accomodation from the COVID-19

22   vaccination?

23        A.    No, I did not.

24        Q.    And did you ever have any

25   discussions with Natalie Isensee regarding

16

1    possible accommodations that would allow her

2    to perform her job duties while being exempt

3    from receiving the COVID-19 vaccination?

4         A.    Well, based on the job duties

5    there's an expectation that she engage in

6    face-to-face conversations just like our

7    competitors, so we didn't discuss any kind of

8    accomodation with respect to her in her

9    present role; however, we did discuss

10   opportunities to consider other roles within

11   Amplity that didn't require face-to-face

12   regular in-person engagements with hospitals

13   and such.

14        Q.    Okay.  And with respect to the role

15   that she was in as an immunology sales

16   representative, were there any discussions

17   regarding regular testing as an accomodation

18   for, for her religious beliefs?

19        A.    No, we did not.

20        Q.    Was there any discussion regarding

21   masking as an accomodation for her religious

22   beliefs?

23        A.    I don't recall.  She may have asked

24   if that was an option, but I, I don't recall

25   specifically if that's a conversation that

17

1    she and I had.

2        Q.   Was there any discussion regarding

3    allowing Ms. Isensee to continue working

4    remotely as a specialty sales representative?

5        A.   I believe she asked if that was an

6    option at one point in time, but we were not

7    able to accommodate in that fashion given the

8    expectations and the contractual obligations,

9    and the required expectation to enter offices

10    and facilities to have face-to-face

11    conversations with doctors and physicians.

12        Q.   Do you know whether or not Ms.

13    Isensee's performance in her job duties while

14    working on a fully remote basis was taken

15    into consideration when determining whether

16    to grant her religious accomodation request?

17        A.   I'm not aware that she was fully

18    remote.  And I'm not aware of any performance

19    issues or concerns, or that that factored

20    into any decision.  It was purely just, you

21    know, the essential functions of the job

22    required in-person engagements.

23        Q.   And do you know whether or not

24    those essential functions of the job changed

25    at all at any point after Ms. Isensee's

18

1    employment was terminated?

2          A.    No, I don't believe that there,

3    there's been any change.  It is part of the

4    credentialing process just like other

5    vaccinations are required to access

6    facilities.  So for in, you know, in-person

7    roles that require vaccination, I don't

8    believe our policy has changed at this point

9    in time.

10         Q.    And with respect to the

11   credentialing, do you know if any of the

12   specific facilities that Ms. Isensee called

13   upon required the COVID-19 vaccination as of

14   November or December of 2021?

15         A.    Can you repeat that question?

16         Q.    Sure.  Do you know whether any of

17   the specific facilities or offices that Ms.

18   Isensee called upon required the COVID-19

19   vaccination in November of 2021?

20         A.    I don't know specifically with

21   respect to the targets in her territory, but

22   I can say that the -- my understanding is the

23   majority of health systems had required

24   COVID-19 vaccination at that time, which was

25   a part of the credentialing process to access

19

1    the facilities, yes.

2         Q.    And do you know if any of those

3    facilities that Ms. Isensee called upon, was,

4    was assigned to call upon, not allowing any

5    religious accomodation from the COVID-19

6    vaccination?

7         A.    Specific to her territories or

8    customers, no, I don't.  I can't.

9         Q.    And it's my understanding that,

10   that Ms. Isensee was actually contracted by

11   Amplity to work for a company called Organon;

12   are you familiar with Organon or Organon?

13        A.    Organon, yes, she was part of the

14   team that was, you know, promoting products

15   on behalf of Organon.

16        Q.    Now, do you know whether or not

17   Organon required that Amplity team members or

18   Amplity employees working on their team

19   receive the COVID-19 vaccination?

20        A.    Yes, that was the expectation.

21        Q.    Do you know if Organon allowed for

22   employees to be granted accommodations based

23   on religious beliefs?

24        A.    Are you speaking about their own

25   employees?

20

1      Q.    Well, let's start with their own

2   employees, if you know.

3      A.    I don't have awareness of that, no.

4      Q.    Do you know if Organ -- well, let

5   me ask a different question.  Did Organon

6   ever communicate to Amplity that we're not

7   going to allow any Amplity employees to

8   continue working on our team if they have not

9   received the COVID-19 vaccination?

10      A.    I'm not aware of any conversation

11   that occurred in that regard.  I do know that

12   our statement of work did require in-person

13   face-to-face engagements with their

14   customers.

15      Q.    And do you know whether any of

16   Organon's customers communicated to Amplity

17   that Amplity employees would not be permitted

18   in their facilities if they had not received

19   the COVID-19 vaccine?

20      A.    I don't know if any customers

21   specifically communicated directly to

22   Amplity, but I have the understanding that

23   any vendor or visitor, right, calling on

24   behalf of doctors, there were offices that

25   would not permit people to enter those

21

1   facilities without vaccination to COVID-19.

2       Q.   But you don't know whether any of

3   those specific facilities were facilities

4   that Ms. Isensee was required to enter as

5   part of her job duties, is that correct?

6       A.   That's correct.

7       Q.   Did you have any communications

8   with anybody from the exemption board

9   regarding the board's decision to deny Ms.

10  Isensee's request to -- or, I'm sorry,

11  request for an accomodation not to receive

12  the COVID-19 vaccine?

13      A.   I did not have any discussions with

14  the exemption review board.

