1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF OHIO

3    WESTERN DIVISION AT DAYTON

4    _____

5    NATALIE ISENSEE,          :

6             Plaintiff,       :

7    -vs-                      : CASE NO. 3:22-CV-370

8    AMPLITY, INC.,            : JUDGE THOMAS M. ROSE

9             Defendant.       :

10   _____

11

12             Zoom deposition of BECKY O'LOUGHLIN,

13   a witness herein, taken by the Plaintiff as

14   upon cross examination and pursuant to the

15   Federal Rules of Civil Procedure, via Zoom

16   videoconference, at 2:01 p.m., on Tuesday,

17   March 19, 2024, before Tina M. Shell, a

18   Registered Professional Reporter and notary

19   public within and for the State of Ohio.

20

21             *   *   *   *   *   *

22

23

24

25

2

<u>QUICK REFERENCE INDEX</u>

WITNESS: BECKY O'LOUGHLIN

|  | DX | CX | RDX | RCX |
|---|---|---|---|---|
| BY: MR. MATTHEWS | 4 | | | |

<u>PREVIOUSLY MARKED EXHIBITS</u>

| | MARKED | PAGE |
|---|---|---|
| PLF'S: | 4 | 33 |

<u>INFORMATION REQUESTED</u>

PAGE

BY: MR. MATTHEWS

NOT APPLICABLE

BY: MR. CAMPBELL

\*   \*   \*   \*   \*

3

1              A P P E A R A N C E S

2

ON BEHALF OF PLAINTIFF (Via Zoom)
3
        Mr. Jason P. Matthews
4       Attorney at Law
        Jason P. Matthews, LLC
5       130 West Second Street
        Suite 924
6       Dayton, Ohio  45402

7  ON BEHALF OF DEFENDANT (Via Zoom)

8       Mr. David A. Campbell, II
        Attorney at Law
9       Gordon Rees Scully Mansukhani
        600 Superior Avenue, East
10      Fifth Third Building, Suite 1300
        Cleveland, Ohio  44114
11
        Mr. Eric Green
12      General Counsel
        Amplity, Inc.
13      2080 Cabot Boulevard West
        Suite 100
14      Langhorne, Pennsylvania  19047

15 ALSO PRESENT (Via Zoom)

16      Ms. Natalie Isensee

17           *   *   *   *   *   *

18

19

20

21

22

23

24

25

4

1      COURT REPORTER:  Do all counsel

2  stipulate to me swearing the witness in

3  remotely?

4      MR. MATTHEWS:  Yes.

5      MR. CAMPBELL:  Yes.

6  WHEREUPON:

7      BECKY O'LOUGHLIN,

8  of lawful age, a witness herein, being first

9  duly sworn as hereinafter certified, was

10  examined and deposed as follows:

11      CROSS EXAMINATION

12  BY MR. MATTHEWS:

13      Q.   My name is Jason Matthews and I

14  represent Natalie Isensee in a lawsuit that's

15  been filed against Amplity.

16      We're here today to take your

17  deposition.  I'm going to be asking you a

18  series of questions and you will be

19  testifying under oath just as if you were

20  testifying in court.

21      So I would like you to please

22  state and spell your name for the record?

23      A.   Becky O'Loughlin.  B-E-C-K-Y, O,

24  apostrophe, capital L, O-U-G-H-L-I-N.

25      Q.   Thank you.  And have you ever had

5

1    your deposition taken before?

2         A.   I haven't, somehow.

3         Q.   Well, you can only avoid these

4    things for so long.

5         A.   I guess.  My turn.

6         Q.   Yeah.  So let me explain a little

7    bit about the process and go over a few

8    things that will hopefully help the process

9    run smoothly this afternoon.

10        A.   Sure, that would be great.

11        Q.   So as I mentioned earlier, I'm

12   going to be asking you a series of questions.

13   And since you are testifying under oath, it

14   is important to give a truthful, accurate,

15   and complete response to my questions to the

16   best of your ability.

17        A.   Uh-huh.

18        Q.   If you believe any of my questions

19   implicate attorney/client privileged

20   information, please let me know and we can go

21   off the record and discuss that with your

22   counsel before moving forward.