15      Q.   Did you receive any type of written

16  communications from the exemption review

17  board pertaining to Ms. Isensee's request for

18  religious accomodation?

19      A.   I did not receive any emails from

20  the exemption review board.  I received

21  communication or direction from my boss at

22  the time, Erica Smith.

23      Q.   Okay.  And with respect to your

24  communications with Ms. Smith, did she

25  communicate to you the basis of the review

22

1    board's denial of Ms. Isensee's accomodation

2    request?

3         A.    Yes.

4         Q.    Okay.  And based on that

5    communication with -- well, let me just back

6    up.  What did Ms. Smith communicate to you

7    regarding Ms. Isensee's accomodation request?

8         A.    Basically that we were unable to

9    accommodate in this role as a field sales

10   representative because that would cause undue

11   hardship.  So, you know, we were

12   contractually obligated for in-person

13   engagements, and so in this role we would be

14   unable to accommodate.

15              Also, we were following CDC

16   guidance that somebody entering facilities

17   especially with immunocompromised patients

18   could put those patients at risk.

19              So it was kind of a two,

20   two-factor decision that applied to all

21   exemption requests, whether that be religious

22   or medical.

23              And, you know, therefore, we

24   would be able to un -- we would not be able

25   to accommodate in this role, but we would

23

1   either, A, happy, happy to help them kind of

2   work through the vaccination process or find

3   another alternative role that did not require

4   regular in-person engagements.

5        Q.   Okay.  And I'd like to discuss a

6   little bit more about the hardship piece.

7   Did Ms. Smith indicate to you that

8   accommodating Ms. Isensee's request --

9   exemption request would create any type of

10  financial hardship for Amplity?

11       A.   Yes.

12       Q.   Okay.  And what specifically did

13  she communicate to you regarding a financial

14  hardship?

15       A.   Essentially that, you know,

16  contractually we had an obligation to our

17  client to, you know, employ sales

18  representatives supporting their products,

19  you know, and as a result, if we weren't able

20  to provide that, that sales team to do that,

21  right, could ultimately put Amplity at risk

22  of, of that team.

23       Q.   Okay.  So the hardship was based on

24  the potential risk of losing, losing a

25  contract with --

24

1   A.  Correct.

2   Q.  -- with Organon?

3   A.  Yes.

4   Q.  At that point had Organon

5 communicated to Amplity that, that it was

6 somehow dissatisfied or unhappy with Ms.

7 Isensee not working or not reporting to

8 certain facilities?

9   A.  No.  But they did share with us

10 that all Amplity employees working on behalf

11 of Organon needed to be vaccinated by I think

12 it was end of November.

13   Q.  Okay.  And do you know if anybody

14 from Amplity made an inquiry to Organon as to

15 whether employees could be exempted from that

16 vaccination requirement due to either

17 religious reasons or due to a disability?

18   A.  I'm not aware of any conversations.

19   Q.  Anything else regarding a financial

20 hardship that, that was discussed between you

21 and Ms. Smith relating to religious

22 accommodations?

23   A.  No.

24   Q.  And with respect to allowing Ms.

25 Isensee to work without a COVID-19

25

1    vaccination, that wouldn't have cost anything

2    out of -- or Amplity wouldn't have had to pay

3    anything out-of-pocket in order to do that,

4    is that correct?

5            A.    That's correct.

6            Q.    And you also mentioned that in your

7    communications with Ms. Smith the subject of

8    accomodation came up; now, with respect to

9    the accomodation that was offered to Ms.

10   Isensee, that was to potentially work in a

11   role that did not require face-to-face

12   customer interaction, is that correct?

13           A.    Yes.

14           Q.    And it's my understanding that you

15   and Ms. Isensee discussed potential

16   positions, but there were no positions

17   available for Ms. Isensee to transition into

18   that would not be -- would not have

19   face-to-face customer interaction and that

20   she would be qualified to perform?

21           A.    Yes, we did take a look at

22   positions that may have been available,

23   looked at her qualifications, her interests,

24   and I don't believe at the time there were

25   any positions open that kind of fit that

26

1    criteria, so at that time, correct, there was

2    no alternative roles at that time.

3        Q.    And to your knowledge, do you know

4    how many Amplity employees requested to be

5    exempt from receiving the COVID-19 vaccine

6    due to religious reasons?

7                MR. CAMPBELL:  I'm going to

8    object to it.  I don't think it's relevant in

9    an accomodation case as to it, but I'll let

10   her answer.  If you know.

11               THE WITNESS:  In a field-based

12   sales role, I believe it was around 30.

13   BY MR. MATTHEWS:

14       Q.    Okay.  And do you know how many of

15   those accomodation requests were granted?

16               MR. CAMPBELL:  I'm going to have

17   the same objection.  But you can answer.

18               THE WITNESS:  I know we were

19   able to find alternative roles for

20   individuals, I don't remember how many.

21   BY MR. MATTHEWS:

22       Q.    Okay.

23       A.    And actually some elected to choose

24   vaccination.

25       Q.    And did Amplity permit any

27

1   employees who requested religious

2   accommodations in the form of an exemption

3   from receiving the COVID-19 vaccine from

4   continuing to work in a customer-facing role?

5          A.    In a field-based role, no.

6          Q.    And with respect to the team that

7   Ms. Isensee was on, it's my understanding

8   that -- well, let me strike that.