23             It is necessary to give an

24   audible response to my questions because

25   things such as head nods or facial

6

1    expressions and things that we do in everyday

2    conversation don't translate very well to a

3    written record, and, Tina, our court

4    reporter, is going to be taking down, taking

5    down everything that's said on the record and

6    preparing a written transcript.

7        A.    I understand.

8        Q.    Okay.  And it's also important to

9    try to use yes or no as opposed to huh-uh or

10   huh-uh and similar things so that we have a

11   clear written record.

12            If you do answer my questions or

13   a question, I have the right to act and

14   assume as though you understood what I was

15   asking.  So if you don't understand my

16   question, please let me know.  If you don't

17   hear part of the question or we have a

18   technical issue, please let me know and I'm

19   happy to back up and ask another question or

20   maybe ask a better question.

21            If you need a break at any point

22   during the deposition, please let me know and

23   we'll go off the record and take a break, but

24   I will most likely ask you to answer the

25   question that's on the table before we break.

7

1           Finally, it's important for me

2   to allow you to finish your answer before I

3   start my next question, and for you to allow

4   me to finish my question before you start

5   your answer even if you know where I'm going

6   with the question, again, just so that we are

7   not talking over one another and we have a

8   clear written record, okay?

9       A.   Yes.

10      Q.   Can you think of any reason why you

11  would be unable to answer my questions

12  truthfully and accurately this afternoon?

13      A.   No.

14      Q.   Okay.  All right.  Are you

15  currently employed?

16      A.   Yes.

17      Q.   And by whom are you employed?

18      A.   Chatham Financial.

19      Q.   And how long have you been with

20  Chatham Financial?

21      A.   Since about last July, August.

22  Last August.

23      Q.   And that would be August of 2023?

24      A.   Yes.

25      Q.   And what is your position with

8

1   Chatham Financial?

2        A.    Chief people officer.

3        Q.    And prior to being employed with

4   Chatham Financial, were you employed with

5   Amplity?

6        A.    Yes.

7        Q.    And what was your position with

8   Amplity?

9        A.    Also chief people officer.

10       Q.    And how long did you -- well, let

11  me back up.  Did you hold any other positions

12  during the course of your employment with

13  Amplity?

14       A.    No.

15       Q.    When did you begin your employment

16  with Amplity?

17       A.    December of 2019.

18       Q.    And with respect to your position

19  as chief people officer, what were, you know,

20  just generally, what were your job duties or

21  responsibilities?

22       A.    I led the people strategy for the

23  organization, led the people team, so I had

24  team members that were responsible for talent

25  acquisition, training, our HR partner team,

9

1    operations, total rewards, benefits and

2    compensation.

3        Q.    And with respect to -- so coming in

4    in December 2019, that had to be good timing

5    to start a new position, so at some point

6    soon after you began your employment with

7    Amplity did Amplity have to implement some

8    strategies to deal with the COVID-19

9    pandemic?

10        A.    Yes.

11        Q.    And with respect to those

12    strategies, did one of those strategies

13    include sales representatives working

14    remotely beginning in August -- or, I'm

15    sorry, beginning in March of 2020?

16        A.    Yes.

17        Q.    Did any of those strategies involve

18    employees social distancing from one another?

19        A.    Yes.

20        Q.    Did any of those strategies involve

21    employees wearing facial coverings?

22        A.    Yes.

23        Q.    Did any of those strategies involve

24    employees testing for -- or Amplity testing

25    employees for COVID-19?

10

1          A.    Amplity?  Just to make sure I

2     understand the question, whether Amplity

3     actually did the testing for them?

4          Q.    Yeah.  Or Amplity required that

5     employees be tested for COVID-19.

6          A.    Yes, I believe so.

7          Q.    Did any of those strategies involve

8     Amplity using staggered work schedules?

9          A.    I don't recall.

10          Q.    And with respect to the COVID-19

11     vaccine, it's my understanding that in the

12     fall of 2021 that Amplity made a decision to

13     require all employees who served in

14     customer-facing positions to be vaccinated

15     against COVID-19, is that accurate?

16          A.    Yes, those that their job

17     requirement was to go in and out of

18     healthcare facilities, providers, in person.