9                Do you know whether or not any

10  employees from Ms. Isensee's team were

11  offered positions in other roles whose

12  religious accommodations were denied?

13         A.    Offered roles or were able to

14  secure roles?

15         Q.    Well, I guess were able -- so let's

16  go back.  So my understanding is, is that,

17  that in order for an employee to actually

18  receive an offer of a role, that there had to

19  be a role available, is that correct?

20         A.    That's correct.

21         Q.    Okay.  Were there any who -- were

22  there any employees who were actually offered

23  an available role?

24         A.    Of the individuals on --

25               MR. CAMPBELL:  Wait.  Wait.

28

1    Wait.  Just so we're clear, are you

2    talking -- you said any employees, are you

3    talking -- you were talking about others

4    holding the same position as Ms. Isensee, but

5    could you clarify it because I don't think

6    that's fair.

7                    MR. MATTHEWS:  Sure.

8    BY MR. MATTHEWS:

9        Q.    So we were talking about Ms.

10   Isensee's team and other members of that

11   team, were any other members of her team

12   offered roles which were available at that

13   time as an accomodation?

14       A.    The roles were -- we had a limited

15   number of roles available at that time, I do

16   not believe anyone from Natalie's team was

17   able to secure a role within Amplity.

18       Q.    Okay.

19                    MR. CAMPBELL:  Why don't we take

20   a short break.  How long do you think you're

21   going to be going?

22                    MR. MATTHEWS:  Probably, I would

23   say, you know, probably another 45 minutes or

24   so to be safe.

25                    MR. CAMPBELL:  Okay.  Why don't

29

1    we come back at a quarter till, does that

2    work?

3              MR. MATTHEWS:  That works, yep.

4              MR. CAMPBELL:  Okay.  Great.

5    Thanks.

6              (WHEREUPON, a discussion was

7    held off the record.)

8    BY MR. MATTHEWS:

9         Q.   So, Ms. McAndrews, did anybody

10   communicate to you that part of the reason

11   that Ms. Isensee's religious accomodation

12   request was denied was that the -- it was

13   determined that she did not possess a sincere

14   belief that was religious in nature to

15   justify her refusal to receive the COVID-19

16   vaccine?

17        A.   So I wouldn't say her request was

18   denied.  I think what we were saying was we

19   were not able to accommodate her, you know,

20   without COVID-19, based on the essential

21   functions of the job.

22             I do believe we had asked for

23   more information because we had our own

24   exemption form and she hadn't filled that

25   form out, she had just sent a letter with

30

1    some information.  So we were looking for,

2    for more information.  I'm not sure that

3    would have changed the outcome, but, and that

4    what I had shared with her is that, you know,

5    certainly we were looking for more

6    information, but based on the essential

7    functions of the job we didn't anticipate

8    that we would be able to accommodate her in

9    the current role.

10                Now, should she have secured a

11   remote role and had to go into client offices

12   or, you know, go into client's facilities for

13   training that required vaccination then,

14   right, we would be able to accommodate

15   because those weren't kind of everyday

16   regular in-person engagements.

17        Q.    Okay.  What I would like to do is,

18   I'd like to review a few documents with you,

19   so let me go ahead and share my screen.  And

20   please let me know if you have any difficulty

21   seeing the documents we're referencing.

22        A.    Sure.

23                (WHEREUPON, Plaintiff's

24   Deposition Exhibit 1 was marked for

25   identification.)

1    BY MR. MATTHEWS:

2         Q.    All right.  Are you able to see my

3    screen okay?

4         A.    I am.

5         Q.    Okay, perfect.  So the first

6    document which has been marked -- I'm just

7    going to scroll down to the exhibit

8    sticker -- as Plaintiff's Exhibit No. 1, this

9    appears to be an email message dated

10   October 5th of 2021.  And please let me know

11   if this is a document that -- and you can let

12   me know when I'm ready to scroll or when you

13   want me to scroll, but I just want to make

14   sure that this is a document that, that

15   you've seen before?

16        A.    Yes, I've seen this before.

17        Q.    Okay.  And was this the document

18   that communicated to Amplity employees the

19   requirements regarding the COVID-19 vaccine?

20        A.    Yes, it is.

21        Q.    Okay.  And it appears that this

22   document is dated October 5th of 2021; do you

23   know whether or not there is any official

24   announcement before this date that employees

25   would be required to receive the COVID-19

32

1    vaccine?

2         A.    No, I believe this was the

3    communication around our policy.

4              (WHEREUPON, Plaintiff's

5    Deposition Exhibit 2 was marked for

6    identification.)

7    BY MR. MATTHEWS:

8         Q.    And I'm going to scroll down to a

9    document that's been marked as Plaintiff's

10   Exhibit No. 2, and I'm just going to scroll

11   through this document and ask if this is a

12   document that you've seen before?

13        A.    Yes.

14        Q.    Okay.  And the document that's been

15   marked as Exhibit 2, does that appear to be

16   the document that Ms. Isensee submitted to

17   you requesting a religious exemption or

18   religious accomodation to be able to work

19   without receiving the COVID-19 vaccine?

20        A.    Yes.

21        Q.    And if we go to the second page of

22   that document, it appears that that document

23   was signed by Ms. Isensee or at least dated

24   October 7th of 2021; do you know if you

25   received that document from her around that

33

1  time?