19          Q.    And were you involved in

20     formulating this policy which required

21     employees to be vaccinated?

22          A.    Yes.

23          Q.    And was anybody else involved in

24     formulating the vaccination policy?

25          A.    We -- Eric Green, our chief legal

11

1    counsel, was involved in that.  It was --

2    there were other team members that were part

3    of the process, HR partners that were on the

4    ground with employees, but I would say the

5    policy itself primarily was developed between

6    Eric, myself, and probably the chief medical

7    officer who was on staff at the time.

8        Q.   And who was the chief medical

9    officer at the time?

10        A.   Torben Colberg.

11        Q.   And with respect to the policy, do

12    you know when, when you began formulating

13    that policy with Mr. Green and the chief

14    medical officer?

15        A.   When we started to talk about it or

16    when we actually -- you were accurate in

17    saying fall of 2021 is when we communicated

18    it, so, you know, in some period of time, I

19    don't have the exact date.

20        Q.   Okay.  And how was it determined

21    whether an employee's position would or would

22    not require them to receive the vaccine?

23        A.   If you were in -- required to be in

24    person, and in person, this was

25    client-facing, so individuals that were going

12

1    into healthcare providers, healthcare

2    facilities, there was a requirement for those

3    that were going to be operating in person in

4    those types of environments.

5         Q.   Okay.  And I'm going to -- I don't

6    really think that we need to go through the

7    documents themselves.  I do have some

8    documents, and one of them indicates that it

9    was announced on October 5th of 2021 that

10   employees in these customer-facing positions

11   would be required to be vaccinated; does that

12   timeframe generally sound accurate to you?

13        A.   Generally it sounds accurate.  And

14   just for clarification, that was when we

15   communicated the intent.  That wasn't

16   obviously when it was -- it wasn't a

17   requirement immediately.

18        Q.   Okay.  And at that time was it also

19   communicated that if an employee was unable

20   to be vaccinated due to a religious reason

21   that the employee could request an

22   accomodation?

23        A.   Yes.

24        Q.   And do you recall receiving an

25   accomodation request from an employee by the

13

1    name of Natalie Isensee?

2         A.    I don't.

3         Q.    And did you serve on a review board

4    that reviewed religious accomodation

5    requests?

6         A.    I did.

7         Q.    And who else served on that review

8    board?

9         A.    Eric Green and Torben Colberg.

10        Q.    And was there just this one review

11   board for all employees of Amplity?

12        A.    Yes.

13        Q.    And with respect to the review

14   board, did the review board, to your

15   recollection, approve any employees who are

16   customer-facing to work without receiving the

17   COVID-19 vaccine?  And just for

18   clarification, to continue working in their

19   customer-facing position without receiving

20   the COVID-19 vaccine?

21        A.    Without -- I don't recall.

22        Q.    Okay.  And do you recall an

23   employee by the name of Ms. McAndrews who

24   worked with some -- who was a liaison

25   between, between the review board and the

14

1  employees requesting accommodations as --

2  serving in an HR business partner role?

3       A.   Yes, Karen McAndrews, and she was a

4  part of my team.

5       Q.   Okay.  And did Ms. McAndrews, did

6  she handle all communications between the

7  review board and employees, or at least

8  certain employees, or did -- well, let me

9  just strike that question.  As a member of

10 the review board, did you communicate with

11 any employees directly regarding their

12 accomodation requests?

13      A.   No.

14      Q.   Do you know whether Mr. Green

15 communicated with any employees directly

16 regarding their accomodation requests?

17      A.   I don't know.

18      Q.   Do you know whether any -- whether

19 the chief medical officer communicated with

20 any employees directly regarding their

21 accomodation requests?

22      A.   I don't know.  It would not have

23 been part of the process.

24      Q.   Okay.  Could you explain how the

25 process worked based on your recollection?

15

1      A.   Yeah.   So we communicated the

2   process to all employees for filing a request

3   or an exemption, and, or accomodation.   And

4   anyone that followed that process and

5   submitted one, all of them would come to the

6   review board.