2       A.    Yes, I did.

3       Q.    And if we go to the third and the

4  fourth pages of the document which appear to

5  be a letter that Ms. Isensee had submitted in

6  support of her accomodation request, it

7  appears that that document is dated

8  October 6th of 2021, signed by Ms. Isensee,

9  and then there's also a pastor's signature

10  which is dated September 12th of 2021; was a

11  pastor required to sign an accomodation

12  request under Amplity's policy?

13      A.    As I recall, no.  I believe we did

14  update the form and on that second form it

15  did say there may be a need to get additional

16  information which may have been a religious

17  leader helping to provide more information.

18      Q.    Okay.  Do you know whether anybody

19  from Amplity reached out to the Pastor Darin

20  Bolden regarding --

21      A.    No, I don't know if anybody reached

22  out to Darin Bolder (sic).

23               (WHEREUPON, Plaintiff's

24  Deposition Exhibit 3 was marked for

25  identification.)

34

1    BY MR. MATTHEWS:

2        Q.    All right.  I'm going to ask you to

3    take a look at the document that's been

4    marked as Plaintiff's Exhibit No. 3.  And I'm

5    just going to scroll through, through this

6    document.  Have you seen the document that's

7    been marked as exhibit, Plaintiff's Exhibit 3

8    before?

9        A.    I believe so, yes.

10       Q.    Okay.  And it appears that this is

11   an email message that Ms. Isensee sent to you

12   on November 23rd, 2021, is that correct?

13       A.    Yes.  Uh-huh.  Yes.

14       Q.    And based on the content of this

15   message, it appears that Amplity had already

16   denied her accomodation request at the time

17   that this email message was sent, is that

18   your understanding?

19       A.    I don't recall the exact dates, to

20   be honest.

21       Q.    Okay.  And in this email Ms.

22   Isensee is requesting a response from you

23   within 72 hours; do you recall whether or not

24   you responded to Ms. Isensee?

25       A.    We had a number of phone

35

1    conversations and a number of email

2    conversations, I don't recall if I emailed

3    back in regards to this email that she sent

4    me.

5        Q.    Okay.

6              (WHEREUPON, Plaintiff's

7    Deposition Exhibit 4 was marked for

8    identification.)

9    BY MR. MATTHEWS:

10       Q.    And I'm going to show you a

11   document that's been marked as Plaintiff's

12   Exhibit No. 4, and please let me know whether

13   or not you've seen Plaintiff's Exhibit No. 4

14   before?

15       A.    Yes, I have.

16       Q.    And this appears to be an email

17   message from you to Ms. Isensee dated

18   November 24th of 2021 at 11:49 a.m., is that

19   correct?

20       A.    Yes.

21       Q.    Okay.  And you lay out a timeline

22   in this email message and I'd like to start

23   with the 11-12 entry; would this be on

24   November 12th of 2021 that, that you notified

25   Ms. Isensee of Amplity's inability to

36

1    accommodate her request for an exemption?

2         A.    Yes.

3         Q.    And you indicate in the first

4    bullet point that:  To be eligible for an

5    exemption -- or, I'm sorry, an exception, you

6    must first establish your refusal to be

7    vaccinated is based upon a sincere belief

8    that is religious in nature.  At that time,

9    the exemption review board did not believe

10   this criteria was met.  Did somebody from the

11   exemption review board communicate to you

12   that Ms. Isensee did not meet the sincere

13   belief criteria?

14        A.    Yes.  Erica Smith had shared that

15   with me.  And I believe the exemption review

16   board was looking for some additional

17   information.  But what I had shared in this

18   email you'll see is that even if we are able

19   to accommodate her in another role, right,

20   you know, we were, we were looking for some

21   more information to substantiate I guess that

22   it was a sincere belief.

23        Q.    Okay.  And I want to ask you a

24   couple of questions regarding your knowledge

25   about this sincere belief issue.  So do you

37

1    know who from the review board you

2    communicated with regarding the sincere

3    belief issue with respect to Ms. Isensee's

4    accomodation request?

5        A.   I didn't communicate with anybody

6    from the exemption review board.  I was asked

7    by Erica Smith, my boss, to obtain more

8    information from Natalie to ascertain I guess

9    whether this was a sincere belief in the --

10   in order to consider an accomodation in

11   another role.  So should, should Natalie have

12   received an opportunity to work in a remote

13   capacity on another contract that didn't

14   require regular in-person engagements but did

15   require, you know, training or other meetings

16   that required vaccination, we would be able

17   to accommodate that.

18            So my understanding was we were

19   looking for some more information so that we

20   could make, you know, make that decision.

21       Q.   Okay.  And you indicate in, in this

22   bullet point as well that on November 15th or

23   on 11-15, I emailed you additional questions

24   to review and respond to.  Did Ms. Isensee

25   ever confirm receipt of that November 15th

38

1    email?

2          A.    I don't recall.

3          Q.    Do you have any, any records

4    indicating that, that she received that

5    November 15th email?

6          A.    I'd have to go back and look.

7          Q.    Do you recall any substantive --

8    well, did Ms. Isensee ever communicate to you

9    that she did not receive the request for

10   additional information?

11         A.    I honestly don't recall.

12         Q.    Do you recall having any other

13   communications with Ms. Smith regarding

14   whether Ms. Isensee's religious exemption

15   request -- I'm sorry -- whether or not Ms.

16   Isensee's accomodation request was based on a

17   sincere religious belief?