7           They would be presented to us

8   through the HR team, including Karen

9   McAndrews who you mentioned.   And we were

10   really looking to see how we could support

11   them in remote positions, that was kind of

12   the ultimate accomodation was to be able to

13   support them in a remote role.   So we would

14   make sure that -- we wanted to make sure that

15   we were -- every request that came forward

16   was consistent with the requirements that we

17   outlined.   So once we kind of would determine

18   that, really most of the discussion was

19   around the time that we were spending trying

20   to accommodate based on remote positions that

21   we had.

22      Q.   Okay.

23      A.   And remote opportunities.

24      Q.   Okay.   Was there any consideration

25   as to how the employee could continue working

16

1    in their current customer-facing role in a

2    safe manner?

3          A.    Can you elaborate?

4          Q.    Sure.  So, for example, if I was

5    unable to receive the vaccine, you testified

6    I believe that you were looking to whether or

7    not there were any other remote roles that I

8    could transition into, but did you consider

9    whether I could continue working in my

10   current customer-facing role in a way that --

11   without receiving the vaccine in any way; for

12   example, using a mask or testing every day or

13   anything of that nature?

14         A.    I recall our focus was on the

15   requirement as holding true to the

16   requirement for the vaccination.  And we had

17   to determine if we could accommodate that

18   exemption again through remote positions.

19               There was I believe a period of

20   time because we had given two to three months

21   for any individual that was in a position

22   that would require a vaccination, we gave

23   them two to three months to work through

24   that, get their vaccination, and/or go

25   through this process with us.

17

1          We did at one point grant a

2     two-month extension that was -- with a focus

3     of helping to continue to find remote work,

4     but it was only for those two months, it was

5     a short-term accomodation where they were

6     tested weekly for those two months.  But that

7     was the only time.

8          Q.    Okay.  And what period of time was

9     that extension granted, if you recall?

10          A.    Yeah, I, I'm not a hundred percent,

11     but just to talk in general terms, I believe

12     that we communicated in October and that the

13     requirement for vaccination, we required that

14     for December 1st.  I believe that it was

15     December and January were the two months, or

16     in and about that timeframe.  It would have

17     soon followed when that requirement was

18     mandated.

19          Q.    And how was it determined whether

20     an employee would be granted that two-month

21     grace period or be terminated in December?

22          A.    I don't recall.

23          Q.    So with respect to your efforts to

24     try to find a fully remote position -- and

25     when you say fully remote position, this

18

1    would be a position other than what the

2    employee was serving in, is that correct, if

3    they were, if they were -- for example, if

4    they were hired into a customer-facing

5    position, they were working in a

6    customer-facing position and then they

7    requested a reasonable accomodation, then the

8    accomodation that was being sought was a

9    fully remote position, is that accurate?

10        A.    Correct.

11        Q.    Okay.

12        A.    Correct.

13        Q.    And what steps did the review board

14   take to determine whether an employee's

15   religious exemption was based on a sincerely

16   held religious belief?

17        A.    I wouldn't say that we took any

18   steps.  I would say that we were clear in our

19   expectation of what would be required to,

20   like to -- you know, for proof of what -- for

21   their request.  But we did not use the time

22   as a review board to verify that in any way,

23   that wasn't, that wasn't our focus.  Our

24   focus was to ensure that we were following

25   our process consistently and that we

19

1   understood what some of those potential

2   accomodation opportunities would be.

3       Q.   Okay.  Going back to the issue

4   of the sincerely held religious belief, were

5   there certain factors that the review board

6   was looking at to determine whether an

7   employee did or didn't have a sincerely held

8   religious belief?

9       A.   Again, I don't remember the

10  details, I just do remember that that was not

11  a focus.  We weren't using that time to

12  qualify whether they were sincerely held.

13  I -- there may have been times where we had

14  some follow-up or we, you know, maybe asked

15  for additional information to make sure that

16  they, they met the requirements of the

17  process that we were following, but that was

18  it.

19      Q.   Do you recall whether any employees

20  were denied an accomodation because the

21  review board found that they did not possess

22  a sincerely held religious belief?

23      A.   I don't.

24      Q.   And when I say denied an

25  accomodation, that they weren't granted the

20

1    accomodation that they had requested to be

2    exempt from receiving the COVID-19 vaccine.

3         A.    Wait, maybe I misunderstood your

4    question.  Can you repeat the question?