18         A.    Ask that question again.

19         Q.    Sure.  Other than what we've just

20   discussed, did you have any other

21   communications with Erica Smith as to whether

22   Ms. Isensee's accomodation request was based

23   upon a sincere religious belief?

24         A.    No, I did not.

25         Q.    Did you have any discussions with

39

1    Ms. Isensee about her sincere religious

2    beliefs or about her religious beliefs?

3         A.    No, I did not.

4         Q.    All right.

5               (WHEREUPON, Plaintiff's

6    Deposition Exhibit 5 was marked for

7    identification.)

8    BY MR. MATTHEWS:

9         Q.    I'm going to ask you to review a

10   document that's been marked as Plaintiff's

11   Exhibit No. 5, which is the document that

12   we're on now.  I'm going to scroll down.  Ms.

13   McAndrews, have you seen this document

14   before?

15        A.    Yes.

16        Q.    Okay.  And this appears to be an

17   email from Natalie Isensee to you dated

18   November 24th, 2021, at 1:47 p.m., is that

19   correct?

20        A.    Looks like it, yes.

21        Q.    And do you know whether or not you

22   responded to this email from Ms. Isensee?

23        A.    I would imagine that I did.  Again,

24   we had a number of phone conversations as

25   well, so if I was asking for additional

40

1    information and she, you know, either did not
2    receive that information, I would -- I
3    believe I sent her those additional questions
4    that we were asking.  But, again, reiterating
5    that, you know, should her exemption be
6    granted, that we wouldn't be able to
7    accommodate her in the current role.
8         Q.    Okay.
9         A.    Based on the essential functions of
10   the job.
11        Q.    And at any point did Amplity amend
12   Ms. Isensee's job description to include
13   being vaccinated against COVID-19 as an
14   essential function of the job?
15        A.    Yes, in the job description it did
16   say that COVID-19 vaccination was required.
17        Q.    And when was that job description
18   amended to include COVID-19 vaccination as a
19   job requirement?
20        A.    I believe it was after our policy.
21   So October 2021.  I'm sorry, that was when we
22   communicated our policy.  I believe we, our
23   policy was that those people in field-based
24   roles requiring vaccination need to be
25   vaccinated by, I believe it was December 1.

41

1    So it would have been December 1 and forward.

2         Q.    Okay.  And does Amplity still

3    require employees serving in the field

4    representative -- the immunology field

5    representative role to be vaccinated against

6    COVID-19?

7         A.    Yes, I believe so.

8         Q.    Now, after receiving this

9    November 24th email from Ms. Isensee, did you

10   resend the November 15th email to her

11   regarding the additional information that was

12   being requested regarding her religious

13   accomodation?

14        A.    I honestly don't recall.

15        Q.    Do you recall having any

16   communications with Ms. Isensee after

17   November 24th of 2021 at 1:47 p.m. in which

18   you gave her the opportunity to submit

19   additional documents pertaining to her

20   religious accomodation?

21        A.    I believe I did.

22        Q.    And how did you -- and what form of

23   communication did you have with Ms. Isensee

24   giving her that opportunity?

25        A.    Well, again, I had phone

42

1    conversation as well as email conversation.

2    It was a sensitive, sensitive situation,

3    right, and I wanted to make sure that, yeah,

4    we were clear, right, around the, the

5    requests and the, you know, the factors, and

6    let her know that we were supporting her in

7    finding another role within Amplity, you

8    know, if we were not able to accommodate.

9         Q.    Okay.  And due to her need to be

10   exempt from receiving the COVID-19 vaccine as

11   a religious accomodation, the only possible

12   accomodation that Amplity would consider

13   would be something working outside of her

14   role, is that correct?

15        A.    That's correct.

16        Q.    Did Amplity take any measures to

17   determine whether or not she could perform in

18   her current role with some type of an

19   accomodation yet still be exempt from

20   receiving the COVID-19 vaccine?

21        A.    Can you repeat that again?

22        Q.    Yeah.  Did Amplity take any

23   measures to determine whether Ms. Isensee

24   could continue working in her current role

25   while receiving the accomodation of being

43

1    exempt from the COVID-19 vaccine?

2        A.   Well, the exemption review board,

3    right, obviously considered our contractual

4    obligation, the essential functions of the

5    job, and whether we were able to accommodate

6    or not.

7        Q.   All right.

8            (WHEREUPON, Plaintiff's

9    Deposition Exhibit 6 was marked for

10    identification.)

11    BY MR. MATTHEWS:

12        Q.   Let me ask you to review the

13    document that's been marked as Plaintiff's

14    Exhibit No. 6.  And have you seen Plaintiff's

15    Exhibit No. 6 before?

16        A.   Yes.

17        Q.   Okay.  And at the top it appears --

18    well, let's start at the bottom.  The bottom

19    message appears to be an email from Natalie

20    Isensee to you dated December 10th of 2021 at

21    10:34 a.m., is that correct?

22        A.   Uh-huh.  Yes.

23        Q.   Okay.  And then if we go to the

24    message above that, it appears to be an email

25    message from you to Ms. Isensee dated

44

1    December 10th, 2021, at 6:49 p.m.  With

2    respect to Ms. Isensee's status as of

3    December 10th, was she on an unpaid leave of

4    absence at that time?

5         A.    I believe so.

6         Q.    And as an accomodation, did Amplity

7    consider extending Ms. Isensee's unpaid leave

8    of absence while additional work was being

9    done to see if a position could be secured

10   for her?