5         Q.    Sure.  Yeah.  So do you recall

6    whether any employees were denied the

7    opportunity to continue working in their

8    customer-facing position without receiving

9    the COVID-19 vaccine because the review board

10   determined that the employee did not have a

11   sincerely held religious belief?

12        A.    Again, that was -- no.  That was

13   not our focus.

14        Q.    With respect to the review board,

15   how did the review board communicate its

16   decision regarding an accomodation request to

17   an employee?

18        A.    The review board was not

19   responsible for communicating to the

20   employee.  The employees were in direct

21   contact with an HR partner, and the HR

22   partner was the individual that was working

23   directly one-on-one with those that had

24   submitted these requests, and working with

25   them to find if -- to find out if there was a

21

1    potential for a remote position that would

2    support them.

3         Q.    Okay.  How did the review board

4    communicate its decision regarding employee

5    accommodations to the appropriate HR business

6    partner?

7         A.    A member of the business partner

8    team would be -- would join the review board.

9    So they would bring to us the individuals

10   that had submitted these requests.

11        Q.    Okay.  And then, and then you as

12   the review board, how would you communicate

13   your decisions to the HR business partner

14   that was responsible --

15        A.    They were --

16        Q.    Oh, I'm sorry -- for communicating

17   to the employee?

18        A.    They were part of the meeting

19   itself.  So, again, there were multiple

20   meetings, so there was always a

21   representative from that team there, so it

22   would be communicated through the person who

23   was part of the HR team, they would take that

24   back.

25        Q.    Okay.

22

1      A.   We never met just the three of us,

2  it was never just Eric, Torben, and myself.

3  It was the three of us and then someone from

4  the HR partner team that would bring the

5  request forward to review with us.

6      Q.   Okay.  So, for example, if Ms.

7  McAndrews -- I'm sorry.  If Ms. Isensee was

8  working with Ms. McAndrews regarding her

9  request for an accomodation, then Ms.

10 McAndrews would have been sitting with the

11 review board when Ms. Isensee's accomodation

12 request was reviewed by the review board?

13     A.   It would either have been Ms.

14 McAndrews or her boss, or each of them.  I

15 wouldn't remember that level of detail to

16 know if whoever was in conversation with the

17 employees would be the exact person in the

18 room.  There were many meetings I wouldn't be

19 able to remember that level of detail.

20     Q.   Okay.

21     A.   But Ms. McAndrews and her boss

22 worked very closely together and one or both

23 of them would be a part of those discussions.

24     Q.   And do you recall who Ms.

25 McAndrews' boss was at that time?

23

1          A.    Erica Smith.

2          Q.    And throughout the accomodation

3    request process did you have any

4    communications with Natalie Isensee?

5          A.    No.

6          Q.    Did you have any communications

7    with Ms. Isensee's pastor, Darin Bolden?

8          A.    No.

9          Q.    Did you ever request that Ms.

10   McAndrews have any specific communications

11   with Ms. Isensee regarding any of her

12   accomodation requests?

13         A.    Can you repeat the question?

14         Q.    Yeah.  Did you at any point request

15   that Ms. McAndrews communicate anything to

16   Ms. Isensee regarding her accomodation

17   requests?

18         A.    I don't recall, but if she -- there

19   would be an assumption if she was the HR

20   partner working with her, that they would

21   have communication with each other.

22         Q.    Do you specifically, though,

23   remember communicating anything to Ms.

24   McAndrews about Ms. Isensee's accomodation

25   requests?

24

1      A.    I don't recall.

2      Q.    Do you recall how many

3  accomodation -- I'm sorry.  Do you recall how

4  many religious accomodation requests that you

5  received from Amplity employees?

6      A.    I don't recall.

7      Q.    Do you recall whether any of those

8  religious accomodation requests were granted?

9      A.    The -- my understanding and

10  recollection is if there -- if -- if there

11  was an opportunity for the individual to work

12  remotely.

13      Q.    Okay.  And you don't know as you

14  sit here today whether there were or there

15  weren't any opportunities for any employees

16  who made religious accomodation requests to

17  work remotely?