11        A.    Sure, we, we considered that

12   option, but there was nothing in the pipeline

13   that indicated we would have a role in the

14   near future.  So without having any knowledge

15   of any future roles, we were unable to keep

16   her on an unpaid leave of absence.

17        Q.    And with respect to maintaining her

18   on an unpaid leave of absence, would that

19   have created any type of financial hardship

20   for Amplity?

21        A.    I'd have to -- sorry, I would have

22   to confirm with our benefits team if, if she

23   would be eligible for any sort of benefits on

24   an unpaid leave of absence, so --

25        Q.    So would it be safe to say that as

45

1    you sit here right now you don't know whether

2    that would have created some type of

3    financial hardship on Amplity?

4         A.    Correct.

5         Q.    All right.  If we could go off the

6    record for about ten minutes, we're getting

7    pretty close to wrapping up, I just need to

8    check my notes and then we can come back on.

9    Thank you.

10                (WHEREUPON, a discussion was

11   held off the record.)

12   BY MR. MATTHEWS:

13        Q.    If everybody's ready, we can go

14   ahead and go back on the record.  Ms.

15   McAndrews, do you know whether anybody from

16   the exemption review board communicated

17   directly with Ms. Isensee regarding her

18   accomodation request?

19        A.    I don't believe so.

20        Q.    When you say I don't believe, you

21   don't believe that anybody from the review

22   board did directly communicate with Ms.

23   Isensee?

24        A.    Correct.

25        Q.    Thank you.  And do you know if the

46

1    exemption review board requested any

2    additional information from Ms. Isensee after

3    she had sent the email to you on

4    November 23rd of 2021?

5         A.   No.

6         Q.   And who was it who made the

7    decision to terminate Ms. Isensee's

8    employment?

9         A.   Erica Smith.

10        Q.   And are you aware of there being

11   communications to Ms. Isensee's team that

12   indicated that she had moved on to another

13   position within Amplity and not to contact

14   her?

15        A.   I'm not aware of any conversations

16   of that nature.

17        Q.   Okay.  Does Amplity have a women's

18   health division?

19        A.   No.

20        Q.   And once Amplity's vaccine

21   requirements or mandate went into effect, how

22   did Amplity verify that an employee had in

23   fact received the COVID-19 vaccine?

24        A.   Sure.  So we gave instructions for

25   employees to upload their vaccination cards

47

1    to a third-party vendor.  It was Health

2    Advocate who's our, one of our benefits

3    providers.

4         Q.   And do you know what steps the

5    third-party vendor took to, to verify the

6    validity of those uploaded cards?

7         A.   I'm not sure that they were

8    validating the cards.  I believe it was more

9    of a just collection of the information.

10        Q.   And did Amplity take any measures

11   to validate those vaccine cards?

12        A.   I think, again, we were just

13   monitoring that those cards were uploaded,

14   those individuals that their roles required

15   vaccination.

16        Q.   Okay.

17             MR. MATTHEWS:  All right.  I

18   think that's the extent of the questions that

19   I have.  I appreciate your time this morning

20   and we can go ahead and conclude unless,

21   unless David has any questions.

22             MR. CAMPBELL:  I have a couple

23   follow-up questions just because we're so

24   close to summary judgment, just to leave no

25   doubt.

48

1              DIRECT EXAMINATION

2    BY MR. CAMPBELL:

3         Q.   So, Karen, I just have a couple

4    questions.  I'm counsel for your employer.

5    And let me just -- you understand you're

6    still under oath?

7         A.   Yes.

8         Q.   Okay.  Let me just ask you a couple

9    questions.  You recall the discussions about

10   Ms. Isensee seeking other positions at

11   Amplity?

12        A.   Yes.

13        Q.   Tell us about your recollection of

14   I guess her efforts to find another position,

15   what do you recall?

16        A.   Sure.  Well, I always, you know,

17   recommend people go on the Amplity.com

18   website, look for those positions, but I also

19   had conversation where we had meetings where

20   we looked at all open positions that may be

21   available.  Again, looking at her, her

22   qualifications, looking at, you know, the

23   qualifications of each role, and her

24   interests.

25             Again, at the time there was

49

1   really limited opportunities but we did kind

2   of go through that process.  I think you saw

3   on that email that I also had -- she -- I

4   don't know if it was myself or herself

5   forwarding her resume to our talent

6   acquisition team.

7               But, again, we were doing

8   everything that we could to find her another

9   position.  My understanding is she did

10  interview for one remote role in December.

11  I'm not sure kind of where that landed, but I

12  am aware that she applied for one and

13  interviewed for a position.

14       Q.   Okay.  And were you personally

15  assisting Ms. Isensee to locate other

16  available positions?

17       A.   Sure.  Yes.

18       Q.   Let me just, just ask you, you were

19  asked some questions regarding other

20  employees who held similar positions to Ms.

21  Isensee, do you remember some of those

22  questions?

23       A.   Yes, I do.

24       Q.   Were those other employees that --

25  did you call them customer-facing or field

50

1    team, what is it that Amplity refers to them

2    as?

3         A.   Field sales representatives.

4         Q.   Field sales representatives, okay.

5    Just so the record's clear, are there any

6    field -- were there any in 2021, after the

7    vaccination policy was implemented, any field

8    sales representatives who were permitted to

9    continue in their roles without the COVID-19

10   vaccination?