18      A.    I do know that we were able to find

19  some remote.  I don't remember any of the

20  numbers.  And, honestly, it wasn't about

21  which type of accomodation it was, it was

22  about whether there was an opportunity for

23  the individuals to work remotely.

24      Q.    Okay.  Now, at the time that Ms.

25  Isensee requested her accomodation, do you

25

1   know whether she was working in person or

2   meeting with, with customers or healthcare

3   providers in person?

4        A.   I don't know.  I don't recall.

5        Q.   And do you know whether or not any

6   of her customers or clients required

7   vaccination of their employees?

8        A.   I don't recall.  I didn't -- I

9   don't know the details of the request or

10   where -- and which client she was working

11   for.

12        Q.   Okay.  Did you have any

13   communications with anybody from a company by

14   the name of Organon?

15        A.   Ever or --

16        Q.   Concerning, concerning Ms.

17   Isensee's religious accomodation request.

18        A.   I, I don't recall.  I don't think

19   so.  I don't recall.

20        Q.   Did you have any discussions with

21   anybody from Organon regarding their

22   vaccination policy for COVID-19?

23        A.   I don't recall.

24        Q.   Do you know whether or not any of

25   the healthcare facilities in which Ms.

26

1   Isensee was required to go into as part of

2   her job regarded -- I'm sorry -- required

3   employees such as her to be vaccinated in

4   order for credentialing purposes?

5          A.   I don't recall.

6          Q.   With respect to accomodation

7   requests generally, were there any steps that

8   were taken to verify whether an employee had

9   a sincerely held religious belief?

10         A.   I don't recall specifically.

11  Again, I'll just restate what I said earlier.

12  We had general requirements and I do remember

13  there being some follow-up for some of the

14  requests that came through, whether we just

15  needed more specificity or wanted to make

16  sure it was consistent in terms of the type

17  of information, you know, that we'd ask of

18  all.  And it was really more of about making

19  sure we had the same consistent level of

20  information across, across all the requests

21  that came in.

22         Q.   Okay.  All right.  I'd like to go

23  ahead and just take a short break, about a

24  five-minute break, and then we'll pick up

25  from there, okay?

27

1    A.    Yeah.

2          (WHEREUPON, a discussion was

3    held off the record.)

4    BY MR. MATTHEWS:

5    Q.    With respect to Ms. Isensee's, the

6    information Ms. Isensee submitted to the

7    review board, did any of that information

8    indicate that she really didn't have a

9    sincerely held religious belief or that she

10   admitted that she didn't have a sincerely

11   held religious belief?

12   A.    I don't recall any of the details

13   of her case specifically.

14   Q.    Okay.  And do you know of any

15   circumstances where it was determined that an

16   Amplity employee had transmitted COVID-19 to

17   another Amplity employee?

18          MR. CAMPBELL:  I'm not -- I

19   don't, I don't know if that's really relevant

20   to this in going into other employees about

21   spreading it.  I -- I'll let her, I'll let

22   her answer, but we're not going to go far

23   afield with every other employee at Amplity

24   as to it.  But you can try to answer to the

25   best of your ability.

28

1              THE WITNESS:  Can you repeat the

2    question again?

3    BY MR. MATTHEWS:

4         Q.    Sure.

5         A.    Do I know if there was a spread of

6    COVID between employees, is that what you're

7    asking?

8         Q.    Right.  Right.  Are you aware of

9    any specific situations in which one Amplity

10   employee transmitted COVID-19 to another

11   Amplity employee?

12        A.    I don't recall.

13        Q.    Are you aware of any situations in

14   which an Amplity employee transmitted

15   COVID-19 to a customer or a provider that --

16              MR. CAMPBELL:  I'm not going

17   there.  I mean, come on.  We're, we're not

18   going to that one, so --

19              MR. MATTHEWS:  Well, it is

20   relevant because, you know, any -- it's

21   relevant to whether or not Amplity's decision

22   was based on speculation or based on fact.