11        A.   No.

12        Q.   Okay.  Was Ms. Isensee treated the

13   same as all other similarly situated

14   employees?

15        A.   Yes, she was.

16        Q.   You mentioned Organon, do you know

17   the spelling of that just so the record's

18   clear?

19        A.   Sure.  O-R-G-A-N-O-N.

20        Q.   Okay.  And what is Organon in

21   relation to Ms. Isensee, just so the record's

22   clear?

23        A.   Sure.  Organon is our client and

24   they contract with Amplity for field sales --

25   basically a sales team calling on customers

51

1   in, in promotion of their product.

2       Q.   Okay.  And you said that the, the,

3   I believe your testimony was that the -- I

4   guess at some point in late 2021 did Organon

5   require under the contract the reinstitution

6   of face-to-face customer meetings?

7       A.   Yes.

8       Q.   When was that, to your knowledge?

9       A.   I guess when offices started

10  opening up, right, the requirement was that

11  the field sales representatives would have

12  face-to-face interactions.  I don't recall

13  exact months.  Every office, right, across

14  the country had a different timeline.  So as

15  soon as offices were opening or letting in

16  sales representatives, there was an

17  expectation that our team would, you know, go

18  into those facilities.

19      Q.   Okay.  If Amplity was not going

20  into those facilities, into the facilities on

21  behalf of Organon, was it a breach of the

22  contract?

23      A.   Well, for facilities that were

24  closed to field sales representatives there

25  was an expectation that that representative

52

1    would still call on those customers, right,

2    in a remote capacity.

3        Q.    Okay.

4        A.    So although we were, we were being

5    contracted to have a field sales team that

6    would go into offices, there were occasions

7    where offices may not let any vendors or any

8    field sales teams in, so -- does that answer

9    the question?

10       Q.    I think my question was not, not

11   clear.  As the offices opened, as the

12   organizations, the Organon customers opened

13   for, for vendors to come in, would it have

14   been a breach of Amplity's contract with

15   Organon to not have Amplity employees going

16   into those organizations that permitted

17   vendors to come on to meet face-to-face to,

18   to present the Organon products?

19       A.    Yes.

20       Q.    Okay.  That's all I was getting at.

21   Now, let me ask you just as to -- you were

22   asked a little bit about administrative

23   costs, so let me ask you this.  How many

24   Organon customers are there, are we talking

25   about 10, 100, 1,000, what are we talking

53

1    about?

2         A.    Thousands of customers across the

3    country.

4         Q.    Okay.

5         A.    So customers, so those folks, those

6    facilities, offices, doctors' offices, right,

7    that have purchased products, but also those

8    targets, right?  So thousands of call, call

9    points.

10        Q.    Okay.  And did Ms. Isensee and

11   other field sales representatives on the

12   Organon team have certain regions that they

13   were responsible for?

14        A.    Yes.

15        Q.    Okay.  And if, if Ms. Isensee could

16   not go visit one of her customers due to the

17   lack of a vaccination, could Amplity have

18   another field sales representative always

19   ready to replace her?

20        A.    No.

21        Q.    Would that be an administrative

22   burden?

23        A.    Yes.

24        Q.    Could Amplity have kept track of

25   the thousands of customers and potential

54

1    customers as to the vaccination easily as to

2    whether they mandated vaccination?

3         A.   No, that would be quite a lift.

4    Because at the time I believe we had about 80

5    field sales representatives with -- that were

6    deployed across the country with hundreds of

7    targets and customers, so it, that would be a

8    big lift to keep track of every single

9    customer whether or not they were allowing

10   field sales representatives in or not.

11             And that was changing, right?

12   That was evolving, you remember, at the time,

13   right?  That 2021 timeframe, right?  Things

14   were evolving and shifting and changing, so

15   that would have required, you know, knowing

16   real time in all of the offices what their,

17   what their policies were around visitors.

18        Q.   And so, just to break that out,

19   one, heavy lift means I'm assuming a lot of

20   manpower or administrate time to create?

21        A.   Yes.

22        Q.   Two, you're saying, one, it would

23   be a heavy lift, a lot of administrative time

24   and manpower to create initially, but you're

25   saying that the vaccination requirements were

55

1    quickly changing and need to be updated

2    regularly?

3        A.    The vaccine requirement was

4    changing, more so they weren't letting any

5    visitors in regardless of their vaccination

6    status.  So, you know, things were evolving

7    and changing and, yes, it would be -- it

8    would take a lot of manpower and a lot of

9    effort to call every single office, every

10   single, you know, health system to

11   understand, A, you know, if they were

12   allowing visitors, and, B, you know, what the

13   status was of vaccination to enter the

14   facilities.

15            My understanding is because the

16   nature of the patients, the majority of the,

17   the, these offices were requiring

18   vaccination.

19       Q.    Okay.  And maybe my question --

20   that was an excellent answer, let me just

21   pinpoint my question a little bit better.

22   The vaccination requirements from the state

23   and federal government may have been set at

24   this point, but as to the customers, what I

25   was getting at is, you do the heavy lift to

56

1    create a list of thousands of customers

2    whether they've mandated vaccination or not

3    on November 1, 2021, but that -- their

4    requirements may change drastically by

5    December 1, 2021, more would require the

6    vaccine, some might decide, hey, that's too

7    much; was it changing with your customers?