23              MR. CAMPBELL:  So I guess you're

24   challenging the CDC guidelines, and I'm happy

25   to let you go and do that all you'd like

1    about the six-foot -- saying that there
2    shouldn't be a six-foot rule and all that.  I
3    appreciate your argument.  But for us to go
4    into other employees, number one, that aren't
5    part of this; number two, that would be
6    health information; number three, it would be
7    involving a third party with it; and number
8    four, when you're doing the tracing there is
9    no setting DNA and verifying, you do the
10   tracing to try to determine who should get
11   notice as to it.  And you've been through
12   that process.  So I'm not letting somebody
13   answer under oath as to that.  We traced as
14   every employee was mandated to do, but you
15   never knew exactly who got it or where.
16              MR. MATTHEWS:  And -- well, let
17   me just ask that question.
18              MR. CAMPBELL:  I'm not going to
19   let her answer it.  You can take it to the
20   court.  I don't think it's appropriate to ask
21   that question.  You can argue to the court
22   that you think the CDC guidelines were
23   nonsense, I mean, you can argue that all
24   you'd like.
25              MR. MATTHEWS:  I don't

30

anticipate to argue that the CDC guidelines
were nonsense.  I do anticipate that I will
argue that, you know, Amplity was basing some
decisions on speculation.

So with respect to -- well,
we'll just keep things open with respect to
that issue and move forward if that's in
agreement?

MR. CAMPBELL:  Yeah, I'm not
going to have her answer those, those types
of questions.  I objected the last time when
you went into other employees.  This is an
accomodation case, this isn't a disparate
treatment case.  Accommodations are case by
case, individualized.

BY MR. MATTHEWS:

Q.   Did the review board make any
inquiry into Ms. Isensee's vaccination
history?

A.   I don't recall the specifics of her
case.

Q.   Did the review board request any
additional documents from Ms. Isensee prior
to denying her religious accomodation
request?

31

1      A.   I will just repeat my answer.  I

2  don't recall the specifics of Ms. Isensee's

3  case.

4      Q.   Understanding that you don't recall

5  the specifics of Ms. Isensee's case, do you

6  know whether the review board offered any

7  employees who had requested accommodations

8  and who had not be transitioned into a fully

9  remote position, unpaid leave, as a

10  reasonable accomodation?

11      A.   I don't recall.

12      Q.   Did the review board consider how

13  much money it would cost Amplity in order to

14  allow Ms. Isensee to work without being

15  vaccinated against COVID-19?

16      A.   Can you repeat the question?  Is it

17  something specific to her, her individual

18  request?

19      Q.   It is something specific to her

20  individual request.

21      A.   I don't recall.

22      Q.   Okay.

23      A.   Although I don't -- the beginning

24  of the question about how much money

25  something was, I don't remember that being a

32

1    part of our process.

2         Q.    All right.  And let me just, let me

3    just ask just to make sure that it's clear.

4    Did Amplity consider the cost of -- the

5    economic cost of allowing employees to work

6    without receiving the COVID-19 vaccine as

7    part of determining whether an employee could

8    be accommodated for religious reasons?

9         A.    Economics had absolutely nothing to

10   do with any decision that we made.

11        Q.    Do you know whether Ms. Isensee

12   proposed weekly COVID-19 testing as a

13   reasonable accomodation for her request to

14   work without receiving the COVID-19 vaccine?

15        A.    I don't recall any specifics of her

16   request.

17             MR. CAMPBELL:  Jason, if all

18   you're going to do is continue to ask her

19   questions about Ms. Isensee, she's said it I

20   think 25 times now.

21             MR. MATTHEWS:  Okay.  Now, let's

22   just go ahead and go off the record.  I'll

23   review my notes.  I think we're getting

24   pretty close to wrapping up.

25             MR. CAMPBELL:  Okay.

33

1          (WHEREUPON, a discussion was

2     held off the record.)

3          (WHEREUPON, previously marked

4     Deposition Exhibit 4 was shown to the

5     witness.)

6     BY MR. MATTHEWS:

7          Q.   Ms. O'Loughlin, I'm going to share

8     my screen with you and ask you to take a look

9     at a document that's been marked as

10    Plaintiff's Exhibit No. 4.  These are the

11    same set of documents that were used for the

12    previous deposition.

13          I'm going to scroll down.  This

14    is a document that's been marked as

15    Plaintiff's Deposition Exhibit No. 4, and it

16    appears to be an email from Karen McAndrews

17    to Natalie Isensee dated November 24th, 2021,

18    at 11:49 a.m.