8         A.   Yes.

9         Q.   Okay.  Now, let me ask you just

10   about what is credentialing?

11        A.   Yeah, so in order to access a

12   health system or hospital, visitors who are

13   regularly going into these facilities need to

14   be credentialed, which is basically a

15   background kind of check.  They -- it's also

16   immunology, there's immunology requirements,

17   so like Hepatitis B or the flu vaccine.  So

18   in order to be in these health systems

19   there's a credentialing process that field

20   sales representatives need to go through.

21   There's training and other things as well as

22   part of that certification and credentialing

23   process.

24        Q.   Did any of the Organon customers

25   include COVID-19 vaccinations as part of the

57

1    credentialing requirements in 2021 and 2022?

2        A.    Yes, I believe, I believe so, yes.

3        Q.    Okay.  Now, let's talk about, just

4    to conclude here, are the patients that Ms.

5    Isensee was targeting as to her sales were,

6    did I hear correctly, oncology patients?

7        A.    Yes.

8        Q.    Okay.  And so the patient base that

9    Ms. Isensee was targeting was particularly

10   sensitive to COVID-19?

11       A.    Yes.

12            MR. CAMPBELL:  I don't have any

13   further questions at this time.  I don't know

14   if you have any follow-up questions to that,

15   counsel.

16            MR. MATTHEWS:  Yeah, I just have

17   a couple.

18            RECROSS EXAMINATION

19   BY MR. MATTHEWS:

20       Q.    Ms. McAndrews, with respect to

21   Organon, did Organon make any complaints to

22   Amplity in 2021 that Ms. Isensee wasn't

23   making face-to-face visits with customers?

24       A.    Not to my knowledge.

25       Q.    Do you know if any customers

58

1    complained to Oregon -- Organon about Ms.

2    Isensee not making in-person visits to their

3    offices?

4         A.   Not to my knowledge.

5         Q.   Do you know whether any of the

6    customers who Ms. Isensee called upon were

7    allowing sales representatives into their

8    offices in 2021?

9         A.   I specifically don't know with

10   respect to her targets whether they were or

11   were not allowing visitors in.

12        Q.   And do you know if any of the

13   customers or, as you mentioned, targets that

14   Ms. Isensee called upon were requiring

15   COVID-19 vaccinations as part of their

16   credentialing process?

17        A.   Specifically her call points, no.

18   But --

19        Q.   Okay.

20        A.   -- in all of my experiences with

21   credentialing, my understanding is almost all

22   were requiring COVID-19 vaccination to access

23   the facility.

24             MR. MATTHEWS:  Okay.  I don't

25   have any further questions.  Thank you.

59

1          MR. CAMPBELL:  Okay.  I don't

2    have any further questions.  Karen, you under

3    the Ohio rules have the right to read, and I

4    would say you don't have to, but if you have

5    time, if this is ordered, you get a chance to

6    read for typos and whatnot.  I would urge you

7    not to waive that, that you retain your right

8    to read the transcript.  Is that okay?

9          THE WITNESS:  Sure.  Yes.

10          MR. CAMPBELL:  Okay.  And with

11    that, I think we're done for today.

12          (WHEREUPON, deposition concluded

13    at 10:38 a.m.)

14

15

16

17

18          _____
                  KAREN MCANDREWS

19
                  *    *    *    *    *
20

21

22

23

24

25

60

1                              C E R T I F I C A T E

2

3       STATE OF OHIO
                                SS:
        COUNTY OF MONTGOMERY
4

5            I, Tina M. Shell, the undersigned, a
        Registered Professional Reporter, and Notary
6       Public within and for the State of Ohio, do
        hereby certify that before the giving of
7       aforesaid deposition, said KAREN MCANDREWS,
        was by me first duly sworn to depose the
8       truth; the whole truth, and nothing but the
        truth; that the foregoing is the deposition
9       given at said time and place by said KAREN
        MCANDREWS; that said deposition was taken in
10      all respects pursuant to the agreement and
        stipulations of counsel hereinbefore set
11      forth; that said deposition was taken in
        stenotypy by the court reporter and
12      transcribed into typewriting under her
        supervision; that the transcribed deposition
13      is to be submitted to the witness for her
        examination and signature; the court reporter
14      is neither a relative of nor attorney for any
        of the parties to the case, nor relative of
15      nor employee for any of the counsel, has no
        interest whatsoever in the result of the
16      action, and am not, nor is the court
        reporting firm for which I am affiliated,
17      under a contract as defined in Civil Rule
        28(D).
18
             IN WITNESS WHEREOF, I herein set my hand
19      and official seal of office this 3rd day of
        April, 2024.
20
        My commission expires_/s/ Tina M. Shell_____
21      March 26, 2026           Tina M. Shell
                        Notary Public, State of Ohio
22

23

24

25

61

1        PLEASE USE THIS ERRATA SHEET TO
MAKE ANY AND ALL CORRECTIONS, BY LISTING
2  THE PAGE NUMBER, LINE NUMBER AND THEN A BRIEF
DESCRIPTION OF THE ERROR.  PLEASE DO NOT MAKE
3  ANY MARKS OR CORRECTIONS ON THE TRANSCRIPT.
IF NEEDED USE THE BACK OF THIS SHEET.
4        UPON COMPLETION PLEASE SIGN AND
DATE THIS SHEET AT THE BOTTOM.  THANK YOU.

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  SIGNATURE:_____DATE:_____