19          And I just want to direct your

20    attention to this entry, it's the first

21    bullet point under the entry that states:  On

22    11-12, I notified you of Amplity's inability

23    to accommodate your request for exemption in

24    your current role and reviewed the following

25    information.

34

1     A.   Uh-huh.

2     Q.   And that bullet point states:  To

3  be eligible for an exception, you must first

4  establish that your refusal to be vaccinated

5  is based upon a sincere belief that is

6  religious in nature.  At any time -- or, I'm

7  sorry.  At that time, the exemption review

8  board did not believe this criteria was met.

9         Does that refresh your

10 recollection at all as to whether the review

11 board did or did not consider Ms. Isensee's

12 accomodation request to be religious in

13 nature?

14    A.   Again, from what I said earlier, I

15 don't remember the specifics of, of her case.

16 But I do recall there were times that we

17 followed up for additional questions, with

18 additional questions, and if anything it was

19 just to ensure that the consistency across

20 the requests that came through were met.  It

21 was more about what we'd asked for for them

22 to provide.

23        So from a process perspective, I

24 do remember there were, there were some

25 requests that came through that we went back

35

1    and asked for additional information.

2         Q.    Do you know if the review board

3    denied any accomodation requests because they

4    did not determine that the employee had a

5    sincere religious belief?

6         A.    Again, and I think it's explained

7    kind of in the next paragraph, that it really

8    was more focused on the role and whether we

9    were able to accommodate the role remotely.

10        Q.    All right.

11              MR. MATTHEWS:  I have no further

12   questions.  Thank you.

13              MR. CAMPBELL:  I don't have any

14   questions for her.  Becky, you get the right

15   to read if it was ordered.  I would suggest

16   you don't waive that right.  Doesn't mean you

17   have to read it, but you typically retain it.

18   So if you just state that you won't, won't

19   waive it.

20              THE WITNESS:  I won't waive it.

21              MR. CAMPBELL:  Other than that,

22   I think we're all set.

23              (WHEREUPON, deposition concluded

24

25

1    at 2:58 p.m.)

2

3

4

5

6                          BECKY O'LOUGHLIN

7

8                          *   *   *   *   *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

C E R T I F I C A T E

STATE OF OHIO
                    SS:
COUNTY OF MONTGOMERY


    I, Tina M. Shell, the undersigned, a
Registered Professional Reporter, and Notary
Public within and for the State of Ohio, do
hereby certify that before the giving of
aforesaid deposition, said BECKY O'LOUGHLIN,
was by me first duly sworn to depose the
truth; the whole truth, and nothing but the
truth; that the foregoing is the deposition
given at said time and place by said BECKY
O'LOUGHLIN; that said deposition was taken in
all respects pursuant to the agreement and
stipulations of counsel hereinbefore set
forth; that said deposition was taken in
stenotypy by the court reporter and
transcribed into typewriting under her
supervision; that the transcribed deposition
is to be submitted to the witness for her
examination and signature; the court reporter
is neither a relative of nor attorney for any
of the parties to the case, nor relative of
nor employee for any of the counsel, has no
interest whatsoever in the result of the
action, and am not, nor is the court
reporting firm for which I am affiliated,
under a contract as defined in Civil Rule
28(D).

    IN WITNESS WHEREOF, I herein set my hand
and official seal of office this 3rd day of
April, 2024.

My commission expires  /s/ Tina M. Shell
March 26, 2026              Tina M. Shell
                    Notary Public, State of Ohio

38

1          PLEASE USE THIS ERRATA SHEET TO
MAKE ANY AND ALL CORRECTIONS, BY LISTING
2   THE PAGE NUMBER, LINE NUMBER AND THEN A BRIEF
DESCRIPTION OF THE ERROR.  PLEASE DO NOT MAKE
3   ANY MARKS OR CORRECTIONS ON THE TRANSCRIPT.
IF NEEDED USE THE BACK OF THIS SHEET.
4          UPON COMPLETION PLEASE SIGN AND
DATE THIS SHEET AT THE BOTTOM.  THANK YOU.

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  SIGNATURE:_____DATE:_____